**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>CBS BROADCASTING INC. &<br>CBS INTERACTIVE INC.,<br><br>　　　　　　Defendants. | Case No. 2:24-cv-00236-Z |

## DEFENDANTS CBS BROADCASTING INC. AND CBS INTERACTIVE INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 3

    I.     The Parties ........................................................................................... 3

    II.    The Interview ....................................................................................... 3

    III.   The Complaint ..................................................................................... 5

ARGUMENT ....................................................................................................... 7

    I.     The Court Lacks Subject-Matter Jurisdiction ....................................... 7

         A.     President Trump Lacks Article III Standing ................................ 7

         B.     Any Formerly Live Controversy Is Now Moot In Light Of President Trump's Victory In The November 2024 Election................................... 10

    II.    President Trump Does Not Have Statutory Standing To Bring This Claim......... 11

    III.   This Action Should Be Dismissed For Failure To State A Claim Under The DTPA ................................................................................................. 13

         A.     The DTPA Does Not Reach CBS' Non-Commercial Speech ................. 14

         B.     President Trump Fails To Allege Confusion As To Source Or Affiliation................................................................................ 17

         C.     President Trump Fails To Allege Detrimental Reliance........................... 18

         D.     President Trump Fails To Allege Any Unconscionable Action .............. 19

    IV.   The First Amendment Bars President Trump's Claim ......................... 20

    V.    At A Minimum, This Case Should Be Abated .................................... 22

CONCLUSION.................................................................................................... 24

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
 568 U.S. 85 (2013)............................................................................................7

*Amstadt v. U.S. Brass Corp.*,
 919 S.W.2d 644 (Tex. 1996)........................................................................11, 12

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..........................................................................................9

*Boyd Int'l, Ltd. v. Honeywell, Inc.*,
 837 F.2d 1312 (5th Cir. 1988) ........................................................................22

*Burton v. Prince*,
 577 S.W.3d 280 (Tex. App.—Houston [14th Dist.] 2019, no pet.)........................12

*Cameron v. Terrell & Garrett*,
 618 S.W.2d 535 (Tex. 1981)............................................................................11

*Citizens United v. FEC*,
 558 U.S. 310 (2010)....................................................................................21, 22

*Clark v. Wells Fargo Home Mortg.*,
 2014 WL 5297723 (N.D. Tex. Oct. 16, 2014) ......................................................23

*CrewFacilities.com, LLC v. Humano, LLC*,
 2024 WL 993898 (W.D. Tex. Mar. 7, 2024) ........................................................18

*Crosswell v. Martinez*,
 120 F.4th 177 (5th Cir. 2024) ..........................................................................12

*Crown Life Ins. Co. v. Casteel*,
 22 S.W.3d 378 (Tex. 2000)..............................................................................11

*Cruz v. Andrews Restoration, Inc.*,
 364 S.W.3d 817 (Tex. 2012)............................................................................19

*Cushman v. GC Servs., L.P.*,
 397 F. App'x 24 (5th Cir. 2010) ......................................................................11

*Daniels v. AETC II Privatized Hous., LLC*,
 2020 WL 6789336 (W.D. Tex. Jan. 6, 2020) ......................................................23

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
 518 U.S. 727 (1996).................................................................................................21

*Env't Conservation Org. v. City of Dallas*,
 529 F.3d 519 (5th Cir. 2008) ..................................................................................7

*FDA v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024)..........................................................................................7, 8, 9

*FEC v. Cruz*,
 596 U.S. 289 (2022)..................................................................................................9

*Franklin v. Apple Inc.*,
 569 F. Supp. 3d 465 (E.D. Tex. 2021)..............................................................22, 23

*Frith v. Guardian Life Ins. Co. of Am.*,
 9 F. Supp. 2d 734 (S.D. Tex. 1998) ......................................................................17

*FTC v. Intuit, Inc.*,
 2024 WL 382358 (2024)........................................................................................15

*FTC v. POM Wonderful, LLC*,
 155 F.T.C. 1, 2013 WL 8364895 (2013), *aff'd*, 777 F.3d 478 (D.C. Cir. 2015) ...................15

*FTC v. R.J. Reynolds*,
 111 F.T.C. 539, 1988 WL 490114 (1988) .............................................................15

*Hines v. Hash*,
 843 S.W.2d 464 (Tex. 1992)..............................................................................22, 23

*Hollingsworth v. Perry*,
 570 U.S. 693 (2013)..................................................................................................8

*Hotze v. Hudspeth*,
 16 F.4th 1121 (5th Cir. 2021) ............................................................................7, 10

*Hunt v. City of Diboll*,
 574 S.W.3d 406 (Tex. App.—Tyler 2017, pet. denied)........................................13

*Hurd v. BAC Home Loans Servicing, LP*,
 880 F. Supp. 2d 747 (N.D. Tex. 2012) ............................................................11, 12

*Keane v. Fox Television Stations, Inc.*,
 297 F. Supp. 2d 921 (S.D. Tex. 2004), *aff'd*, 129 F. App'x 874 (5th Cir. 2005) ...................5

*Kersh v. UnitedHealthcare Ins. Co.*,
 946 F. Supp. 2d 621 (W.D. Tex. 2013).................................................................19

*Kumar v. Panera Bread Co.*,
  2024 WL 1216562 (5th Cir. Mar. 21, 2024)....................................................12

*Little v. KMPG LLP*,
  575 F.3d 533 (5th Cir. 2009) ........................................................................9

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................7

*Masson v. New Yorker Mag., Inc.*,
  501 U.S. 496 (1991)....................................................................................21

*McClung v. Wal-Mart*,
  866 F. Supp. 306 (N.D. Tex. 1994) ............................................................19

*Melody Home Mfg. Co. v. Barnes*,
  741 S.W.2d 349 (Tex. 1987)........................................................................11

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974).....................................................................................20

*MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*,
  929 F.3d 310 (5th Cir. 2019) ......................................................................10

*Miller v. BAC Home Loans Servicing, L.P.*,
  726 F.3d 717 (5th Cir. 2013) ......................................................................12

*Miss. Gay All. v. Goudelock*,
  536 F.2d 1073 (5th Cir. 1976) ....................................................................21

*Mother & Unborn Baby Care of N. Tex., Inc. v. State*,
  749 S.W.2d 533 (Tex. App.—Fort Worth 1988, writ denied)...................14

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)....................................................................................21

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
  45 F.4th 816 (5th Cir. 2022) .........................................................................9

*PPG Indus., Inc. v. JMP/Houston Ctrs. Partners Ltd. P'ship*,
  146 S.W.3d 79 (Tex. 2004)..........................................................................13

*Radiance Found., Inc. v. NAACP*,
  786 F.3d 316 (4th Cir. 2015) ......................................................................16

*Rehak Creative Servs., Inc v. Witt*,
  404 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ...............20

*Seven-Up Co. v. Coca-Cola Co.,*
  86 F.3d 1379 (5th Cir. 1996) ............................................................16

*Shemwell v. City of McKinney,*
  63 F.4th 480 (5th Cir. 2023) ............................................................10

*Tatum v. Dall. Morning News, Inc.,*
  493 S.W.3d 646 (Tex. App.—Dallas 2015, pet. granted).......................14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007)........................................................................3

*Tony Gullo Motors I, L.P. v. Chapa,*
  212 S.W.3d 299 (Tex. 2006)............................................................23

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)........................................................................8

*Twitter, Inc. v. Paxton,*
  No. 21-15869 (9th Cir. 2021), ECF No. 33 ........................................15

*Washburn v. Sterling McCall Ford,*
  521 S.W.3d 871 (Tex. App.—Houston [14th Dist.] 2017, no pet.)..........20

*Yumilicious Franchise L.L.C. v. Barrie,*
  2015 WL 1822877 (N.D. Tex. Apr. 22, 2015) ....................................18

**Statutes**

Tex. Bus. & Com. Code § 17.44.........................................................14

Tex. Bus. & Com. Code § 17.45..................................................11, 14, 20

Tex. Bus. & Com. Code § 17.46................................................. *passim*

Tex. Bus. & Com. Code § 17.50................................................. *passim*

Tex. Bus. & Com. Code § 17.505............................................... *passim*

15 U.S.C. § 45...............................................................................15

15 U.S.C. § 1125 (Lanham Act § 43) ...............................................16

28 U.S.C. § 1332...........................................................................11

**Rules**

Fed. R. Civ. P. 9........................................................................1, 12, 14

Fed. R. Civ. P. 12 ................................................................................................2, 13

**Other Authorities**

Legislative History of S.B. 75,
    https://lrl.texas.gov/scanned/DTPA/SB75_63R.pdf ...............................................15

## PRELIMINARY STATEMENT

For more than half a century, CBS' *60 Minutes*, America's No. 1 news program, has interviewed the major party candidates for president in October before a presidential election. Vice President Harris accepted *60 Minutes'* invitation to be interviewed this year and excerpts of her interview aired during a special *60 Minutes* episode on October 7, 2024 (the "Interview"). President Trump originally agreed to be interviewed also, but he ultimately withdrew. Instead, employing Texas' consumer protection statute, the Deceptive Trade Practices Act ("DTPA"), President Trump filed this lawsuit accusing *60 Minutes* of "deceptive editing" of the Vice President's answer to a single question, editing he claims could result in "election and voter interference." ECF No. 1 ("Complaint") ¶¶ 1, 42. *60 Minutes'* editing was not deceptive. But more to the point, the DTPA was designed to protect Texas consumers engaged in commercial transactions against false, misleading, and deceptive business practices, not to police editorial decisions made by news organizations with which one disagrees. Under President Trump's interpretation, the DTPA would become a weapon for any candidate to challenge media coverage they did not like. The DTPA has never been so used and it has no application to the alleged facts here.

Whether viewed through the lens of standing, statutory construction, or the First Amendment, President Trump's claim does not withstand scrutiny, and most certainly fails under the heightened pleading standard of Rule 9(b) applicable to DTPA claims. To start, President Trump lacks both Article III and statutory standing to bring this case. According to the Complaint, President Trump filed this action to redress alleged "election and voter interference through . . . news distortion calculated to (a) confuse, deceive, and mislead the public, and (b) attempt to tip the scales in favor of the Democratic Party as the heated 2024 Presidential Election

1

. . . approache[d] its conclusion." ECF No. 1 at ¶ 1. These are precisely the types of generalized grievances that do not confer Article III standing. Moreover, President Trump's conclusory allegation that *60 Minutes*' editing decisions harmed his campaign fundraising to the tune of several billion dollars is not only far too speculative and inherently improbable to warrant standing, it is also irrelevant, since he brought this lawsuit in his individual capacity, not on behalf of his campaign. And even if the alleged injuries to his fundraising and support ever gave *candidate* Trump standing, his claim is now moot. With *President-elect* Trump having won the election, any live case or controversy has been extinguished, and this action must be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction. Further, President Trump lacks standing under the DTPA: The one thing that President Trump needed to allege, but failed to allege at all, is that *60 Minutes*' editing deceptively induced him to enter into a commercial transaction.

The DTPA claim fares no better on the merits. The editorial speech at issue here, made in the throes of a presidential election, addresses issues of "utmost public significance," and is entitled to the strongest possible constitutional protection. ECF No. 1 at ¶ 60. President Trump's challenge to CBS' editorial choices lies entirely outside the scope of the DTPA. And even if the DTPA were construed to regulate such non-commercial speech, the First Amendment's protection for a news organization's editorial decision-making would squarely foreclose the claim. President Trump's DTPA claim also does not survive basic statutory analysis. At every step, the claim stumbles. He fails to plausibly allege that (1) he is a consumer who purchased or leased goods or services from CBS, as required under the statute; (2) any confusion as to source or affiliation, as the Interview indisputably emanated from CBS; (3) any detrimental reliance on

2

any such confusion; and (4) how he lacks "knowledge, ability, experience, or capacity," as required to state a claim for an unconscionable action. The DTPA claim is without merit.

Finally, President Trump did not comply with the DTPA's notice requirements, *see* Tex. Bus. & Com. Code § 17.505(a), and CBS hereby exercises its right to abatement.

## BACKGROUND

### I.    The Parties

CBS Broadcasting Inc., a New York corporation with its principal place of business in New York, operates CBS News, which offers "commentary and analysis on politics, finance, business, and other matters of public importance or interest." ECF No. 1 at ¶¶ 18, 22. CBS Interactive Inc., a Delaware corporation with its principal place of business in New York, operates CBS' interactive and content services, which are available to Internet users across the country. *See id.* ¶ 20; Declaration of Gayle C. Sproul ("Sproul Decl.") ¶ 7.

President Trump is "a resident of the State of Florida." ECF No. 1 at ¶ 17. Having served as President of the United States from January 2017 to January 2021, in November 2024, he was reelected to serve a second term. At the time the CBS programs at issue aired in October 2024, President Trump was the Republican nominee for president.

### II.    The Interview

In the run-up to the presidential election of 2024, consistent with its practice for more than half a century, *60 Minutes* prepared to interview the presidential candidates for both major parties. *See* Declaration of Bill Owens ("Owens Decl.") ¶ 5; Owens Decl., Ex. C at 9:48-10:08.[1] Although President Trump originally agreed to be interviewed, he ultimately withdrew from that interview. Owens Decl. ¶ 6; Owens Decl., Ex. C at 10:02-11:42. Vice President Kamala Harris

---

[1]  On a motion to dismiss, courts "must consider . . . documents incorporated into the complaint by reference," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), as the two

accepted *60 Minutes*' invitation and veteran CBS News journalist, Bill Whitaker, interviewed the Democratic candidate for president on the campaign trail in Ripon, Wisconsin and at her residence in Washington, D.C. Owens Decl. ¶ 7; Owens Decl., Ex. C at 12:22-12:31. The Interview aired on a special broadcast of *60 Minutes* on October 7, 2024.[2] Owens Decl. ¶ 10.

*60 Minutes* provided an excerpt of the Interview to its sister news program, "CBS Sunday news show, *Face the Nation.*"  ECF No. 1 at ¶ 7; Owens Decl. ¶ 11. On October 6, 2024, Margaret Brennan, the host of *Face the Nation*, opened the news show by reporting ongoing airstrikes from Israel into Gaza and Southern Beirut and observing that the "question of just how effective U.S. leadership has been and potentially would be in a new administration when it comes to Israel is one raised frequently on the campaign trail." Owens Decl., Ex. A at 2:58-3:09. She then introduced a brief excerpt from the "special election edition of *60 Minutes*," with "our Bill Whitaker" who "sat down with Vice President Harris and asked her about U.S. influence with Israeli Prime Minister Benjamin Netanyahu." *Id.* at 3:09-3:22.

The excerpt lasted about two-and-a-half minutes. *See id.* at 3:22-5:44. In response to Whitaker's question about whether the United States has "sway" over Israeli Prime Minister Benjamin Netanyahu, Vice President Harris provided a lengthy answer that lasted approximately one minute. Then, Whitaker challenged the Vice President, asking "But it seems that Prime Minister Netanyahu is not listening." Vice President Harris is then shown responding: "Well, Bill, the work that we have done has resulted in a number of movements in that region by Israel that were very much prompted by or a result of many things, including our advocacy for what needs to happen in the region." *Id.* at 5:04-5:25; *see* ECF No. 1 at ¶¶ 6-7.

_____

broadcasts are.

The following day, on October 7, 2024, CBS aired a special edition of *60 Minutes* that included approximately 15 minutes from Whitaker's interview with Vice President Harris (interspersed with footage related to topics being addressed, such as images of Vice President Harris from prior campaigns and images related to immigration, as well as excerpts from Whitaker's interview with Vice President Harris' running-mate, Governor Tim Walz). *See* Owens Decl., Ex. C at 12:44-27:09 & 34:25-35:20. At all times, the CBS Eyemark logo appeared on screen. *See id.* The Interview covered a range of topics, including the war in Ukraine, immigration, how Vice President Harris planned to pay for her suggested child tax credit, her changing positions on fracking, and other topics. *See id.* On the administration's relationship with Israeli Prime Minister Netanyahu, the Interview included excerpts of the same questions previously prepared by *60 Minutes* for airing on *Face the Nation*, but with shorter responses from the Vice President, including a shorter version of her response to Whitaker's observation that "it seems that Prime Minister Netanyahu is not listening." *Compare* ECF No. 1-4, Appendix A, *with id.*, Appendix B. There, *60 Minutes* used the part of the same answer given by Vice President Harris where she states, "We are not gonna stop pursuing what is necessary for the United States to be clear about where we stand on the need for this war to end." *Id.*, Appendix B.

President Trump's claim that *60 Minutes* violated the DTPA is based solely on the edited version of this response as broadcast on *60 Minutes*.

## III. The Complaint

Prior to filing this action, President Trump first accused *60 Minutes* of "deceptively 'doctoring'" the Interview in an October 7, 2024 Truth Social post. ECF No. 1 at ¶ 9. This was

---

[2]  The Complaint erroneously alleges that the *Face the Nation* excerpt and the *60 Minutes* Interview aired on October 5 and 6, 2024, when in fact, they aired on October 6 and 7, respectively. *See, e.g.*, ECF No. 1 at ¶¶ 5-6. CBS will use the correct dates throughout this motion.

followed by an exchange of letters between counsel for President Trump and CBS News concerning the Interview.[3] In a letter dated October 29, 2024, President Trump invoked the DTPA for the first time. ECF No. 1-3. Without waiting the requisite 60 days before filing suit as required under the DTPA or even awaiting *60 Minutes*' response to that letter, President Trump commenced this action two days later, on October 31, 2024.[4]

In his Complaint, rather than identify allegedly deceitful conduct in commerce under the DTPA, President Trump targets *60 Minutes*' editorial choices, alleging that CBS engaged in "unlawful acts of election and voter interference" through "substantial news distortion." ECF No. 1 at ¶ 1. He claims that the portion of Vice President Harris' response to the question on Prime Minister Netanyahu shown on *Face the Nation* on October 6 contains the Vice President's "typical word salad," whereas her response shown on *60 Minutes* on October 7 was "deceptively edited" to include "a completely different, more succinct answer." *Id.* ¶¶ 7-8, 57. President Trump claims that the airing of these different portions of the Vice President's answer in the different programs constituted "false, misleading, and deceptive acts" in violation of the DTPA. *Id.* ¶ 56. While he never alleges that this editing caused him confusion, he alleges generally that the "edited broadcast created confusion" by "portray[ing] Kamala as intelligent, well-informed, and confident when, in fact, she is none of the above." *Id.* ¶¶ 58, 61. President Trump claims

---

[3] President Trump also alleges that CBS News "conced[ed]" it "doctored" the Interview "to confuse, deceive, and mislead the American People," ECF No. 1 at ¶ 10, citing *60 Minutes*' October 20, 2024 statement relating to the Interview. In reality, *60 Minutes* made no such concession in the statement. Instead, it explained: "60 Minutes gave an excerpt of our interview to Face the Nation that used a longer section of her answer than that on 60 Minutes. Same question. Same answer. But a different portion of the response." *See* CBS News, *A Statement from 60 Minutes* (Oct. 20, 2024), https://www.cbsnews.com/news/60-minutes-statement/. "[C]ourts 'are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.'" *Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 925 (S.D. Tex. 2004) (citation omitted), *aff'd*, 129 F. App'x 874 (5th Cir. 2005).

[4] On November 3, 2024, CBS informed President Trump that the DTPA "mandates a 60-day notice period prior to filing suit," and that, "[i]n addition to failing to comply with the 60-day notice period, [his] 'notice' also omitted any 'reasonable detail' regarding [his] purported

without any supporting detail that he sustained damages of "at least" $10 billion on the basis that "CBS's distortion of the *60 Minutes* Interview damages President Trump's fundraising and support values by several billions of dollars, particularly in Texas." *Id.* ¶ 64 & n.1. On November 5, 2024, President Trump won the 2024 presidential election—including Texas's 40 Electoral College votes.

## ARGUMENT

### I. The Court Lacks Subject-Matter Jurisdiction

Article III of the Constitution "confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). The standing doctrine implements this limitation by ensuring that the plaintiff has "a 'personal stake' in the dispute." *Id.* at 379 (citation omitted). The mootness doctrine also implements Article III's limitation. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013). It requires that an actual controversy "exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Id.* (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)). "As a general rule, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (citation and internal quotation marks omitted). President Trump fails to allege any theory of injury that satisfies both of these constitutional requirements.

### A. President Trump Lacks Article III Standing

To establish standing, the plaintiff must demonstrate "(i) that []he has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA*, 602 U.S. at 380 (citations omitted). An "injury in fact" must be "(a) concrete and

---

damages as required." Sproul Decl. Ex. A (citing Tex. Bus. & Com. Code § 17.505(a)).

particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). Standing is determined on a claim-by-claim basis. *See Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021). A court must consider each of the plaintiff's alleged injuries to determine which, if any, passes constitutional muster. *See FDA*, 602 U.S. at 386-96.

President Trump's various attempts to allege injury are far too generalized and speculative to confer standing. Just as a federal court "is not a legislative assembly, a town square, or a faculty lounge[,]" it is not a public editor. *Id.* at 382. President Trump's opinion that CBS "crossed a line" with its editing of the Interview does not constitute a personalized, concrete injury. ECF No. 1 at ¶ 39. Moreover, President Trump's allegation that he "stands in the shoes of each Texas voter" or that "the public" was deceived only confirms the generalized nature of his grievance and his lack of Article III standing. *Id.* ¶¶ 55, 58. "Refusing to entertain [such] generalized grievances ensures that . . . courts exercise power that is judicial in nature . . . and ensures that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013) (internal citations and quotation marks omitted).

The DTPA also cannot confer Article III standing. Even if President Trump were authorized under the DTPA to bring this action (which he is not, *see infra* Section II), he would still need to satisfy Article III. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-27 (2021) (standing not automatic "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right") (citation omitted); *Hollingsworth*, 570 U.S. at 715 (states cannot manufacture standing in federal court). But he cannot do so because he merely asserts a claim based on alleged harm to the public at large.

President Trump also cannot establish standing by alleging that CBS News' *60 Minutes* Interview created confusion. *See, e.g.*, ECF No. 1 at ¶¶ 1, 9, 63(a). First and foremost, he never alleges that *he* was confused by the Interview. In fact, President Trump *expressly denies* that the Interview confused him about Vice President Harris, repeatedly alleging that he has always known "the truth." *Id.* ¶ 44; *id.* ¶¶ 3, 9, 10, 61. At any rate, even if he had suffered confusion, Fifth Circuit precedent is clear that "the state of confusion, absent more, is not a concrete injury under Article III." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 825 (5th Cir. 2022).

Finally, President Trump fails to allege any monetary loss, or any other tangible harm, that he personally suffered from the Interview. Instead, he alleges only that the Interview damaged his "fundraising and support values by several billions of dollars.[5] ECF No. 1 at ¶ 64 & n.1. President Trump's reference to "billions" in "fundraising" shortfalls is not only implausible but too conclusory to support Article III standing. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). And President Trump fails to allege how lost fundraising donations *to his campaign* caused any injury personal *to him*—or how a monetary award to him *personally* would redress losses suffered *by his campaign*. *See FEC v. Cruz*, 596 U.S. 289, 294 (2022) (campaign is "a legal entity distinct from the candidate"). Nor does he plausibly allege how an interview of his opponent caused any would-be supporter not to contribute to him (or identify any such person), especially when the challenged Interview statements were not about him. *See Little v. KMPG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (claims of lost business insufficient where they depended "on several layers of decisions by third parties," as such claims were "too speculative to confer Article III standing"). In sum, President Trump may disagree with *60 Minutes*' editorial

---

[5]  Notably, President Trump does not define "support value" or explain how that concept could give rise to a concrete injury.

decisions, and he may believe that they cast his former opponent in too favorable a light during the election, but "those kinds of objections alone do not establish a justiciable case or controversy in federal court." *FDA*, 602 U.S. at 396.

### B.    Any Formerly Live Controversy Is Now Moot In Light Of President Trump's Victory In The November 2024 Election

President Trump's claim is also moot to the extent he claims damages or seeks injunctive relief stemming from alleged "election interference." ECF No. 1 at ¶ 10. His Complaint leaves no doubt that, when he filed this case, he viewed CBS' actions and their effect on him through the lens of the election. *See, e.g.*, *id.* ¶ 2 ("CBS and other legacy media organizations" were trying "to get Kamala elected"); *id.* ¶ 10 (CBS' actions were an attempt "to try and interfere in the election on behalf of Kamala"); *see also id.* ¶¶ 17, 55, 63(a), 63(c).

But President Trump's electoral victory moots any such controversy. President Trump is no longer a candidate; he is now President-elect. His win means that the concerns raised in his Complaint regarding election fairness, voter information, and campaign funds are no longer live. *See Hotze*, 16 F.4th at 1124 ("Since Plaintiffs filed their appeal, the November 2020 election has been completed . . . . Therefore, the issues presented are no longer 'live.'") (citation and internal quotation marks omitted); *Shemwell v. City of McKinney*, 63 F.4th 480, 483-85 (5th Cir. 2023) ("[Plaintiff] lost a legally cognizable interest in this case when the election ended on November 3, 2020."). Nor is there any concern that these issues will be repeated, especially since President Trump is constitutionally ineligible to run for reelection. *See* U.S. Const. amend. XXII; *see also Shemwell*, 63 F.4th at 484 (plaintiff's claim for prospective relief insufficient where possibility of identical future election was remote).

10

In sum, with the election resolved in President Trump's favor and no basis to invoke the capable-of-repetition doctrine, this Court lacks subject-matter jurisdiction over President Trump's claimed harm to his candidacy.[6]

## II.    President Trump Does Not Have Statutory Standing To Bring This Claim

President Trump also lacks standing under the DTPA. The purpose of the DTPA is "to protect consumers in consumer transactions." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see also Cameron v. Terrell & Garrett*, 618 S.W.2d 535, 541 (Tex. 1981) ("The [DTPA] is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of any goods or services."). "The Texas Supreme Court has consistently held that '[o]nly a "consumer" can maintain a cause of action directly under the DTPA.'" *Cushman v. GC Servs., L.P.*, 397 F. App'x 24, 27-28 (5th Cir. 2010) (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 386 (Tex. 2000)); *see also Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351 (Tex. 1987) ("DTPA plaintiffs must qualify as consumers . . . to maintain a private cause of action under section 17.50 of the [DTPA]."). A "consumer" is "an individual . . . who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(4). "To qualify as a consumer, 'a person must have sought or acquired goods or services by purchase or lease' and 'the goods and services purchased or leased must form the basis of the complaint.'" *Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 765 (N.D. Tex. 2012) (Lynn, J.) (quoting *Cameron*, 618 S.W.2d at 539). Put differently, the plaintiff must allege that "the defendant's deceptive conduct . . . occur[red] in connection with a

---

[6]  President Trump also fails to properly allege diversity jurisdiction under 28 U.S.C. § 1332(a), by failing to allege the state of his citizenship. He alleges that he is a "resident" of the State of Florida, but not that he is a Florida citizen or that Florida is his domicile. *See, e.g., MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 314 (5th Cir. 2019) (allegation of individual's residence, but not citizenship, was defective).

consumer transaction." *Amstadt*, 919 S.W.2d at 649; *accord, e.g.*, *Burton v. Prince*, 577 S.W.3d 280, 292 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

President Trump does nothing more than allege he is a "consumer" under the DTPA since he "sought and received CBS's broadcast services." ECF No. 1 at ¶ 55. Yet it is not enough under the DTPA for a plaintiff to allege that he sought and received services. Rather, the DTPA requires that a plaintiff allege with particularity that he "purchased or leased" defendant's services. *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 725 (5th Cir. 2013) ("[T]he person must seek or acquire goods or services *by purchase or lease*." (emphasis added)). Indeed, DTPA claims are subject to Rule 9(b), which requires pleading "with particularity." *Kumar v. Panera Bread Co.*, 2024 WL 1216562, at *4 (5th Cir. Mar. 21, 2024); *accord Crosswell v. Martinez*, 120 F.4th 177, 188-89 (5th Cir. 2024) (applying Rule 9(b) to alleged DTPA violations). Nowhere in the Complaint does President Trump allege that he in fact "purchased or leased" any CBS services or, if he had, when, where, or how he did so. Because President Trump "fails to specify any allegations in support of [his] alleged consumer status," he lacks standing to bring the DTPA claim here. *Hurd*, 880 F. Supp. 2d at 765.

To the extent President Trump tries to save his claim by asserting that he "stands in the shoes" of Texas consumers who were allegedly confused by CBS' broadcast services, ECF No. 1 at ¶¶ 55, 63(a), that allegation fares no better. Again, he does not identify any predicate consumer transaction, whether involving him or any other Texas resident. And even if Texas residents did purchase or lease CBS' services, the existence of a consumer transaction between CBS *and third parties* does not confer standing on President Trump to bring a DTPA claim ostensibly on behalf of these third parties. The DTPA allows "*aggrieved consumers* to seek redress"; "*those abused* by certain proscribed conduct [can] avail *themselves* of the remedies of

the Act." *PPG Indus., Inc. v. JMP/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84-85 (Tex. 2004) (emphasis in original). The Texas Supreme Court has emphasized the "personal aspect" of the DTPA, rejecting efforts to expand standing such that "instead of swindled consumers bringing their own DTPA claims, they will be brought by someone else." *Id.* at 85, 91-92.

"[A]lthough privity of contract with the defendant is not required for a plaintiff to be a consumer under the DTPA, the plaintiff must show" at a minimum that he was "sufficiently connected with the transaction to be [a] consumer[] under the DTPA"—that is, that the plaintiff was more than an incidental beneficiary of the consumer transaction. *Hunt v. City of Diboll*, 574 S.W.3d 406, 432 (Tex. App.—Tyler 2017, pet. denied); *see id.* at 433 (holding that vehicle owners lacked standing under the DTPA to sue the operator of the city's red light camera system because they did not establish "that they sought or acquired any goods or services" from the operator or that "they were the intended beneficiaries of the transaction"). Here, President Trump does not begin to allege that he was an intended beneficiary of any transaction between Texas television viewers and CBS, as he must to bring a claim predicated on Texas consumers' confusion. The failure to plausibly allege standing as a consumer thus dooms his claim from the start.

## III.    This Action Should Be Dismissed For Failure To State A Claim Under The DTPA

This action independently fails on the merits and should be dismissed under Rule 12(b)(6) for several independent reasons. President Trump purports to assert a claim under Section 17.50(a)(1) of the DTPA, which provides that a consumer may maintain an action for "the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A) specifically enumerated in . . . Section 17.46(b); and (B) relied on by a consumer to the

consumer's detriment," and resulting in "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a)(1). President Trump fails in multiple respects to plausibly allege the elements of a Section 17.50(a)(1) claim, much less to satisfy the heightened pleading standards of Rule 9(b).

### A.    The DTPA Does Not Reach CBS' Non-Commercial Speech

The overarching impediment to President Trump's claim is that he affirmatively pleads that he is challenging non-commercial, editorial speech when the DTPA on its face applies *only* to commercial speech. The DTPA was enacted "to protect consumers against false, misleading, and deceptive business practices." Tex. Bus. & Com. Code § 17.44. Section 17.46, which the Complaint relies upon, prohibits "[f]alse, misleading, or deceptive acts or practices *in the conduct of any trade or commerce*." Tex. Bus. & Com. Code § 17.46(a) (emphasis added).[7]

Governed by this clear statutory construct, Texas courts have uniformly found that the DTPA does not purport to regulate non-commercial speech and especially not the editorial judgments of news organizations. Consider, for example, *Tatum v. Dallas Morning News, Inc.*, where the court affirmed the dismissal of a DTPA claim brought against a newspaper by parents who had purchased an obituary for their son, but were later criticized in an editorial column concerning the events related to their son's death. 493 S.W.3d 646, 674 (Tex. App.—Dallas 2015, pet. granted), *rev'd on other grounds*, 554 S.W.3d 614 (Tex. 2018). In rejecting the DTPA claim, the court distinguished between the commercial transaction involving the purchase of an obituary and the journalism of its reporter which did not relate to the obituary services involved. *Id.* at 675; *see also Mother & Unborn Baby Care of N. Tex., Inc. v. State*, 749 S.W.2d 533, 540

---

[7]  "Trade" and "commerce" are in turn defined to "mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated." Tex. Bus. & Com. Code § 17.45(6).

(Tex. App.—Fort Worth 1988, writ denied) (recognizing that the DTPA "prohibits false statements or advertisements to protect the public" and "does not further encompass protected speech or conduct"). Consistent with such decisions, Texas' own Attorney General has argued that DTPA investigations into purportedly "deceptive or misleading" speech are permissible only to the extent the speech involves commercial representations and not editorial decisions. *Twitter, Inc. v. Paxton*, No. 21-15869 (9th Cir. 2021), ECF No. 33, at 20-22.

The legislative history underscores that the DTPA is limited to commercial speech concerning commercial transactions. Asked whether the statute "appl[ies] to political advertising," the drafter of the bill (Joe Longley, Chief of the Anti-Trust and Consumer Protection Division of the Texas Attorney General's Office) said "I've come to the persuasion that nothing applies to political advertising," to which Texas Senator Ron Clower, chairman of the Subcommittee on Consumer Affairs, replied "Good."[8] In other words, even political advertising—much less pure editorial speech—is outside the reach of the DTPA.

The Federal Trade Commission and courts across the country interpreting the Lanham Act all recognize the critical distinction between, on the one hand, commercial speech subject to regulatory regimes like the DTPA, and, on the other hand, political or editorial speech.[9] Just as the scope of the DTPA extends only to commercial speech, so too does the jurisdiction of the FTC. *See, e.g.*, *FTC v. R.J. Reynolds*, 111 F.T.C. 539, 1988 WL 490114, at *2 (F.T.C. Mar. 4, 1988); *FTC v. POM Wonderful, LLC*, 155 F.T.C. 1, 2013 WL 8364895, at *47 (F.T.C. Jan. 10, 2013), *aff'd*, 777 F.3d 478 (D.C. Cir. 2015); *FTC v. Intuit, Inc.*, 2024 WL 382358, at *67 (F.T.C.

---

[8]  *See* Legislative History of S.B. 75, at 83, https://lrl.texas.gov/scanned/DTPA/SB75_63R.pdf.
[9]  The DTPA expressly recognizes that "interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act"—the provision analogous to the DTPA that prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1)—should guide interpretations of the DTPA, Tex. Bus. & Com. Code § 17.46(c)(1), and that courts construing the DTPA are free to "consider[] relevant and pertinent decisions of courts in other jurisdictions," *id.* § 17.46(c)(2).

Jan. 22, 2024). As the FTC has explained, "[t]he more limited protection accorded commercial speech permits the FTC to act when necessary to challenge false or deceptive advertising." *R.J. Reynolds*, 1988 WL 490114, at *3. Similarly, Section 43 of the Lanham Act—which, like the DTPA, regulates false or misleading representations—"specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court" and "should not be read in any way to limit political speech, consumer or editorial comment . . . or other constitutionally protected material." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n.6 (5th Cir. 1996) (quoting legislative history of Section 43); *see also, e.g.*, *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 332 (4th Cir. 2015) (rejecting Lanham Act claim based on speech that is "not an advertisement"). The DTPA's application only to commercial and not to editorial speech is therefore consistent with unfair competition law nationally.

*Face the Nation* and *60 Minutes* are indisputably news programs and President Trump's claim indisputably challenges editorial speech. The editing of the Interview at issue concerned, in the words of the Complaint, a question "of the utmost public significance—U.S. foreign policy on the matter of the Israel/Gaza war—at a time of immense importance, mere weeks before the most critical presidential election in American history." ECF No. 1 at ¶ 60. Indeed, the Complaint over and over admits that it challenges editorial decision-making, not commercial speech or advertising, describing *Face the Nation* as a "morning *news* show," referring repeatedly to "*news* distortion," and alleging that CBS engaged in "deceitful, deceptive manipulation of *news*" or "rigging or slanting [of] the *news*." *Id.* ¶¶ 1, 4, 7, 15, 55, 59 (emphasis added). There can be no serious argument that President Trump's claim arises out of commercial speech, as required for a viable DTPA claim. For this reason alone, the action fails.

**B.  President Trump Fails To Allege Confusion As To Source Or Affiliation**

The DTPA claim fails for the independent reason that President Trump does not plausibly allege confusion as to source or affiliation. The two provisions of Section 17.46(b) his claim relies upon cover "false, misleading, or deceptive acts or practices" that "caus[e] confusion or misunderstanding as to" either "the source, sponsorship, approval, or certification of goods or services" or "affiliation, connection, or association with, or certification, by another." *Id.* § 17.46(b)(2)-(3); *see* ECF No. 1 at ¶ 52. But the Complaint alleges no facts in support of these allegations. On the contrary, the pleaded facts underlying *60 Minutes*' allegedly "false, misleading, and deceptive acts" have nothing to do with confusion as to source or affiliation. ECF No. 1 at ¶ 56; *id.* ¶¶ 57-58 (alleging that the confusion concerned not the source of CBS' broadcast services but the Vice President's alleged "lack of abilities, intelligence, and appeal"). In fact, the only allegations in the Complaint directly relating to source affirmatively state that *Face the Nation* and *60 Minutes* are "well-known" programming components of the CBS News portfolio. *See id.* ¶ 22. And the Interview itself clearly and expressly carried the CBS logo throughout the *60 Minutes* broadcast. *See* Owens Decl., Ex. C. In short, there was not, and could not reasonably be, any confusion as to the source *of CBS' broadcast services*.

President Trump nonetheless alleges, without any pleaded facts, that viewers would find it "impossible . . . to determine whether the *60 Minutes* interview was independent journalism or de facto advertising for the Kamala Campaign." ECF No. 1 at ¶ 63. But this conclusory allegation does not begin to rise to the level of pleading with particularity required to state a DTPA claim. *See, e.g.*, *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998) (collecting cases). Nor is there any plausible basis for a viewer to conclude that the Interview was "de facto advertising" for the Vice President. To the contrary, the Interview shows that long-time CBS correspondent Bill Whitaker engaged in probing and tough questioning of

the Vice President throughout, asking difficult questions and pressing the Vice President for answers when he felt she had not addressed the question.[10] Far from an effort to "help" the Harris campaign, as President Trump contends, ECF No. 1 at ¶ 62, the Interview plainly fulfilled its role as "news" programming, as the Complaint concedes, *id.* ¶¶ 1, 4, 7, 15, 55, 59.[11]

### C. President Trump Fails To Allege Detrimental Reliance

The Complaint also does not even attempt to allege anything that would support a finding of detrimental reliance, as is required to state a DTPA claim. Specifically, President Trump does not articulate what misrepresentation *he relied upon* or what action *he took* in reliance upon that misrepresentation.

Section 17.50(a)(1) requires the plaintiff to establish detrimental reliance based on a false, misleading, or deceptive act, resulting in economic damages or damages for mental anguish. *See* Tex. Bus. & Com. Code § 17.50(a)(1); *see also, e.g.*, *CrewFacilities.com, LLC v. Humano, LLC*, 2024 WL 993898, at *3 (W.D. Tex. Mar. 7, 2024) (dismissing DTPA claim for failure to "plausibly allege detrimental reliance"); *Yumilicious Franchise L.L.C. v. Barrie*, 2015 WL 1822877, at *4-6 (N.D. Tex. Apr. 22, 2015) (Lindsay, J.) (same). In other words, there needs to be a causal connection—the false, misleading or deceptive act must precede the action taken in "reliance" on that misinformation. A DTPA claim is stated, for example, when a plaintiff

---

[10]  *E.g.*, Owens Decl., Ex. C at 15:52-17:31 (Whitaker: "[Y]our economic plan would add $3 trillion to the federal deficit over the next decade. How are you going to pay for that? . . . Pardon me, Madam Vice President. The question was how are you going to pay for it. . . . We're dealing with the real world here. How are you going to get this through Congress? . . . And Congress has shown no inclination to move in your direction.").

[11]  The Complaint also alleges that viewers could be confused by "the Interview's 'certification by' CBS given its legal obligation to broadcast news in a non-distortive manner" or that CBS misled and deceived him because "the source of Kamala's edited answer in the Interview was not, in fact, Kamala, but CBS taking its editorial pen to confuse viewers as to what she said." ECF No. 1 at ¶¶ 61, 63. But, while the word "source" appears in the allegation, this is not confusion as to "source" or "affiliation" cognizable under Section 17.46.(b)(2) or (3). Viewers of course understand that CBS is the "source" of programming like *60 Minutes* because it airs on CBS, it contains the CBS Eyemark logo throughout, and it is hosted by CBS News correspondents. No one could plausibly contend any confusion as to source.

shows reliance on misrepresentations about the terms or benefits of insurance coverage in deciding not to obtain insurance elsewhere, *see Kersh v. UnitedHealthcare Ins. Co.*, 946 F. Supp. 2d 621, 643 (W.D. Tex. 2013), or when a plaintiff takes actions based upon representations "when buying a good, such as a warranty accompanying a good, or financial counseling in connection with the sale of securities," *McClung v. Wal-Mart*, 866 F. Supp. 306, 309 (N.D. Tex. 1994) (Belew, J.).

Here, President Trump does not plead anything of the kind. Not only does he fail to allege that he actually acquired by lease or purchase any goods or services from CBS, he most certainly never claims the broadcast of the Interview occurred *before* he acquired CBS' broadcast services; that is, he makes no attempt even to suggest that the alleged distortion enticed him into acquiring its services. Nor does he allege that he made any commercial purchase or lease (or failed to take any such action) as a result of the Interview. To the contrary, he in fact alleges that he was *not* confused by the Interview and its alleged "distortion." ECF No. 1 at ¶¶ 1, 9. President Trump knew the *60 Minutes* interview responses were edited or, as he calls it "deceptively 'doctor[ed],'" when he promptly took to Truth Social to say as much. *Id.* ¶ 9. "[W]ithout proof that he relied to his detriment on the deceptive act," a plaintiff "loses" his claim under Section 17.50(a)(1). *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823 (Tex. 2012).

### D. President Trump Fails To Allege Any Unconscionable Action

Although the sole count in the Complaint is for a violation of Section 17.46(a), "Actionable Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1)," ECF No. 1 at at 14, the Complaint also cites Section 17.50(a)(3), which provides that a consumer may maintain an action based on "any unconscionable action or course of action by any person" that causes economic damages or damages for mental anguish. *See* Tex. Bus. & Com. Code § 17.50(a)(3); ECF No. 1 at ¶ 53; *see also id.* ¶¶ 55, 63. An "unconscionable action or course of action" is "an

act or practice, which . . . takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). In other words, to state a claim for an unconscionable action, the plaintiff must plead the consumer's "lack of knowledge, ability, experience, or capacity." *See Washburn v. Sterling McCall Ford*, 521 S.W.3d 871, 877 (Tex. App.—Houston [14th Dist.] 2017, no pet.). President Trump does not contend that he lacks the knowledge, ability, experience, or capacity to consume and evaluate television news. To the contrary, he pleads that he understood the Interview was edited (again, in his words, "doctored") and alerted the public to that fact well before CBS issued a statement about it. *See* ECF No. 1 at ¶¶ 9-10. President Trump accordingly cannot claim CBS acted "unconscionabl[y]" toward him within the meaning of the DTPA.

## IV.    The First Amendment Bars President Trump's Claim

Last but surely not least, while the Court need not reach this question because President Trump lacks standing and his claim fails on the merits, even had he cleared these hurdles, his claim would still be subject to dismissal. The First Amendment prevents holding CBS liable for editorial judgments the President may not like. While President Trump may wish to stretch the DTPA to reach journalism he disagrees with, "[t]he scope of free speech protection does not depend on the legal theory asserted by an inventive plaintiff." *Rehak Creative Servs., Inc v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (internal citation, quotation marks, and alteration omitted), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015).

As the Supreme Court recognized in *Miami Herald Publishing Co. v. Tornillo*, "[t]he choice of material to go into a newspaper . . . and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." 418 U.S. 241, 258 (1974). Such editorial judgments are not the proper subject of judicial review:

"[T]he editorial function itself is an aspect of 'speech,' and a court's decision that a private party, say, the station owner, is a 'censor,' could itself interfere with that private 'censor's' freedom to speak as an editor." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-38 (1996); *see also Miss. Gay All. v. Goudelock*, 536 F.2d 1073, 1075 (5th Cir. 1976) ("[W]e think the First Amendment interdicts judicial interference with the editorial decision."). *60 Minutes*' decisions regarding how to edit the Interview with Vice President Harris to fit within the time allotted are not only constitutionally protected, they are no different than the decisions print journalists make every day about how much of a source to quote to fit within a word limit. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 515 (1991) (explaining that the "practical necessity" of a medium, in that case, a newspaper, often requires editing). Such decisions are not subject to judicial second-guessing.

It is especially an affront to the First Amendment to impose liability under the auspices of state consumer protection law for editorial speech made in the throes of a national presidential campaign. "The First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office.'" *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)); *see also id.* at 372-73, 385 (Roberts, C.J., concurring) (rejecting "a theory of the First Amendment that would allow censorship . . . of television and radio broadcasts," particularly "at election time, when it matters most"); *see generally N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). In a world in which "[o]ur Nation's speech dynamic is changing" and "[s]peakers have become [increasingly] adept at presenting citizens with sound bites," *Citizens United*, 558 U.S. at 364, punishing the act of editing a politician's comments to

21

make them more "concise," ECF No. 1 at ¶¶ 48, 56(b), raises grave First Amendment concerns. "The First Amendment does not permit laws that force speakers to . . . seek declaratory rulings before discussing the most salient political issues of our day." *Citizens United*, 558 U.S. at 324. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence." *Id.* at 340. The First Amendment does not countenance President Trump's effort to use the DTPA to punish CBS for exercising its right to make editorial judgments about political speech.

## V. At A Minimum, This Case Should Be Abated

"As a prerequisite to filing a suit" that seeks damages under Section 17.50(b)(1), the plaintiff must give written notice "at least 60 days before filing the suit" advising the would-be defendant "in reasonable detail of the consumer's specific complaint and the amount of economic damages, damages for mental anguish, and expenses, including attorneys' fees, if any." Tex. Bus. & Com. Code § 17.505(a). "The notice requirement of the DTPA is clearly mandatory." *Hines v. Hash*, 843 S.W.2d 464, 467 (Tex. 1992). "[T]he wording of the DTPA requires 'the amount of' damages sought, not merely an allegation that some sort of damages occurred." *Franklin v. Apple Inc.*, 569 F. Supp. 3d 465, 483 (E.D. Tex. 2021) (citation omitted). "To countenance [a] failure to comply with the Act's notice requirement before bringing suit would frustrate its purpose to encourage settlement and minimize litigation." *Boyd Int'l, Ltd. v. Honeywell, Inc.*, 837 F.2d 1312, 1316 (5th Cir. 1988).

President Trump first invoked the DTPA on October 29, 2024, when he sent a letter to CBS News purporting to offer "pre-suit notice" that "CBS's deceptive editing of the Interview" "caused President Trump to sustain economic damages." ECF No. 1-3. That letter did not articulate how President Trump individually was harmed or offer any specific "amount of economic damages, damages for mental anguish, and expenses," as required under the statute.

Tex. Bus. & Com. Code § 17.505(a). Accordingly, that letter does not satisfy the notice requirement and this matter is subject to abatement.

Abatement is especially appropriate because President Trump still has not detailed how he arrived at $10 billion in purported damages. *See, e.g.*, *Clark v. Wells Fargo Home Mortg.*, 2014 WL 5297723, at *2 (N.D. Tex. Oct. 16, 2014) (Lindsay, J.) (demand did not satisfy Section 17.505(a) of the DTPA when it failed to "provide any information regarding the damages that Plaintiffs seek" other than the amount). No doubt, President Trump has not done so because he cannot explain how he arrived at that number.[12] Notably, although his Complaint seeks "attorneys' fees," he also neither "alleges that any notice to [CBS] included this" nor does he specify the amount of attorneys' fees sought in the Complaint itself. The "failure to specify any amount of attorneys' fees," when attorneys' fees have been requested, renders the Complaint— like the October 29 letter—inadequate notice. *Franklin*, 569 F. Supp. 3d at 483 (citing *Int'l Nickel Co. v. Trammel Crow Distrib. Corp.*, 803 F.2d 150, 156 (5th Cir. 1986)).

Because notice has not been given under the statute, Defendants hereby file a plea in abatement, Tex. Bus. & Com. Code § 17.505(c), and a 60-day abatement should now be ordered, *see id.* §§ 17.505(d), (e); *see also Hines*, 843 S.W.2d at 469 ("the trial court must abate the proceedings for 60 days" where defendant requests an abatement with the filing of an answer); *Daniels v. AETC II Privatized Hous., LLC*, 2020 WL 6789336, at *4-6 (W.D. Tex. Jan. 6, 2020) (emphasizing that the "pre-suit notice requirement is 'mandatory'" and granting motion to abate); Sproul Decl., Ex. A.[13]

---

[12]  Damages under the DTPA are circumscribed. A successful DTPA plaintiff may recover only actual damages and, where the plaintiff shows that the defendant acted intentionally, a trier of fact may not award more than three times actual damages. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 307 (Tex. 2006).

[13]  Even if President Trump's October 29 letter constituted adequate notice, which it plainly does not given the absence of any information whatsoever regarding his damages, that letter came just two days before President Trump filed suit—far short of the 60 days required under Texas law.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss Plaintiff's Complaint with prejudice or, in the alternative, order abatement of this matter pending compliance with statutory prerequisites.[14]

---

Accordingly, at a bare minimum, this case must be abated until December 30, 60 days after that letter was sent. *See* Tex. Bus. & Com. Code § 17.505(e).

[14]  Because this action is "groundless," CBS reserves the right to seek attorney's fees pursuant to the DTPA. Tex. Bus. & Com. Code § 17.50(c).

Respectfully submitted,

/s/ *Thomas C. Riney*

**UNDERWOOD LAW FIRM, P.C.**

Thomas C. Riney
State Bar No. 16935100
C. Jason Fenton
State Bar No. 24087505
PO Box 9158 (79105-9158)
500 S. Taylor, Suite 1200
Amarillo, TX 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
tom.riney@uwlaw.com
jason.fenton@uwlaw.com

**JACKSON WALKER LLP**

Marc A. Fuller
State Bar No. 24032210
2323 Ross Ave., Ste. 600
Dallas, TX 75201
Telephone: (214) 953-6000
Facsimile: (214) 953-5822
mfuller@jw.com

**DAVIS WRIGHT TREMAINE LLP**

Elizabeth A. McNamara (admitted *pro hac vice*)
Jeremy A. Chase (admitted *pro hac vice*)
Alexandra Perloff-Giles (admitted *pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Telephone: (212) 489-8230
elizabethmcnamara@dwt.com
jeremychase@dwt.com
alexandraperloffgiles@dwt.com

*Attorneys for CBS Broadcasting Inc. and CBS
Interactive Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2024 a true and correct copy of the foregoing was served via CM/ECF on all counsel of record.

*/s/ Thomas C. Riney*_____