# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, and REPRESENTATIVE RONNY JACKSON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>PARAMOUNT GLOBAL d/b/a PARAMOUNT, a Delaware corporation, CBS BROADCASTING INC., a New York corporation, and CBS INTERACTIVE INC., a Delaware corporation,<br><br>Defendants. | Case 2:24-cv-00236-Z<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, PRESIDENT DONALD J. TRUMP ("President Trump") and REPRESENTATIVE RONNY JACKSON ("Representative Jackson"), by and through undersigned counsel, bring this action against Defendants PARAMOUNT GLOBAL d/b/a PARAMOUNT (together with its affiliates and subsidiaries, "Paramount"), CBS BROADCASTING INC. ("CBS Broadcasting"), and CBS INTERACTIVE INC. ("CBS Interactive") (CBS Broadcasting and CBS Interactive together, and with their affiliates and subsidiaries, "CBS"; Paramount together with CBS, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.      "In plain English, freedom carries with it responsibility even for the press; freedom of the press is *not* a freedom from responsibility for its exercise." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 263 (1974) (White, J., concurring) (emphasis added). Paramount and CBS disagree; they believe in unbounded freedom to (a) harm media content competitors, including

President Trump, by misrepresenting the nature, characteristics, and qualities of their broadcast and digital services; (b) deceive consumers, including Plaintiffs, through advertisement and commercial promotion of substantially distorted broadcast and digital media content masquerading as news; (c) freely disseminate such substantially distorted broadcast and digital media content to the detriment of competitors and consumers; and (d) brand their distorted broadcast and digital media content as legitimately edited news, all for profit and without any level responsibility commensurate with their influence over the American public.

2.      On November 5, 2024, President Trump won the 2024 Presidential Election over Vice President Kamala Harris ("Harris") in historic fashion, emerging victorious in both the Electoral College and the Popular Vote and securing a resounding mandate from the American people. President Trump trounced Harris with 312 electoral votes and a sweep of all seven "battleground" states. This commanding victory reaffirmed not only President Trump's political brilliance and the popularity of his America First agenda, but also the power of his personal media brand, through which he creates and produces digital and traditional media content about news, politics, pop culture, and public affairs, some of it for commercial and entertainment purposes, and much of which he disseminates through his media holdings.



3.     President Trump's victory was all the more remarkable because he had to overcome persistent election interference from the legacy media, including Defendants, which frequently tried to tip the scales of the Election by advertising and placing into the stream of commerce false and manipulated broadcast and digital content to consumers for commercial benefit and pecuniary gain. This occurred to the detriment of other media content brands and competitors, including

President Trump, and further to the detriment of consumers of broadcast and digital media, including Plaintiffs.

4.     In October 2024, one month before President Trump's landslide victory, Defendants, consistent with their *modus operandi* of advertising and disseminating false Election-related content for commercial benefit and pecuniary gain, advertised and promoted their CBS News[1] *60 Minutes* Election Special show (the "Election Special"), which was to air in prime-time on Monday, October 7, 2024, and feature interviews with then-candidate Harris and her running mate, Minnesota Governor Tim Walz.

5.     The interview with Harris (the "Interview") was conducted by CBS's Bill Whitaker ("Whitaker") and recorded in two sessions.

6.     On Sunday, October 6, 2024, Defendants broadcast and posted online a brief promotional excerpt of the Interview (the "Preview") for the commercial and pecuniary purpose of advertising and previewing the Election Special. This occurred during CBS's *Face the Nation,* when host Margaret Brennan advertised the Election Special by introducing the Preview, describing it as being from a "special election edition of *60 Minutes*," with "our Bill Whitaker" who "sat down with Vice President Harris and asked her about U.S. influence with Israeli Prime Minister Benjamin Netanyahu."

---

[1] CBS News is the news division of CBS.



7.      The Preview, which Defendants broadcast and posted online for the commercial and pecuniary purpose of advertising and otherwise drawing attention to their Election Special, lasted about two-and-a-half minutes. Harris provided a rambling one-minute answer to Whitaker's question about whether the United States has "sway" over Israeli Prime Minister Benjamin Netanyahu; the Preview then concluded with a follow-up assertion from Whitaker to Harris: "But it seems that Prime Minister Netanyahu is not listening." Harris replied incoherently and indecisively to Whitaker without taking a clear position on Israel's war of self-defense against Hamas terrorists: "Well, Bill, the work that we have done has resulted in a number of movements in that region by Israel that were very much prompted by, or a result of many things, including our advocacy for what needs to happen in the region." (The "Advertised Harris Reply").

8.      The next day, October 7, 2024, Defendants broadcast and posted online their Election Special containing approximately fifteen minutes of manipulated footage from the Interview interspersed with about six minutes of footage related to the topics being addressed. Once again, Whitaker made the same assertion about Prime Minister Netanyahu "not listening," but this time, Harris's reply was coherent, decisive, and apparently in favor of ending Israel's war

of self-defense against Hamas terrorists: "We are not going to stop pursuing what is necessary for the United States to be clear about where we stand on the need for this war to end." (The "Manipulated Harris Reply").



9.       The Preview and the Election Special individually and together served a primarily commercial and pecuniary purpose for Defendants, attracting millions of viewers during the prime-time broadcast and then online after the initial broadcast—on platforms such as Defendants' *Paramount+* and *60 Minutes' YouTube* channel.[2] CBS, as it usually does, aired profitable third-party advertisements and viewership-driving promotions for important CBS content during the Election Special.

10.       Although Defendants had access to well over an hour of recorded footage of Whitaker interviewing Harris, Defendants selected Whitaker's exchange with Harris about Prime Minister Netanyahu as the most commercially compelling exchange of the Interview. Defendants

---

[2] As of the date this pleading is filed, the Interview has been viewed 3.8 million times on *YouTube*. *See* https://www.youtube.com/watch?v=TJys7OVH24E (last visited Feb. 7, 2025).

then made this exchange the centerpiece of the Preview with the goal of maximizing consumer exposure to the Election Special.

11.    However, consumers who purchased or otherwise acquired Defendants' broadcast or digital content services to watch the Election Special and other Paramount or CBS content—including Plaintiffs—were confused, deceived, and misled by the Preview and Defendants' other advertising of the Election Special.

12.    Quite simply, the version of the Interview that Plaintiffs and other consumers ultimately saw during *60 Minutes* on October 7, 2024 was *not* the Interview that Defendants advertised on October 6, 2024 during *Face the Nation* and at other times prior to the Election Special. The Preview and the Interview are both distortive, and to Defendants' commercial and pecuniary benefit.

13.    Instead of broadcasting and posting the Interview online as advertised during the Preview and at other times prior to the Election Special, Defendants deceptively manipulated the Interview in a manner calculated to make Harris appear coherent and decisive, and thus the product more commercially appealing to Defendants' audience. Defendants accomplished this not only by manipulating the portion about Prime Minister Netanyahu, but also by manipulating the *entire* Interview.

14.    This manipulation served no legitimate editorial purpose—it was deceptive commercial speech and substantial broadcast distortion that harmed consumers, including Plaintiffs.

15.    As the *New York Post* observed: "Like all too many legacy media operations, [CBS] needs to clear out the partisan rot. It can start by booting '*60 Minutes*' head producer Bill Owens, who has made all too many bad calls. Most obviously, to slice-and-dice the Harris interview,

7

cutting down one word-salad answer after another into seemingly coherent responses." *See* Post Editorial Board, *CBS must fix its lefty-propaganda problem*: *Start with '60 Minutes' exec Bill Owens*, NEW YORK POST (Feb. 6, 2025), https://nypost.com/2025/02/06/opinion/cbs-must-fix-its-lefty-propaganda-problem-start-with-60-minutes-exec-bill-owens/ (last visited Feb. 7, 2025).

16.    Defendants' deceptive advertising and "slice-and-dice" manipulation of the Interview was also an act of unfair competition against President Trump, a significant owner of shares in publicly traded company Trump Media & Technology Group Corp. ("TMTG") (trading under "DJT" on NASDAQ).  TMTG owns President Trump's wildly popular social media platform *Truth Social*, in which President Trump owns a substantial share, and which is one of Defendants' competitors in the broadcast, online, and digital media content creation spaces.





17.     Defendants, exacerbating the harm to Plaintiffs, other consumers, and other competitors caused by their deception, repeatedly refused to release the unedited transcript and footage of the Interview before the Election, despite reasonable demands from President Trump and others, including then-Commissioner and now Chairman of the Federal Communications Commission ("FCC") Brendan Carr ("Chairman Carr"). Instead, Defendants claimed that CBS "edited" the Manipulated Harris Reply due to time considerations.

18.     However, it was apparent that Defendants' actions were not editorial in nature; rather, Defendants tampered with the Interview to aid the struggling Harris for their commercial and pecuniary benefit. Defendants' subsequently proffered excuse regarding run time is smoke and mirrors—they posted *only* the version of the Interview containing the Manipulated Harris Reply (in both transcript and video form) on the *60 Minutes* website and other digital platforms, where run time is no concern.

19.     And, even after Harris was routed on November 5, 2024, in both the Electoral College and the Popular Vote, Defendants remained intransigent—they would not release her unedited Reply to Whitaker's comment about Prime Minister Netanyahu, even knowing that this

simple act would cost nothing. In truth, Defendants, plagued by credibility problems since the catastrophic Dan Rather scandal at CBS in 2004, never changed or evolved, nor could they. Paramount and CBS remain to this day elitist legacy media organizations with much to hide.

20.    Only after the FCC sent a letter of inquiry dated January 29, 2025 to CBS News demanding the "full, unedited transcript and camera feeds" from the Interview did Defendants lay bare their deception. *See CBS News to comply with FCC demand for "60 Minutes" transcript and video*, CBS NEWS (Jan. 31, 2025), https://www.cbsnews.com/news/cbs-news-fcc-60-minutes/ (last visited Feb. 7, 2025); *60 Minutes publishes transcripts, video requested by FCC*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/news/60-minutes-publishes-transcripts-video-requested-by-fcc/ (last visited Feb. 7, 2025).

21.    "Rigging or slanting the news is a most heinous act against the public interest—indeed, there is no act more harmful to the public's ability to handle its affairs." *In Re Complaints Covering CBS PROGRAM "HUNGER IN AMERICA*,*"* 20 F.C.C. 2d 143, 151 (Oct. 15, 1969). This rings particularly true as "[b]roadcasters are public trustees licensed to operate in the public interest and, as such, may not engage in intentional falsification or suppression of news."  *In re Application of KMPA, Inc*., 72 F.C.C. 2d 241, 244 (June 12, 1979).

22.    Defendants violated and continue to violate this public trust. Accordingly, Plaintiffs bring this action seeking monetary and injunctive relief necessary to remedy Defendants' unlawful and substantial broadcast and digital distortion that was calculated to give Defendants an unfair advantage over their media content competitors, including President Trump, and to deceive and mislead tens of millions of consumers in Texas and across America, including Plaintiffs. Defendants' conduct constitutes an ongoing violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which subjects to liability persons who "in commercial advertising or promotion,

misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . services, or commercial activities," and a violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Comm. Code § 17.46(a), which proscribes "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

## THE PARTIES

23.     President Trump is a citizen of the United States, a citizen of the State of Florida, the 45th President of the United States of America, and, having handily won the 2024 Presidential Election despite election interference by Defendants and many others, was reinaugurated as the 47th President of the United States of America on January 20, 2025. As set forth below, President Trump creates and produces online media content about news, politics, pop culture, and public affairs, some of it for commercial and entertainment purposes, and much of which he disseminates in his personal capacity and through his media brands, including *Truth Social*. Defendants operate in the same digital media content space, and thus, President Trump and Defendants are commercial and pecuniary competitors for a finite number of consumers and viewership. Indeed, as revealed in the unedited transcript of the Interview, even Harris said: "I think [Defendants'] viewers have options in terms of how they're going to hear from [President Trump]." Those options include media owned and operated by President Trump on a daily basis in competition with Defendants. *Truth Social*, in which President Trump owns a substantial share, is widely used in Texas and widely used by Texas citizens, including in this judicial District and Division.

24.     Representative Jackson is a citizen of the United States and the State of Texas and represents Texas's 13th Congressional District in the House of Representatives. He was elected to Congress in 2020, having served as physician to the President from 2013 to 2018 under President Obama and then President Trump. He retired from the United States Navy in December 2019 after

many years of distinguished service. As alleged further herein, Representative Jackson is a consumer of broadcast and digital news media content in this State, District, and Division, including the broadcast and digital news media content from Defendants at issue in this action, and he has thus been injured by Defendants' conduct alleged herein.

25.     Defendant Paramount is a Delaware corporation with its principal place of business in New York, NY, operates as a media company, and is publicly traded on NASDAQ (PARA). Paramount owns CBS Broadcasting and CBS Interactive, and as such, has substantial control over CBS's commercial decisions and broadcast content.

26.     Paramount is a nonresident who engages in business in Texas. Therefore, Paramount may be served via its registered agent for service in the State of Texas, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

27.     On July 7, 2024, Paramount announced a definitive agreement to merge with Skydance Media in a deal valued at $8,000,000,000. The company plans to form a new entity known as "New Paramount," which would have an estimated value of $28,000,000,000. If approved by federal regulators, the transaction would close in September 2025.

28.     Defendant CBS Broadcasting is a New York corporation with its principal place of business in New York, NY.

29.     CBS Broadcasting is a nonresident who engages in business in this state. Therefore, the Texas Secretary of State is CBS Broadcasting's agent for service of process. The Texas Secretary of State may be served with process and may forward such process to CBS

Broadcasting's New York registered agent for service, Corporation Service Company, 80 State Street, Albany, NY 12207-2543.

30.     Defendant CBS Interactive is a Delaware corporation with its principal place of business in New York, NY.

31.     CBS Interactive is a nonresident who engages in business in this state. Therefore, CBS Interactive may be served via its registered agent for service in the State of Texas, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

32.     Defendants operate an enormous media organization with global reach that creates, produces, and disseminates broadcast and digital media content about news, politics, pop culture, public affairs, and sports, all of it for commercial and entertainment purposes, as well as a wide array of movies and television programs. Defendants' media portfolio includes *Face the Nation* and *60 Minutes*, the long-running and well-known programs at issue here, as well as countless other CBS programs, *Paramount+,* and a myriad of content on *YouTube*.

33.     Inherent in Defendants' business model is the creation and dissemination of digital content, which puts it in competition with President Trump for a finite number of viewers of cultural, media, and political content.

34.     *Paramount+,* formerly known as CBS All Access, is a subscription video on-demand over-the-top streaming service owned by Paramount, drawing content from a wide array of media properties within the Paramount family, including CBS. Available among the *Paramount+* offerings are live streams of local CBS broadcast stations and CBS News content including *Face the Nation* and *60 Minutes. Paramount+* has a significant number of subscribers in Texas who receive this and other media content through the streaming service.

35.     In furtherance of building and maintaining their Texas presence, Defendants engage in extensive advertising in Texas generally and in this District specifically, and Defendants' CBS programs, including *Face the Nation* and *60 Minutes*, are broadcast daily in Texas and to Texas residents, including Representative Jackson. *See* https://www.cbsnews.com/texas/program-guide/ (last visited Feb. 7, 2025).

36.     Indeed, beyond *Paramount+, YouTube*, and other digital media platforms, Defendants also reach much of their Texas audience, including Representative Jackson, through numerous local CBS affiliates in Texas that employ Texas citizens at both the corporate and local levels.

37.     One such affiliate in this District is television station KTVT in Dallas/Fort Worth, owned by Paramount through its wholly owned subsidiary, CBS Stations Group of Texas LLC. KTVT has a license with the FCC. *See* https://publicfiles.fcc.gov/tv-profile/ktvt (last visited Feb. 7, 2025).

38.     Defendants even brand KTVT as "CBS News Texas" to facilitate this engagement with their Texas audience, and to further build CBS brand recognition in Texas. *See* https://www.cbsnews.com/texas/ (last visited Feb. 7, 2025); *see also* https://www.cbsnews.com/texas/live/ (last visited Feb. 7, 2025).

39.     Defendants also own television station KTXA in Dallas/Fort Worth, another Paramount subsidiary. KTXA has a license with the FCC. *See* https://publicfiles.fcc.gov/tv-profile/KTXA (last visited Feb. 7, 2025).

40.     Paramount owns KTVT and KTXA directly and/or indirectly.

41.     In the Texas Panhandle, Defendants engage with another affiliate to ensure that their broadcasts are disseminated in Amarillo and the surrounding area. Station KFDA, which also

has an FCC license, has been a long-time CBS affiliate and at all relevant times was the CBS affiliate in Amarillo. *See* https://publicfiles.fcc.gov/tv-profile/KFDA-TV (last visited Feb. 7, 2025).

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331, as this action arises under the laws of the United States, specifically the Lanham Act.

43.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' state law claim under the DTPA.

44.     For the reasons detailed in this Amended Complaint, Defendants are subject to general personal jurisdiction in Texas. Defendants own, operate, and affiliate with numerous broadcast stations throughout the state, including KTVT, KTXA, KFDA, and many others. Each of the broadcast stations that Defendants own and operate have their principal place of business in Texas, conduct substantially all their business operations in Texas, have employees whose knowledge will be relevant to this case within Texas, and direct all their broadcasts at specific geographic regions within Texas, including the broadcasts at issue in this litigation. Although some Defendants such as Paramount appear to additionally conduct business elsewhere and maintain offices in other jurisdictions, some of which may be relevant to this case, each of the Defendants has forged an enduring relationship with Texas, regularly conducts business in Texas, purposefully avails itself of the benefits of Texas residence, and deliberately maintains continuous, systematic, and substantial business operations and contacts within Texas.

45.     In the alternative, Defendants are each subject to specific personal jurisdiction in Texas for the conduct underlying Plaintiffs' claims. Defendants have purposefully availed

themselves of the privilege of conducting activities within Texas, thus invoking the benefits and protection of its laws, and those activities have given rise to Plaintiffs' injuries.

46.    Defendants purposefully directed the broadcasts and online postings of the Preview and Interview into Texas for viewing by Texans. Defendants maintain a network of directly and indirectly owned broadcast stations, and/or contract with broadcast affiliates, as well as websites, to ensure that every citizen of Texas had access to the Interview, including Representative Jackson. Those Texas broadcasts and online postings of the Preview, the Interview, and the Election Special injured President Trump and his business interests, both as a competitor to Defendants and as a consumer of Defendants' broadcasts and advertisements, and required diversion of President Trump's attention and resources while campaigning. Those Texas broadcasts also injured Representative Jackson, both as a consumer of President Trump's media brands and as a consumer of CBS's broadcasts, online postings and advertisements. As a Texas resident and a Member of Congress representing the Texas panhandle, Representative Jackson was subjected to the broadcast and online postings of the Preview and Interview within Texas.

47.    Undeniably, *Face the Nation*, *60 Minutes* and other CBS programs have significant viewership in Texas generally and in the Northern District of Texas in particular.

48.    The Preview and the Interview were aired in Texas, were posted online in Texas, remain accessible to the public in Texas, and have been viewed by individuals in Texas, including Representative Jackson.

49.    The Interview was aired in Texas through KTVT, KTXA, KFDA, and other local affiliates that are owned, operated, or licensed by Defendants.

50.    Personal jurisdiction over Defendants is proper under Tex. Civ. Prac. & Rem. Code §17.042 because Defendants, during the operative period alleged in this Amended Complaint,

engaged in substantial and not isolated business activities in Texas, and more specifically, in this District.

51.    Personal jurisdiction is also proper under Tex. Civ. Prac. & Rem. Code §17.042(1) on the grounds that Defendants "contract[] by mail or otherwise with . . . Texas resident[s]" by providing website access in exchange for subscription fees, a contractual arrangement being performed "in whole or in part in [Texas]"; under Tex. Civ. Prac. & Rem. Code §17.042(2) on the grounds that Defendants committed tortious acts in this state (as alleged in this Amended Complaint); and under Tex. Civ. Prac. & Rem. Code §17.042(3) on the grounds that Defendants "recruits Texas residents, directly or indirectly through an intermediary located in [Texas], for employment inside or outside [Texas]."

52.    Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District by virtue of the Interview being transmitted by Defendants into this District through *Paramount+* and on *YouTube*, and through KTVT, KTXA, KFDA, and other local Defendant CBS affiliates, including to Representative Jackson. By at least some metrics, Dallas/Fort Worth is the fourth largest media market in the United States. *See, e.g.*, https://www.nexstar.tv/stations/kdaf-d-2/ (last visited Feb. 7, 2025). Similarly, Amarillo is the largest media market in the Texas panhandle. *See, e.g.*, https://www.nexstar.tv/stations/kamr-d-2/ (last visited Feb. 7, 2025). Representative Jackson's congressional district includes Amarillo and the Texas Panhandle, and the harm that he experienced was incurred in this District. Accordingly, because Defendants deliberately broadcast the programs at issue in these media markets and throughout the Northern District of Texas, which caused harm to President Trump's media brands throughout the District, and affected Texas

consumers throughout the District, and for the reasons stated in this Amended Complaint, venue in this Court is proper.

## FACTUAL ALLEGATIONS

### *President Trump's Remarkable Success as a Content Creator*

53.     It is universally known that President Trump has for decades been one of the most influential and successful businessmen in the United States, particularly in real estate. He initially learned about the real estate business from his father and then achieved his own historic success in New York City's notoriously challenging real estate market.

54.     Indeed, President Trump's early success and business acumen were nationally recognized in 1982 as he was listed in *The Forbes 400* List of the wealthiest people in America. *See* Antoine Gara, *Donald Trump Through the Years*, FORBES (Dec. 2, 2016), https://www.forbes.com/pictures/ghmf45edldg/1982-the-forbes-400 (last visited Feb. 7, 2025).

55.     Thereafter, President Trump's stewardship of the Trump Organization made his organization and name not only synonymous with New York City real estate but with excellence, luxury, and worldwide success. Under President Trump's leadership, the Trump brand has come to symbolize the highest standards of class, quality, and consumer satisfaction.

56.     But President Trump's business success has for most of his career extended well beyond real estate and into the world of media content creation, first in print, then on television and in movies, and most recently online through the creation of digital content about pop culture, current events, and politics, world affairs, communicated to his tens of millions of followers on his *X* account and on his *Truth Social* account, and through his significant ownership of shares in publicly traded company TMTG and through the *Truth Social* platform, in which President Trump owns a substantial share, and most recently through the $TRUMP meme crypto project.

57.     President Trump regularly releases written and video content on his digital platforms, including insightful commentary on current events of national and international significance, witty cultural observations, and messages to his followers.

58.     Among his most remarkable content creation achievements was his performance as the star of "The Apprentice," one of the top-rated shows of all time and a trailblazer in American television. Thanks solely to President Trump's *sui generis* charisma and unique business acumen, "The Apprentice" generated billions of dollars in revenue and remained on television for over thirteen years, with nearly 200 episodes. "The Apprentice" represented the cultural magnitude of President Trump's singular prowess, which captured the *zeitgeist* of the early twenty-first century.



59.     President Trump also authored 14 bestsellers among dozens of chart-topping books: *Trump: The Art of the Deal* (1987); *Trump: Surviving at the Top* (1990); *Trump: The Art of the Comeback* (1997); *The America We Deserve* (2000); *Trump: How to Get Rich* (2004); *Trump: Think Like a Billionaire* (2004); *Why We Want You to Be Rich* (2006); *Trump 101: The Way to Success* (2006); *Trump: The Best Real Estate Advice I Ever Received* (2006); *Think Big and Kick*

*Ass: In Business and Life* (2007); *Never Give Up: How I Turned My Biggest Challenges into Success* (2008); *Think Like a Champion: An Informal Education In Business and Life* (2008); *Time to Get Tough: Making America #1 Again!* (2011); *Midas Touch: Why Some Entrepreneurs Get Rich - and Why Most Don't* (2012); *Why We Want You to Be Rich: Two Men, One Message* (2014); *Crippled America: How to Make America Great Again* (2015); *Great Again: How to Fix Our Crippled America* (2015); *Our Journey Together* (2021); *The Greatest Speeches of Donald J. Trump* (2022); *Letters to Trump* (2023); *Trumped: The Wit and Wisdom of Donald J. Trump* (2024); *Time to Get Tough: Make America Great Again* (2024); and *Save America* (2024).



60.    Moreover, President Trump's hundreds of history-making media appearances include: *WrestleMania V* (1989); *Ghosts Can't Do It* (1989); *All My Children* (1992); *Lady Boss* (1992); *Home Alone 2* (1992); *Fallen Champ: The Untold Story of Mike Tyson* (1993); *Fresh Prince of Bel Air* (1994); *The Little Rascals* (1994); *Across the Sea of Time* (1995); *Eddie* (1996); *The Nanny* (1996); *The Associate* (1996); *The Drew Carey Show* (1997); *NightMan* (1997); *Spin*

*City* (1998); *54* (1998); *Celebrity* (1998)*; Sex In The City* (1998); *Miss Universe 2001* (2001); *The Job* (2001-2002); *Zoolander* (2001); *Donald Trump Real Estate Tycoon!* (2002) (video game); *Two Weeks Notice* (2002); *Miss USA 2002* (2002); *Ali G Show* (2003); *Marmalade* (2004); *Days of Our Lives* (2005); *Miss Universe Pageant*; *The Apprentice* (2004-2015) *and Celebrity Apprentice* (2008-2015); Hosted *Saturday Night Live* (2015); and much more.

61.     After leaving office in 2021, President Trump began new business ventures, ranging from social media enterprises like *Truth Social* to cryptocurrency offerings such as the $TRUMP meme crypto project. *Truth Social* reaffirmed beyond any doubt his strength as a creator of cultural and political content. According to reports, "[s]hares of Trump Media closed up more than 18%, extending the *Truth Social* owner's sudden turnaround from recent stock price lows and adding hundreds of millions of dollars to Donald Trump's on-paper net worth." *See* Kevin Breuninger, *Trump Media stock surges as election betting odds shift, Truth Social launches streaming site*, CNBC (Oct. 14, 2024), https://www.cnbc.com/2024/10/14/djt-trump-media-election-truth-social-harris.html (last visited Feb. 7, 2025). From October 2, 2024 to October 24, 2024, the TMTG stock price skyrocketed nearly 75%. *See* Google.com (search "DJT" and "month") (last visited Feb. 7, 2025).

62.     The power of President Trump's media brand was exemplified by the unprecedented viewership numbers for his Inauguration on January 20, 2025. *See, e.g.*, Joseph A. Wulfsohn, *Over 10 million viewers watched Fox News' Inauguration coverage*, *crushing all networks*, NEW YORK TIMES  (Jan. 21, 2025), https://www.foxnews.com/media/over-10-million-viewers-watched-fox-news-inauguration-coverage-crushing-all-other-networks (last visited Feb. 7, 2025); *360 MILLION Views for Trump's inauguration*, DMG MEDIA (Jan. 22, 2025), https://www.dmgmedia.co.uk/news/360-million-views-for-trumps-inauguration/ (last visited Feb.

7, 2025); Dmytro Murko, *New viewership records on Twitch and YouTube thanks to Donald Trump's Inauguration*, STREAM CHARTS (Jan. 21, 2025), https://streamscharts.com/news/donald-trumps-inauguration-viewership (last visited Feb. 7, 2025). As President Trump himself noted:

> President Donald J. Trump's Historic Inauguration Sets Viewership Record
>
> Data from Stream Charts shows that due to coverage of President Trump's Inauguration, the News section of *YouTube* set a new "All Time Viewership Record" with 9.6 million viewers.
>
> Additionally, the Inaugural Ceremony stream on President Donald J. Trump's X account received a stunning 36.7 million views.
>
> In combination with TV viewership, an estimated 80.7 million viewers watched the President's Inauguration, which beats the previous record of 42 million viewers with Ronald Reagan's Inauguration in 1981.
>
> *See* President Donald J. Trump, @realDonaldTrump, X (Jan. 25, 2025), https://truthsocial.com/@realDonaldTrump/posts/113891965069994650 (last visited Feb. 7, 2025).

### *The Tampered Interview*

63.     From the moment the Democrat establishment ousted President Joe Biden in an unprecedented and anti-democratic political coup, and installed Harris as their replacement candidate—ignoring the will of their own primary voters, who cast zero votes for Harris—Defendants and other legacy media organizations went into overdrive to get Harris elected and sought to profit handsomely by drumming up fake enthusiasm and electricity for the ill-fated replacement candidate.

64.     Notwithstanding Harris's well-documented, deep unpopularity even within her own political party, these media organizations, including Defendants, tried to increase viewership and profits by falsely recasting her as the candidate of "joy," whitewashed her lengthy record of

policy failures, and painted over her repeated, disqualifying gaffes. *See, e.g.,* Herald readers, *Message of 'joy' at Democratic Convention hides Kamala Harris' poor track record*, MIAMI HERALD (Aug. 27, 2024), https://www.miamiherald.com/opinion/article291479270.html (last visited Feb. 7, 2025).

65. Defendants had an extremely large platform to commercially benefit from their coverage of Harris, thanks to the success of their flagship news show, *60 Minutes*. According to Defendants' online promotion of the show, "*60 Minutes* has been the #1 News show in America for 50 straight years. Watch the biggest interviews and most important stories." *See* https://www.cbsnews.com/60-minutes/ (last visited Feb. 7, 2025). This gave Defendants ample opportunity to advertise their deceptive broadcast and digital services, disguised behind a façade of traditional news reporting from a bygone era of journalistic integrity that no longer exists, all for commercial and pecuniary gain.

66. However, even aided by Defendants and other media outlets looking to profit from manufactured enthusiasm for Harris, her Campaign was unable to conceal numerous embarrassing weaknesses that contributed to her crushing Election defeat.

67. In addition to her policy failures, one of Harris's most embarrassing weaknesses was her habit of uttering "word salads,"—*i.e.*, jumbles of exceptionally incoherent speech that drew disapproval even from dyed-in-the-wool Democratic commentators such as Van Jones, David Axelrod, and other mainstream media contributors. *See* Ian Hanchett, *Van Jones: Harris Had Needless 'Evasions' During CNN Town Hall, 'Word Salad Stuff' Is Annoying*, BREITBART (Oct. 24, 2024), https://www.breitbart.com/clips/2024/10/24/van-jones-harris-had-needless-evasions-during-cnn-town-hall-word-salad-stuff-is-annoying/ (last visited Feb. 7, 2025); Ian Hanchett, *Axelrod: Harris Gives a 'Kind of' 'Word Salad' 'When She Doesn't Want to Answer a*

*Question*'    *Like*    *on*    *Israel*, Breitbart    (Oct.    24,    2024),
https://www.breitbart.com/clips/2024/10/24/axelrod-harris-gives-a-kind-of-word-salad-when-she-doesnt-want-to-answer-a-question-like-on-israel/ (last visited Feb. 7, 2025); Hanna Panreck,
*CNN panel critical of Kamala Harris' town hall performance: 'Word salad city'*, CNN (Oct. 24,
2024) https://www.foxnews.com/media/cnn-panel-critical-kamala-harris-town-hall-performance-word-salad-city (last visited Feb. 7, 2025).

68.    As revealed after the Election, the Harris Campaign knew all along that she would
lose, and that she would lose spectacularly. Diana Glebova, *Harris camp's own polling never
showed VP leading Trump, team 'surprised' by reports showing her ahead: top adviser*, New
York Post (Nov. 27, 2024) https://nypost.com/2024/11/27/us-news/harris-camps-own-polling-never-showed-vp-leading-trump-team-surprised-by-reports-showing-her-ahead-sr-adviser/(last
visited Feb. 7, 2025); Sam Woodward, *Kamala Harris advisers: Internal polling never showed VP
ahead,*    Usa    Today    (Nov.    27,    2024)
https://www.usatoday.com/story/news/politics/elections/2024/11/27/kamala-harris-advisers-internal-polling/76626278007/ (last visited Feb. 7, 2024).

69.    Well-connected legacy media organizations, including Defendants, also knew that
Harris trailed President Trump all along. Realizing that Harris was headed for a historic defeat,
Defendants nonetheless saw a commercial opportunity to profit by presenting a coherent and
decisive version of the flailing Democrat candidate that did not actually exist. Not only would CBS
interview Harris, but it would also present her in a manner that Defendants believed would increase
viewership, ratings, and profits from not only their typical left-leaning audience, but from viewers
of President Trump's media content as well.

70.     To assemble the Interview, CBS conducted two shoots with Harris; a meeting on October 3, 2024, on the campaign trail in Ripon, Wisconsin; and a meeting on October 5, 2024, at Harris's residence at the U.S. Naval Observatory in Washington, D.C.

71.     The Interview covered a wide range of topics, including Israel's war of self-defense against terrorists in Gaza and elsewhere arising out of the Hamas-led, Iran-funded massacre of innocent civilians on October 7, 2023. This was a matter of particularly urgent public interest considering the Biden-Harris administration's pathetic weakness on the international stage.

72.     CBS aired the Preview on *Face the Nation* on Sunday, October 6, 2024, whereupon the following exchange occurred, culminating in the Advertised Harris Reply, which was a word salad about "movements," "things," and "what needs to happen."

> <u>Whitaker</u>: We supply Israel with billions of dollars in military aid, and yet Prime Minister Netanyahu seems to be charting his own course. The Biden-Harris administration has pressed him to agree to a ceasefire. He's resisted. You urged him not to go into Lebanon. He went in anyway. Does the U.S. have no sway over Prime Minister Netanyahu?
> <u>Harris</u>: The work that we do diplomatically with the leadership of Israel is an ongoing pursuit around making clear our principles.
> <u>Whitaker</u>: But it seems that Prime Minister Netanyahu is not listening.
> <u>Harris</u>: *Well, Bill, the work that we have done has resulted in a number of movements in that region by Israel that were very much prompted by, or a result of many things, including our advocacy for what needs to happen in the region.*

(Emphasis added).

73.     Defendants then aired the Interview on *60 Minutes* the next evening, Monday, October 7, 2024, whereupon the following exchange occurred, culminating in the Manipulated Harris Reply, in which the Harris word salad about "movements," "many things," and "what needs to happen" was eliminated and replaced with a completely different, coherent, and decisive response to Whitaker's assertion about Prime Minister Netanyahu.

> <u>Whitaker</u>: We supply Israel with billions of dollars in military aid, and yet Prime Minister Netanyahu seems to be charting his own course. The Biden-Harris administration has

pressed him to agree to a ceasefire. He's resisted. You urged him not to go into Lebanon. He went in anyway. Does the U.S. have no sway over Prime Minister Netanyahu?
<u>Harris</u>: The work that we do diplomatically with the leadership of Israel is an ongoing pursuit around making clear our principles.
<u>Whitaker</u>: But it seems that Prime Minister Netanyahu is not listening.
<u>Harris</u>: *We are not going to stop pursuing what is necessary for the United States to be clear about where we stand on the need for this war to end.*

74.    In Whitaker's written introduction to the Interview (currently posted on the CBS News website and last updated on October 7, 2024, at 8:01 p.m. EDT), he once again demonstrated how CBS would stop at nothing to drive viewership and ratings by casting Harris as the victim of supposed aggression by President Trump. "Kamala Harris has been a candidate for president for just two-and-a-half months and the post-convention 'honeymoon' is over. With the election just 29 days away, Harris and her running mate Minnesota Gov. Tim Walz face *unrelenting attacks from Donald Trump*, and the race remains extremely close." *See* Bill Whitaker, *Kamala Harris makes the case in 60 Minutes interview for why she should be president*, CBS NEWS (October 7, 2024), https://www.cbsnews.com/news/kamala-harris-2024-election-interview-60-minutes-transcript (last visited Feb. 7, 2025) (emphasis added).

75.    The transcript beneath Whitaker's introduction contains the Manipulated Harris Reply rather than the jumbled word salad in the Advertised Harris Reply. *Id.*

76.    The video of the Interview posted above Whitaker's introduction and transcript also contains the Manipulated Harris Reply rather than the Advertised Harris Reply. *Id.* Indeed, conspicuously and conveniently missing from the transcript and video posted on the *60 Minutes* website is the word salad that CBS's competitors and consumers saw on *Face the Nation*.

77.    Defendants even put the Interview on *Paramount+*, their paid streaming service. *See* https://www.paramountplus.com/shows/video/_XywwDYpdrGv73SwGyTpheFuLkaA8g3P/ (last visited Feb. 7, 2025).

26

78.    Millions of Americans, including President Trump, Representative Jackson, and other citizens of Texas, were deceived and misled by the astonishing contrast between the two versions of Harris's Reply to Whitaker's assertion about Prime Minister Netanyahu. President Trump commented on the matter, writing on *Truth Social*: "In normal times, what happened on 60 Minutes, (deceptively 'doctoring' her answers), would be THE END OF ANYONE'S CAMPAIGN! Kamala is slow, incoherent, and in no way qualified to be President of the United States. RELEASE THE TAPES FOR THE GOOD OF AMERICA. We can do it the nice way, or the hard way!" *See* President Donald J. Trump, @realDonaldTrump, TRUTH SOCIAL (Oct. 7, 2024), https://truthsocial.com/@realDonaldTrump (last visited Feb. 7, 2025).

79.    President Trump again commented on the scandal three days later: "A giant Fake News Scam by CBS & 60 Minutes. Her REAL ANSWER WAS CRAZY, OR DUMB, so they actually REPLACED it with another answer in order to save her or, at least, make her look better. A FAKE NEWS SCAM, which is totally illegal. TAKE AWAY THE CBS LICENSE. Election Interference. She is a Moron, and the Fake News Media wants to hide that fact. An UNPRECEDENTED SCANDAL!!! The Dems got them to do this and should be forced to concede the Election? WOW!" *See* President Donald J. Trump, @realDonaldTrump, TRUTH SOCIAL (Oct. 10, 2024), https://truthsocial.com/@realDonaldTrump (last visited Feb. 7, 2025).

80.    On October 20, 2024, attempting unsuccessfully to stop a flood of negative attention but without providing transparency, CBS News released a statement effectively conceding that President Trump was accurate in his assertion that the Interview with Harris was manipulated to deceive and mislead the American People for CBS's commercial gain. *See A statement from 60 Minutes*, CBS NEWS (Oct. 20, 2024), https://www.cbsnews.com/news/60-minutes-statement/ (last visited Feb. 7, 2025).

81.    Indeed, it is a matter of public record that "CBS cut portions of Kamala's answer to a question about the war in Gaza in its initial broadcast, but it later provided [an allegedly] full transcript of her remarks online." *See* Ashleigh Fields, *Trump 'thinks' he will sue over Harris's '60 Minutes' interview*, THE HILL (Oct. 18, 2024), https://thehill.com/homenews/campaign/4942021-trump-thinks-sue-cbs-60-minutes (last visited Feb. 7, 2025).

82.    But Defendants' manipulation of the Interview went far beyond tampering with Harris's Reply to Whitaker's assertion about Prime Minister Netanyahu. *See, e.g.,* Stephen L. Miller, *Breaking down in detail, clip by clip, just how 60 Minutes and CBS News reshaped and re-edited Kamala Harris's answers on Israel*, VERSUS MEDIA (Oct. 9, 2024), https://millerversusmedia.substack.com/p/10924-breaking-down-in-detail-clip?r=1txqip&utm_campaign=post&utm_medium=web&triedRedirect=true (last visited Feb. 7, 2025).

83.    Indeed, to make the Interview more commercially appealing to its audience, Defendants didn't merely tamper with Harris's Reply to Whitaker about Prime Minister Netanyahu. In addition, Defendants deliberately edited out numerous other Harris word salads that made no sense, unbelievably long and rambling answers the meandered to nowhere, incoherent attempts at policy statements, and even comments by Harris where she apparently agreed that Israel has a right to self-defense against terrorists, as set forth below. *Id.*

### *Defendants Knew that the Interview Was Abnormal and Deceptive*

84.    Exacerbating Defendants' wrongdoing is the fact that *60 Minutes*' Executive Producer, Bill Owens, *knew* that the obvious difference between the Advertised Harris Reply and the Manipulated Harris Reply was deceptive, irregular, and not editorial in nature. Indeed, between

the broadcast of *Face the Nation* and the broadcast of the Election Special the following evening, he took the highly unusual step of asking Executive Editor Tanya Simon whether their tampering was a "legal edit." *See* Joe Flint, *How the Head of '60 Minutes' Ended Up at the Center of Trump's Fight With CBS News*, THE WALL STREET JOURNAL (Feb. 7, 2025), https://archive.is/mdpnW#selection-1423.0-1463.8 (last visited Feb. 7, 2025).

85.     As reported by The Wall Street Journal:

> Early last October, "60 Minutes" Executive Producer Bill Owens sat in a screening room at the show's New York headquarters, watching an edit of a highly anticipated Kamala Harris interview. Executive editor Tanya Simon told Owens that Harris's remark about Israeli Prime Minister Netanyahu to be used in the Monday, Oct. 7, show was different from an edited clip the Sunday morning show "Face the Nation" was using Oct. 6.

> Owens asked if it was a "legal edit," meaning the answer the then-presidential candidate had given in the "Face the Nation" clip was part of the response to the same question he wanted for "60 Minutes." Simon said it was. Owens responded: "That's fine."

> *Id.*

86.     No producer would have to ask whether an alteration to interview content was a "legal edit" unless that producer knew there was something wrong with the alteration, so much so that the meaning of the answer was materially changed.

87.     This exchange between Owens and Simon lays bare why Defendants doggedly refused to release the unedited transcript and video footage for so long: the Interview was deceptive from the beginning, and Defendants' producers knew exactly what they were doing.

### *The CAR Broadcast Distortion Complaint*

88.     On October 16, 2024, the Center for American Rights ("CAR") submitted a broadcast distortion complaint against CBS to the FCC for the deceptive editing of the Interview (the "FCC Complaint"). *See* **Exhibit A** attached hereto; *see also In re Complaint Against WCBS-*

*TV* (Oct. 16, 2024), https://www.americanrights.org/cases/cbs-accused-of-news-distortion-in-vice-president-kamala-harris-interview-center-for-american-rights-files-formal-fcc-complaint (last visited Feb. 7, 2025).

89.     Commenting on the FCC Complaint, Commissioner Nathan Simington observed, "[t]he thing about trust is that once it's lost, it's very difficult to regain." *See* Brian Flood & Alba Cuebas-Fantauzzi, *FCC commissioner explains if CBS could be in hot water over controversial '60 Minutes'*, FOX NEWS (Oct. 18, 2024), https://archive.is/mdpnW#selection-1423.0-1463.8 (last visited Feb. 7, 2025).

90.     Simington was not alone in his concern; four days later, now-Chairman Carr publicly urged CBS to release the transcript. *See* Kristen Altus, *FCC Commissioner urges CBS to release the transcript from Harris's '60 Minutes' interview*, FOX BUSINESS (Oct. 22, 2024), https://www.foxbusiness.com/media/fcc-commissioner-cbs-release-transctipt-harris-60-minutes-interview (last visited Feb. 7, 2025).

91.     The gravamen of the FCC Complaint was concise and accurate: "Same interview, same question, two completely different answers." *See* **Exhibit A** at 2. CAR correctly observed that the Interview was "an act of significant and substantial news alteration, made in the middle of a heated presidential campaign." *Id*.

92.     "CBS crossed a line when its production reaches the point of so transforming an interviewee's answer that it is a fundamentally different answer. This CBS may not do." *Id*.

93.     The FCC Complaint highlighted not only Defendants' deceptive tampering with the Interview but also their lack of transparency, for "CBS has refused to provide the complete transcript of the show despite numerous requests and precedent for doing so on high-profile interviews." *Id*. at 3.

94.     Defendants' concealment of the transcript was proof of their corrupt, partisan motives. For example, prominent journalist and Fox News contributor Mollie Hemingway commented: "The fact that CBS @60 Minutes is refusing to release the full, unedited transcript of its interview with Kamala Harris is a huge scandal. Suggests that much of the entire finished product was manipulative and deceitful, and not just the one horrible example that was discovered." *Id*. (citing @MZHEMINGWAY, X.com, (https://x.com/MZHemingway/status/1845170976616583339) (last visited Feb. 7, 2025).

95.     As Hemingway observed, Defendants' misconduct goes even further than the deceptive tampering and concealment of the transcript. An additional problem arose from Defendants' deception: it was reasonable to infer that other parts of the Interview were also deceptively doctored. *Id*. As discussed below, this proved to be exactly true when Defendants finally did release the unedited transcript and video footage of the Interview.

96.     Accordingly, the FCC Complaint sought as relief what was necessary to examine Defendants' deceit: "Direct CBS to release the complete transcript of the Vice President's interview with 'Sixty Minutes.' The need for the Commission's action is strengthened by CBS's refusal thus far to release the transcript, which it has done in similar interviews in the past." *See* FCC Complaint at 5; *accord*. Daniel Schorn, *Transcript: Tom Brady, Part 1* (November 4, 2005), https://www.cbsnews.com/news/transcript-tom-brady-part-1/ (last visited Feb. 7, 2025); Daniel Kohn, *Transcript: Saddam Hussein Interview, Part 1* (February 26, 2003), https://www.cbsnews.com/news/transcript-saddam-hussein-interview-pt-1/ (last visited Feb. 7, 2025).

97.     The favorable public reactions to the FCC Complaint by two FCC Commissioners also spoke volumes. Defendants were hiding their tortious misconduct and hiding the truth.

98.    On January 16, 2025, lending corrupt aid to Defendants, outgoing Biden-appointed FCC chair Jessica Rosenworcel dismissed the FCC Complaint. *See* Brian Stelter, *Outgoing FCC chair rejects high-profile TV petitions as attempt to 'weaponize' government*, CNN BUSINESS (Jan. 16, 2025), https://www.cnn.com/2025/01/16/media/fcc-rosenworcel-petitions-trump-fox/index.html (last visited Feb. 7, 2025).

99.    However, on January 22, 2025, Chairman Carr reinstated the FCC Complaint, accompanied by an official statement that the dismissal was "issued prematurely" and "based on an insufficient investigatory record for the station-specific conduct at issue." *See* Ted Johnson, *New FCC Chair Revives Complaints About CBS And NBC Content That His Predecessor Rejected As "At Odds With The First Amendment*," DEADLINE (Jan. 22, 2025), https://deadline.com/2025/01/fcc-complaints-trump-cbs-nbc-abc-1236263995/ (last visited Feb. 7, 2025).

### *'60 Minutes' becomes '21 Minutes'*

100.    On October 21, 2024, President Trump's counsel demanded via letter that CBS "immediately provide and publicly release the full, unedited transcript of the [Interview]" (**Exhibit B** attached hereto). *See also* Joseph A. Wulfsohn & Brooke Singman, *Trump sends letter to CBS demanding unedited '60 Minutes' Harris transcript, teases potential lawsuit,'* FOX NEWS (Oct. 21, 2024), https://www.foxnews.com/media/trump-sends-letter-cbs-demanding-unedited-60-minutes-harris-transcript-teases-potential-lawsuit) (last visited Feb. 7, 2025).

101.    Instead of doing the right thing and coming clean, Defendants hid behind the predictable and unsubstantiated defense that "the Interview was edited for time with the aim of allowing the public to hear from the Vice President on as many subjects as possible in a 21-minute

interview." (**Exhibit C** attached hereto). Accordingly, CBS's counsel wrote, "we decline" to "provide you with the unedited transcript of the Interview . . . ." *Id.*

102.    President Trump, in reply, sent a second letter (a) reiterating his demand for public release of the full, unedited transcript of the Interview and (b) serving as his pre-suit notice under Tex. Bus. & Comm. Code § 17.505. (**Exhibit D** attached hereto).

103.    In President Trump's first letter to CBS, his counsel made a straightforward and fair demand for CBS to provide the unedited transcript of the Interview. *See* **Exhibit B**. Besides concealing the truth, Defendants lacked any justification to decline such a reasonable demand. Any sensible news organization should have welcomed the opportunity to set the record straight—unless doing so would embarrass and expose that organization, or its preferred candidate.

104.    Defendants' explanation that the Interview was edited for time defied common sense and logic. Inclusion of the complete, real, and unintelligible version of Harris's Reply to Whitaker would have added, at most, mere seconds to the Interview. Moreover, as stated *supra*, the "time" excuse is a red herring—Defendants could have easily posted a transcript or video of the full Interview, or at minimum an accurate version of Harris's Reply, on the *60 Minutes* website, *Paramount+,* or on *YouTube*, all platforms where run time is no concern.

105.    Instead, for months, viewers—including Plaintiffs—were left with the fake Advertised Harris Reply, which was doctored to such an extent that the meaning of the answer was fundamentally altered for commercial purposes. Indeed, this was not a case in which the Manipulated Harris Reply captured the "gist" of the interviewee's response. The tampering here left viewers with two completely different Replies—the Advertised Harris Reply and the Manipulated Harris Reply—which were either fragments of the same reply, a fragment of an answer to an altogether different question, or two different takes.

106.    Furthermore, Defendants' tampering went way beyond the exchange about Prime Minister Netanyahu. This was a full-blown cover-up of an incompetent candidate in Harris, substantially motivated by commercial gain and rabid partisanship.

107.    This is not the first time Defendants used *60 Minutes* as a vehicle to engage in unethical and unlawful behavior for improper commercial gain and sabotage of a Republican Presidential candidate.

108.    Defendants' misconduct here is evocative of the 2004 Dan Rather *60 Minutes* scandal, where Rather presented four forged documents as authentic to impugn President George W. Bush's integrity regarding his service in the Texas Air National Guard from 1972–73. *See* Michael Dobbs & Howard Kurtz, *Expert Cited by CBS Says He Didn't Authenticate Papers*, THE WASHINGTON                    POST                    (Sept.                    14,                    2004), https://www.washingtonpost.com/archive/politics/2004/09/14/expert-cited-by-cbs-says-he-didnt-authenticate-papers/012e601d-b47f-4d4c-974d-599f54963468 (last visited Feb. 7, 2025); Brian Ross and Howard Rosenberg, Document Analysts: *CBS News Ignored Doubts*, ABC NEWS (Sept. 14,  2004),  https://abcnews.go.com/WNT/Investigation/story?id=131423&page=1  (last  visited Feb. 7, 2025); *CBS Ousts 4 over Bush Guard story*, ASSOCIATED PRESS (January 10, 2005), https://www.nbcnews.com/id/wbna6807825 (last visited Feb. 7, 2025).

109.    Defendants recently proved that old habits die hard, frequently indulging in dishonest reporting about President Trump. For example, as reported by Fox News journalist and *Nightcap* anchor Trace Gallagher during a recent panel discussion: "CBS now getting slammed again for airing a thinly sourced [and false] story of Donald Trump disparaging a slain Army Specialist and refusing to pay her funeral expenses. *Family says totally false*." Trace Gallagher, *Nightcap*        Panel        Discussion,        FOX        NEWS        (Oct.        24,        2024),

https://x.com/tracegallagher/status/1849623452245950540 (last visited Feb. 7, 2025) (emphasis

added). One of the panelists on Gallagher's program, White House correspondent Kevin Corke,

replied: "I think in this case, it has to be intentional, Trace." *Id.* Another panelist, correspondent

Christina Coleman, added: "Absolutely. And that's why I agree with Kevin [and] everybody here.

I believe it was intentional. I also believe it's hurtful and disrespectful for the family to politicize

this. And you know, it makes me sad because this is why people lose trust in the media." *Id.*

110.    The bottom line is this: even after the Interview was the subject of an FCC

Complaint, pointed comments by two FCC Commissioners, significant and well-deserved negative

press, and, most importantly, two letters from President Trump, Defendants remained intransigent

in their refusal to release the unedited transcript and footage of the Interview.

### *Defendants Reluctantly Release the Unedited Interview,* ### *Revealing the Full Extent of Their Deception*

111.    Only following the FCC's letter of inquiry to CBS News demanding the "full,

unedited transcript and camera feeds" from the Interview, did Defendants turn over the unedited

materials to the FCC. *See CBS News to comply with FCC demand for "60 Minutes" transcript and*

*video*, *supra*; *60 Minutes publishes transcripts, video requested by FCC*, *supra*. The FCC also

posted the unedited Interview materials. *See* https://www.fcc.gov/sites/default/files/Transcript-

Transcribed-Unedited-Interview-Footage-6-of-14.pdf (last visited Feb. 7, 2025).

112.    As Chairman Carr observed after the belated release of the unedited material,

"CBS's conduct is hard to explain." *See* Joseph A. Wulfson and Brian Flood, *Deceptive editing at*

*'60 Minutes' to favor Harris exposed*, Fox News (Feb. 6, 2025),

https://www.foxnews.com/media/fcc-chair-calls-cbs-news-conduct-hard-explain-following-

release-kamala-harris-interview-transcript (last visited Feb. 7, 2025). Chairman Carr continued,

"[o]n the one hand, CBS immediately released the unredacted transcript of a recent interview with

Vice President Vance. Yet for months they refused to release the one with Vice President Harris." *Id.* (referring to CBS News' releasing the transcript of the *Face the Nation* interview with JD Vance); *see also* Transcript: Vice President JD Vance on "Face the Nation with Margaret Brennan," Jan. 26, 2025 (Jan. 26, 2025), https://www.cbsnews.com/news/jd-vance-transcript-face-the-nation-01-26-2025/ (last visited Feb. 7, 2025).

113.    Defendants' refusal to release the unedited Harris Interview transcript until required to do so by the FCC, in contrast to their voluntary release of the Vance transcript, is further evidence of consciousness of wrongdoing.

114.    Once Defendants finally released the unedited version of the Interview, it became apparent that they had engaged in gross broadcast distortion cover-up and manipulated not only Harris's Reply about Prime Minister Netanyahu, but the Interview in its entirety.

115.    As an initial matter, the unedited transcript revealed that the Advertised Harris Reply and the Manipulated Harris Reply were both part of a single answer mangled beyond recognition by Defendants' tampering:

> <u>Whitaker</u>: We supply Israel with billions of dollars in military aid, and yet Prime Minister Netanyahu seems to be charting his own course. The Biden-Harris administration has pressed him to agree to a ceasefire. He's resisted. You urged him not to go into Lebanon. He went in anyway. Does the U.S. have no sway over Prime Minister Netanyahu?
> <u>Harris</u>: The work that we do diplomatically with the leadership of Israel is an ongoing pursuit around making clear our principles.
> <u>Whitaker</u>: But it seems that Prime Minister Netanyahu is not listening.
> <u>Harris</u>: ***Well, Bill, the work that we have done has resulted in a number of movements in that region by Israel that were very much prompted by, or a result of many things, including our advocacy for what needs to happen in the region.*** *And we're not going to stop doing that.* <u>*We are not going to stop pursuing what is necessary for the United States to be clear about where we stand on the need for this war to end.*</u>

> (Bold portion aired on *Face the Nation* on October 6, 2024, underlined portion aired during Election Special on October 7, 2024, remainder unused).

116.    As revealed elsewhere in the unedited transcript, "Kamala Harris gave a meandering 179-word answer on Israel that '60 Minutes' cut to just 20 words . . . ." *See* Ariel Zliber, Alexandra Steigrad and Josh Kosman, *Uncut '60 Minutes' Kamala Harris interview reveals 'word salad' responses were heavily edited by CBS—snipped Israel answer to just 20 words*, NEW YORK POST (Oct. 11, 2024), https://nypost.com/2025/02/05/media/cbs-releases-unedited-video-of-60-minutes-interview-with-kamala-harris/ (last visited Feb. 7, 2025).

117.    Moreover, Defendants, to cater to their left-wing consumers and the antisemitic Democrat base infected with an abiding hatred of Israel, even cut one of Harris's least controversial answers in which she stated: "And when we think about the threat that Hamas, Hezbollah presents Iran, I think that it is without any question our imperative to do what we can to allow Israel to defend itself against those kind of attacks."

118.    Added Jesse Waters of the exchange about Prime Minister Netanyahu, "[CBS] was caught deceptively editing the answer." *See* Jesse Waters, *CBS chopped Kamala's babbling answer*, FOXNEWS ON YOUTUBE (Feb. 5, 2024), https://www.youtube.com/watch?v=7uKzathNcMY (last visited Feb. 7, 2025).

119.    Defendants' tampering ran the gamut of deception, including multiple instances in which they outright eliminated Harris's most perplexing word salad answers. Perhaps the most bizarre was her incoherent claim of bipartisan support for her campaign: "Listen, if you look at my campaign, I am supported by over 200 former members of Mitt Romney—Romney, John McCain, both President Bush, and even former President Trump's teams." There is no such thing as "members of Mitt Romney," and both Senator John McCain and President George H.W. Bush are deceased and could not possibly have supported Harris's campaign.

120.    In another cut exchange demonstrating Harris's incompetence, Whitaker asked Harris how "the numbers of [border] crossings quadrupled under the first three years of the Biden-Harris Administration." Harris offered the following vacuous reply: "There are a variety of factors that relate to what we have seen globally, and what we are not immune from at our own border in terms of what we have seen in terms of the surge of immigration and irregular migration. And there are solutions at hand, but we've got to have leaders who are solution-oriented, which we've been and are, and I am going forward, instead of leaders who want to make it a problem they can run on."

121.    In yet another cut exchange, Whitaker asked Harris how she would "convince a divided Congress" to support her plans, to which she offered this puzzling reply: "It's going to be taxes. It's going to be literally the economists—I mean, they're—from each, the spectrum."

122.    CBS even *moved* Harris's answer in at least one other instance, further confirming that the Interview was not merely edited, but distorted. Indeed, the unedited transcript reveals that the following exchange actually occurred:

> <u>Whitaker</u>: But the numbers did quadruple under your watch.
> <u>Harris</u>: And the numbers today, because of what we have done, we have cut the flow of illegal immigration by half. We have cut the flow of fentanyl by half.
> <u>Whitaker</u>:  But should you have done that, shouldn't you have done that --
> <u>Harris</u>: But we need Congress to be able to act to actually fix the problem.

123.    In contrast, viewers of the Election Special saw the following exchange with Harris's fentanyl answer *moved*:

> <u>Whitaker</u>: But the numbers did quadruple under your watch.
> <u>Harris</u>: And the numbers today, because of what we have done, we have cut the flow of illegal immigration by half.
> <u>Whitaker</u>:  Should you have done that, should you have done that --
> <u>Harris</u>: We have cut the flow of fentanyl by half. But we need Congress to be able to act to actually fix the problem.

124.    Quite simply, the unedited transcript and video footage confirms that Defendants intentionally deceived the public, including Plaintiffs.

125.    President Trump summarized the deception best, writing on *Truth Social*: "CBS and *60 Minutes* defrauded the public by doing something which has never, to this extent, been seen before. They 100% removed Kamala's horrible election changing answers to questions, and replaced them with completely different, and far better, answers, taken from another part of the interview. This was Election changing 'stuff,' Election Interference and, quite simply, Election Fraud at a level never seen before. CBS should lose its license, and the cheaters at *60 Minutes* should all be thrown out, and this disreputable 'NEWS' show should be immediately terminated. With the new Democrat scandal that just arose with respect to USAID illegally paying large sums of money to Politico and other media outlets, the question must me asked, was CBS paid for committing this FRAUD??? Many other questions to come! This will go down as the biggest Broadcasting SCANDAL in History!!!" *See* President Donald J. Trump, @realDonaldTrump, TRUTH SOCIAL (Feb. 6, 2025), https://truthsocial.com/@realDonaldTrump/posts/113956631326391344 (last visited Feb. 7, 2025).

### *Defendants' Distortive Tampering for Pecuniary Gain is Deceptive Commercial Speech Not Protected by the First Amendment*

126.    "Editing to make something clearer is not nefarious. It's Journalism 101. Editing to distort for political purposes is something else entirely." *See* Robert Knight, *Deceptive editing at '60 Minutes' to favor Harris exposed*, WASHINGTON TIMES (Oct. 11, 2024), https://www.washingtontimes.com/news/2024/oct/11/deceptive-editing-at-60-minutes-to-favor-harris-ex/ (last visited Feb. 7, 2025).

127.    It is beyond dispute that Defendants wanted Harris to win the Election, and indeed political gain for Harris was certainly Defendants' intent behind their tampering with the Interview. But Defendants' primary motivation was commercial and pecuniary gain. By deceptively advertising the Interview in the Preview on *Face the Nation*, but then presenting to competitors and consumers an Interview on *60 Minutes* that contained an entirely different coherent and decisive version of Harris, Defendants were seeking to maximize viewership, ratings, and profits, and to divert viewership away from competitors, including President Trump.

128.    The Preview, made available across Defendants' family of multiple platforms, was commercial speech calculated to attract attention to the Election Special; and the Preview ultimately promoted content that was altogether different than what Defendants advertised.

129.    The manipulated Interview was also commercial speech calculated to drive Defendants' profits and viewership.

130.    "Indeed, the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) (quoting *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 426 (1993)). "[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position on in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995) (quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)).

## CLAIMS FOR RELIEF

### COUNT I

*False Advertising and Unfair Competition under Section 43(a)(1)(B) of the Lanham Act,*
*15 U.S.C. § 1125(a)(1)(B)*
(Plaintiff President Trump v. All Defendants)

131.    Plaintiffs reallege their allegations contained in paragraphs 1 through 130 as if set fully forth herein.

132.    15 U.S.C.§ 1125(a)(1)(B) provides:

    **(a)** CIVIL ACTION

        **(1)** Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origination, false or misleading description of fact, or false or misleading representation of fact, which—

            **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities of his or her or another person's . . . services, or commercial activities,

            shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

133.    Defendants and President Trump are industry participants that seek to create, market, distribute, sell and otherwise commercialize news media content.

134.    President Trump creates and produces digital media content about news, politics, pop culture, and public affairs, some of it for commercial and entertainment purposes, and much of which he disseminates in his personal capacity and through his media brands including *Truth Social*. Defendants operate in the same broadcast and digital media content space, and thus, President Trump and Defendants are commercial and pecuniary competitors for a finite number of consumers and viewership.

135.    The Lanham Act was designed to protect against duplicitous conduct by industry participants (such as Defendants) that results in unfair competition.

136.    Defendants' practices, as described herein, constitute false and misleading advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125 (a)(1)(B).

137.    Defendants have intentionally misled and continue to mislead the public, including their viewers and advertisers, as to the content of their news media programs, including, without limitation, falsely suggesting and implying that the Interview contained certain material even though it did not.

138.    Defendants have violated and continue to violate the Lanham Act by using false and misleading advertising and marketing claims, or impliedly false advertising and marketing claims, that misrepresent the nature, characteristics, and/ or qualities of the Interview and the Election Special, including by advertising the Interview and Election Special as programs including certain statements, when in fact those statements were not part of the Interview or the Election Special more broadly.

139.    Defendants' false advertising of the Interview in the Preview was a materially false representation of the Interview and the Election Special that was likely and intended to—and did in fact—influence decisions of viewers, advertisers, and consumers of news media to watch, view, stream, download, or otherwise engage with the Interview and the Election Special.

140.    Furthermore, Defendants' tampering with the entirety of the Interview presented a materially false version of the Interview and in turn the Election Special that was also intended to—and did in fact—also influence decisions of viewers, advertisers, and consumers of news media to watch, view, stream, download or otherwise engage with the Interview and the Election

Special—and to do so instead of watching, viewing, streaming, downloading, or otherwise engaging with competitor media content, including President Trump's media content.

141.    Defendants' false advertising of the Interview and Election Special, and tampering with the entirety of the Interview, also fueled the misconceptions by their viewers, advertisers, and the American public as to Harris's actual position on hot-button issues, including foreign policy, to gain an unfair competitive advantage over President Trump.

142.    Specifically, Defendants' deceptive mislabeling of the content of the Interview and Election Special, and tampering with the entirety of the Interview and Election Special, relates to inherent and important characteristics that defined the Interview and Election Special.

143.    Defendants' false advertising and mislabeling of the Interview and Election Special, and tampering with the entirety of the Interview, creates a substantial, unfair and undeserved competitive advantage for Defendants in the sale and other commercialization of news media.

144.    Defendants' false descriptions of the qualities and characteristics of the Interview and Election Special enabled Defendants to obscure the true nature of the Interview and Election Special, misleading the American public and driving engagement with the Interview and Election Special due to questions about the authenticity of this programming.

145.    The accuracy of recorded statements made during the Interview was a material quality of the Interview and the Election Special more broadly. Consumers of all political affiliations were drawn to the Interview, and more broadly to the Election Special, on the basis that the Interview was an accurate representation of responses to policy questions given in the heat of campaigning for the 2024 Presidential Election.

146.    Defendants' false advertisement of the Interview and the Election Special during the Preview attempted to give viewers the impression that the content of the Interview, and more broadly the Election Special, was different than its actual content, particularly related to statements made regarding Israel, other foreign policy, immigration, and other hot-button issues.

147.    Defendants then presented a materially false version of the Interview during the Election Special.

148.    Defendants were economically motivated to make false representations about the Interview and the Election Special, and to tamper with the entirety of the Interview, because falsely representing the content of the Interview and the Election Special would induce consumers, including Defendants' viewers, advertisers, donors, and supporters and adversaries of both candidates, to watch the Interview and to Election Special, and to engage with Defendants' media content more generally.

149.    Since leaving office in 2021, President Trump has pursued several business ventures, ranging from social media enterprises to cryptocurrency offerings. Specifically, President Trump owns a significant percentage of TMTG, fluctuations of which significantly impact his on-paper net worth.[3] As an owner of a significant interest in a media enterprise in competition with Defendants, President Trump was damaged by Defendants' false advertising of the Interview and Election Special. As a direct and proximate result of Defendants' misconduct, significant viewership was improperly diverted to Defendants' media platforms, resulting in lower consumer engagement, advertising revenues, and profits by TMTG and President Trump's other media holdings.

---

[3] *See* Breuninger, *supra*.

150.    Upon information and belief, because of Defendants' misconduct described herein, President Trump was harmed as a competitor in the news media industry and suffered actual damages in an amount to be determined upon trial of this action. The damages suffered by President Trump stem in substantial part from consumers' withholding of trade by reduced engagement with content distributed by *Truth Social* and President Trump's other media holdings, and was exacerbated by increased expenses associated with clarifying the true nature of the Interview and its content.

151.    Defendants' deceptive misrepresentation of the Interview and Election Special, and tampering with the entirety of the Interview, is and was a false and misleading commercial advertisement under the Lanham Act.

152.    Defendants' news media has been sold and/or commercialized in interstate commerce and is available nationwide.

153.    President Trump directly competes with Defendants' media services through *Truth Social* and President Trump's other media holdings.

154.    President Trump, both through *Truth Social* and his other media holdings, disseminates media, including news media, that is directly competitive with Defendants' services, in interstate commerce.

155.    Consumers of news media, including Plaintiff Representative Jackson and third parties, were foreseeably and actually misled by Defendants' advertising of the Interview and Election Special, as containing certain statements by Harris, when in fact the Interview did not contain the statements represented to be included by Defendants, and the Interview did not even remotely contain what Harris actually said throughout her conversations with Whitaker.

156.    Because they were misled by Defendants' false advertising and tampering with the entirety of the Interview, viewers withheld attention from President Trump and *Truth Social* by directing their attention to Defendants' media platforms. This increased Defendants' engagement, viewership, and advertising revenue, and decreased the value of President Trump's ownership in TMTG and other media holdings.

157.    Similarly, to counteract the deception caused by Defendants' false advertising of the Interview and Election Special, and tampering with the entirety of the Interview, President Trump was forced to re-direct significant time, money, and effort that he otherwise would have dedicated to pursuing his campaign, as well as various business enterprises, to correcting the public record regarding the content of the Interview and Election Special.

158.    In addition to owning a significant share of a competing media company, President Trump is a direct competitor with Defendants as a media personality and businessman who derives significant commercial benefit from his continued presence in the eyes of the American public. Defendants' material misrepresentation of the nature of the Interview improperly harmed President Trump's competitive position in the digital media and other markets, causing him to suffer damages.

159.    Upon information and belief, had President Trump agreed to sit for an interview to be broadcast and posted online by Defendants, they would have edited and/or distorted the contents of his interview to inaccurately represent the contents of his answers to cause him harm as a competitor, as a businessman, and as a candidate, just as Defendants tampered with the Harris Interview to improve her perception and standing.

160.    Defendants' false description and misrepresentation of the Interview and Election Special constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

161.    As a direct and proximate result of Defendants' wrongful acts, Defendants unfairly secured commercial sales, business relationships, improved reputation, profits, and other commercial benefits.

162.    As a direct and proximate result of Defendants' knowing and willful false and misleading statements, false advertising, and wrongful acts of false and misleading advertising and unfair competition, President Trump has suffered injury in fact and actual damages.

163.    Pursuant to 15 U.S.C. § 1117(a), President Trump's damages should be trebled to (i) punish and deter the flagrant, knowing, and willful misconduct by Defendants, and (ii) account for the intangible benefits that Defendants derived from their misconduct, including the fact that their anticompetitive and illicit behavior gave rise to Defendants' current position in the market as a competitor.

164.    By reason of the foregoing, President Trump is entitled actual damages in an amount reasonably believed to be no less than $10,000,000,000, treble damages, disgorgement of Defendant's profits, the costs of this action, and attorneys' fees pursuant to 15 U.S.C. § 1117(a), as well as all other available remedies as set forth herein.

### COUNT II
*Violation of the DTPA - Tex. Bus. & Comm. Code §§ 17.46(a) and 17.46(b)(2), (3), (5), (9), Actionable Pursuant to Tex. Bus. & Comm. Code §17.50(a)(1)*
(All Plaintiffs v. All Defendants)

165.    Plaintiffs reallege their allegations contained in paragraphs 1 through 164 as if set fully forth herein.

166.    In addition to the Lanham Act, this action is also brought pursuant to the DTPA and its relevant provisions, Tex. Bus. & Comm. Code §§ 17.44, 17.46(a), 17.46(b), 17.50(a)(1), and 17.50(b).

167.    Pursuant to Tex. Bus. & Comm. Code § 17.44, the DTPA "shall be *liberally construed* and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty."  (Emphasis added). Indeed, "the legislative intent in enacting the DTPA was to provide plaintiffs a remedy where the common law fails." *Latham v. Castillo*, 972 S.W.2d 66, 69 (1998). "The DTPA is a consumer protection statute, and according to the Legislature, is to be construed liberally to promote its central purpose." *Miller v. Keyser*, 90 S.W.3d 712 (2002).

168.    Tex. Bus. & Comm. Code § 17.46(a) provides: "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful . . . ."

169.    Tex. Bus. & Comm. Code § 17.46(b) provides, in pertinent part, that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to," the following acts: "(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services"; "(3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification, by another"; "(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not"; and "(9) advertising goods or services with intent not to sell them as advertised."

170.    Pursuant to Tex. Bus. & Comm. Code § 17.45(2), "services" are "work, labor or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." "Services" may include intangible services. *See, e.g.*, *First Fed. Sav. & Loan Ass'n v. Ritenour*, 704 S.W.2d 895, 897 (Tex. App.—Corpus Christi-Edinburg 1986). Defendants' broadcasts are "services" within the meaning of the DTPA.

171.    Tex. Bus. & Comm. Code § 17.50(a)(1) provides: "A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and (B) relied on by a consumer to the consumer's detriment . . . . [or] (3) any unconscionable action or course of action by any person . . . . "

172.    In a suit filed under Tex. Bus. & Comm. Code § 17.50(a)(1), "each consumer who prevails may obtain [*inter alia*]: (b)(1) the amount of economic damages found by the trier of fact . . . (b)(2) an order enjoining such acts or failure to act . . . [and] (d) "court costs and reasonable and necessary attorneys' fees." *See* Tex. Bus. & Comm. Code § 17.50(b).

173.    President Trump is a "consumer" under the DTPA since he is an individual who purchased or otherwise acquired Defendants' broadcast and digital media content services, directly or indirectly.

174.    President Trump's acquisition of Defendants' broadcast and digital media services had multiple important objectives, including the ability to view CBS News programs such as *60 Minutes* and *Face the Nation*, as well as other content produced by Defendants and their affiliates. Another important objective of President Trump's acquisition of Defendants' broadcast and digital media content services was viewing accurate and truthful news content. By relying on Defendants' false and misleading advertisements and deceptively edited content, President Trump was harmed.

175.    Representative Jackson is a "consumer" under the DTPA since he is an individual who purchased or otherwise acquired Defendants' broadcast and digital media content services, directly or indirectly, in Texas. As a Texas resident himself, and as the Member of Congress

representing Amarillo and the Texas Panhandle, Representative Jackson experienced that harm within Texas and within the Northern District of Texas.

176.     Representative Jackson's acquisition of Defendants' broadcast and digital media services in Texas had multiple important objectives, including the ability to view CBS News programs such as *60 Minutes* and *Face the Nation*, as well as other content produced by Defendants and their affiliates. Another important objective of Representative Jackson's acquisition of Defendants' broadcast and digital media content services was viewing accurate and truthful news content. By relying on Defendants' false and misleading advertisements and deceptively edited content, Representative Jackson was harmed.

177.     CBS, as a provider of broadcast and digital media content services, and Paramount, as the parent that directs CBS and as a provider of broadcast and digital media content services, are subject to liability under the DTPA, which explicitly uses the term "broadcast station" and does not exempt broadcast stations or broadcast-related conduct from the extensive sweep of the DTPA. "Exemptions," contained in Tex. Bus. & Comm. Code § 17.49(a), apply to:

> the owner or employees of a regularly published newspaper, magazine, or telephone directory, or *broadcast station*, or billboard, wherein any advertisement in violation of this subchapter is published or disseminated, unless it is established that the owner or employee of the advertising medium have knowledge of the false, deceptive, or misleading acts or practices declared to be unlawful by this subchapter, or had direct or substantial financial interest in the sale or distribution of the unlawfully advertised good or service.

> (Emphasis added).

178.     By explicitly including "broadcast stations" in the DTPA but not exempting them from liability, the Texas Legislature indicated its intent that broadcast stations and other media content providers be subject to liability and that their broadcast services be included within the scope of the term "services." The explicit placement of broadcast stations within the statutory

structure means that broadcasting and advertising are "services" within the meaning of the DTPA. Indeed, the existence of this exemption only makes sense if broadcasting is a service. Furthermore, the exemption section only applies to broadcast stations with respect to advertising, and even there, no exemption applies where the defendant has knowledge or a financial interest. Defendants had both knowledge of and a financial interest in misleading Texans and others to drive viewership of the Interview: the subject advertisements, broadcasts, and postings were Defendants' own programming, and their deceptive conduct inured directly to their financial benefit.

179.    As the Supreme Court of Texas has observed:

> As we stated in *Cameron v. Terrell & Garrett, Inc*., if the Legislature had intended to place such a restriction on the class of persons who could be sued under the Act for deceptive trade practices, it could easily have done so by simply drafting the restriction into the definition of consumer or some other provision of the Act.

*Keyser*, 90 S.W.3d at 719 (citing *Cameron v. Terrell & Garrett, Inc*., 618 S.W.2d 535, 540 (1981).

180.    However:

> *The Legislature did not do so, and we presume the Legislature did not perform a needless act* by enacting Section 17.49. The Legislature created a limited exemption for advertising media employees, and it drafted the statute to allow a consumer to bring suit against "any person" who causes the consumer's harm. Thus, as the statute is written, "any person" who makes a representation is liable under the Act if that representation is false, misleading, or deceptive. Any other reading of the DTPA renders Section 17.49's language useless.

*Miller*, 90 S.W.3d at 719 (citing *Hunter v. Fort Worth Capital Corp*., 620 S.W.2d 547, 551 (Tex. 1981); *Cameron*, 618 S.W.2d at 540) (emphasis added).

181.    As made clear by the Supreme Court of Texas, any exemptions that do not appear on the face of the DTPA do not exist.

182.    *Miller* is not the only instance in which the Supreme Court of Texas has reached this conclusion. In fact, in *Cameron*, the Court outright stated that media defendants are liable under the DTPA.

> These media defendants, of course, *do not furnish the goods or services* that they advertise for third parties. Consequently, if the Act already excluded defendants who do not furnish the goods or services, as argued by *Terrell & Garrett*, there would have been no need for the legislature to exempt media defendants from liability or to have provided that *media defendants could be sued in the two situations mentioned above. The legislature is never presumed to have done a useless act.*

*Cameron*, 618 S.W.2d at 540 (citing *Red River Bank v. Ferguson*, 109 Tex. 287 (1918); *Brown v. Memorial Villages Water Authority*, 361 S.W.2d 453 (Tex. Civ. App. Houston 1962)) (emphasis added).

183.    But the facts of this case are even less favorable to the media defendants than those in *Cameron*. Here, the services that the Defendants are furnishing were *their own programs*. Both the Advertised Harris Reply and the Manipulated Harris Reply were offered not on behalf of an uninvolved third party, but on behalf of Defendants themselves. Similarly, the remainder of the Interview, which was a materially false version of what Harris actually said, was offered on behalf of Defendants as well. By driving viewership to the Election Special across multiple platforms through use of deception, Defendants were not merely passing along the unvetted message of a third-party advertiser; Defendants were misleading consumers to increase ratings and line their own pockets.

184.    Defendants also drove profits and viewership by misleading consumers with numerous other tampered answers throughout the Interview, as set forth in this Amended Complaint, and on multiple topics including foreign policy, immigration, and the economy.

185.    Using this rationale adopted by the Supreme Court of Texas, Paramount and CBS are liable under the DTPA because the Legislature *chose* to mention "broadcast stations" in Section 17.49 and yet also *chose* not to exempt broadcast stations except for "innocent misrepresentations."

186.    Moreover, in any event, Defendants' dissemination of the Preview and the Interview, and more broadly the Election Special, were not limited to broadcasts; Defendants also

disseminated the Preview and the Interview, and the Election Special, across their non-broadcast digital platforms, which are also covered under the DTPA as services, including services acquired through subscriptions and otherwise.

187.    Here, Defendants engaged in multiple false, misleading, and deceptive commercial acts directed at Plaintiffs and other consumers, including but not limited to (a) broadcasting and posting online the Advertised Harris Reply to promote the Election Special but then using the Manipulated Harris Reply during the Election Special, confusing Plaintiffs and other consumers; (b) posting the Interview and transcript with the Manipulated Harris Reply on the *60 Minutes* website and elsewhere, further confusing Plaintiffs and other consumers; (c) tampering with the entirety of the Interview and then broadcasting and posting this materially deceptive content across multiple media platforms as part of the Election Special; and (d) doubling down and refusing to release an accurate transcript of the Interview until required to do so by the FCC, ensuring that the deception continued long enough to cause substantial harm to Plaintiffs and other consumers.

188.    Defendants and their *Face the Nation* and *60 Minutes* producers intentionally misled their competitors and consumers by broadcasting and posting online a carefully doctored Interview and transcript after advertising something altogether different. Such manipulation occurred to make Harris appear coherent and decisive, and in the process, to increase viewership and profitability of the Election Special.

189.    Broadcast and digital media content producers such as Defendants are responsible for advertising and presenting their programming services in a non-deceptive manner, not distorting an interview to try and falsely make their preferred candidate appear coherent and decisive for commercial gain. Due to Defendants' actions, the public could not distinguish which

Harris they saw in the Interview: the candidate or the actual puppet of behind-the-scenes manipulation.

190.    As described above, Defendants directly and indirectly own and affiliate with multiple broadcast stations throughout Texas and within the Northern District of Texas, including KTVT, KTXA, KFDA, and many others.

191.    Because the FCC licenses CBS-owned and operated stations in Texas, the FCC requires those stations to broadcast the news in an honest and transparent manner. As the FCC has stated, "rigging or slanting the news is a most heinous act against the public interest." *See* https://www.fcc.gov/media/radio/public-and-broadcasting#DISTORT (last visited Feb. 7, 2025). Defendants failed in their duty to provide honest services by engaging in false, misleading, deceptive, and, therefore, unconscionable and detrimental news distortion for commercial and pecuniary gain.

192.    Defendants misled Plaintiffs and millions of other consumers in Texas and this District by violating the news distortion policy contained in 47 U.S.C. § 309(a). "[T]o violate the news distortion policy, the distortion must be about a significant matter and not merely something trivial or incidental." *See* FCC Complaint at 4 (quoting Lili Levi, *Reporting the Official Truth: The revival of the FCC's news distortion policy*, 78 Wash. U.L. Q. 1005, 1023 (2000)).

193.    Here, Whitaker's exchange with Harris about Prime Minister Netanyahu was of the utmost public significance—U.S. foreign policy on the matter of the Israel/Gaza war—at a time of immense importance, mere weeks before the most critical presidential election in American history. Whitaker's question was even more significant because Harris had mostly consistently avoided interviews and other media opportunities that require her to speak without prepared lines.

But Defendants instead manipulated the exchange between the two for commercial and pecuniary gain.

194.    Moreover, Whitaker's other exchanges with Harris on multiple other topics set forth in this Amended Complaint were also of utmost public significance, including on foreign policy, immigration, and the economy.

195.    Defendants further misled and deceived Plaintiffs and millions of people in Texas and this District—and violated the broadcast distortion policy—because the source of the Manipulated Harris Reply and the other tampered Harris replies throughout the Interview were not, in fact, Harris, but Defendants tampering with the Interview to confuse viewers as to what she said. The distorted broadcast created confusion because that was Defendants' intent: to increase profits and viewership, harm media competitors and consumers, and aid Harris by doing whatever it took to portray Harris as intelligent, well-informed, and confident.

196.    Where, as here, Defendants and their employees know the false, deceptive, or misleading acts or practices, liability attaches. Here, Defendants and the producers of *Face the Nation* and *60 Minutes* knew they were doctoring the Interview and its transcript to make Harris look better for Defendants' commercial and pecuniary benefit.

197.    Put simply, Defendants' distortive misconduct here gives rise to liability under the DTPA in at least five respects: (a) Defendants' misconduct "caus[ed] confusion or misunderstanding" to Plaintiffs and tens of millions of other American consumers, and in Texas, "as to the source, sponsorship, approval, or certification of" Defendants' broadcast services, rendering it impossible for even the most discerning viewers to determine what Harris really said and why her two Replies were so different, and why her true answers to many other questions were deleted or manipulated; (b) Defendants' misconduct "caus[ed] confusion or misunderstanding as

to" Defendants' "affiliation, connection, or association with" Harris and her Campaign and caused "confusion or misunderstanding" as to the Interview's "certification by" Defendants given their legal obligation to broadcast news in a non-distortive manner; (c) Defendants' misconduct "represented that their services had . . . characteristics . . . which they do not have," specifically broadcasting and otherwise disseminating an Interview that had no resemblance to what Harris really told Whitaker and no resemblance to Harris's actual qualities as a candidate and as a person; (d) Defendants "advertis[ed] . . . services with intent not to sell them as advertised," presenting an Interview with a version of Harris that doesn't really exist; and (e) Defendants' misconduct was unconscionable because it amounts to a brazen attempt to interfere in the 2024 U.S. Presidential Election through broadcast distortion for commercial and pecuniary gain.

198.    President Trump and Representative Jackson both acquired and viewed the Preview, the Interview, and the Election Special; both President Trump and Representative Jackson were deceived and confused by the Preview, the Interview, and the Election Special; and Representative Jackson acquired and viewed, and was deceived and confused by the Preview, the Interview, and the Election Special, in Texas and in this District.

199.    Because of Defendants' false, misleading, and deceptive conduct, President Trump has sustained damages in an amount reasonably believed to be at least $10,000,000,000,[4] that will be determined upon trial of this action. Not only did Defendants' deceptive conduct harm President Trump's business interests, it required diversion of President Trump's attention and resources while campaigning.

---

[4] CBS's distortion of the *60 Minutes* Interview damaged President Trump's fundraising and support values by several billions of dollars, including in Texas.

200.    Additionally, Representative Jackson has sustained substantial damages in an amount to be determined upon trial of this action.

201.    Additionally, pursuant to DTPA § 17.50(b)(2), Plaintiffs are entitled to an order enjoining Defendants from continuing to post the deceptively tampered Interview on their *60 Minutes* website and elsewhere across all of their digital and other platforms; enjoining Defendants from continuing to post other, related deceptively tampered content across their digital and other platforms that harms consumers, including Plaintiffs; and requiring Defendants to take all necessary corrective action to remedy their deception.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial as to all issues so triable.

**WHEREFORE**, Plaintiffs PRESIDENT DONALD J. TRUMP and REPRESENTATIVE RONNY JACKSON demand judgment against Defendants PARAMOUNT GLOBAL d/b/a PARAMOUNT, CBS BROADCASTING INC., and CBS INTERACTIVE INC., as follows:

(a) On Count One, pursuant to 15 U.S.C. § 1117(a), and all other relevant law, Defendants' profits arising out of the Preview, the Interview, and the Election Special, damages sustained by President Trump in an amount no less than $10,000,000,000, and the attorneys' fees and costs of this action, including pre-judgment and post-judgment interest thereon;

(b) On Count Two, compensatory damages in an amount to be determined upon the trial of this action, but reasonably believed to be no less than $10,000,000,000.00;

(c) On Count Two, an order enjoining Defendants' ongoing false, misleading, and deceptive acts, and the remedying of such acts by corrective action undertaken by Defendants;

(d) On Count Two, the attorneys' fees and costs of this action;

(e) Punitive damages as authorized by law; and

(f) Such other relief as the Court deems just and proper.

Date: February 7, 2025                                   Respectfully submitted,

                                                        EDWARD ANDREW PALTZIK
                                                        Texas Bar No. 24140402
                                                        Bochner PLLC
                                                        1040 Avenue of the Americas
                                                        15th Floor
                                                        New York, NY 10018
                                                        (516) 526-0341
                                                        edward@bochner.law

                                                        *Edward Paltzik*

                                                        Edward Andrew Paltzik

                                                        DANIEL Z. EPSTEIN
                                                        Texas Bar No. 24110713
                                                        1455 Pennsylvania Avenue NW
                                                        Suite 400
                                                        Washington, DC 20004
                                                        (202) 240-2398
                                                        dan@epsteinco.co

                                                        Daniel Z. Epstein
                                                        (*pro hac vice*)

CHRIS D. PARKER
Texas Bar No. 15479100
Farris Parker & Hubbard
A Professional Corporation
P. O. Box 9620
Amarillo, TX 79105-9620
(806) 374-5317 (T)
(806) 372-2107 (F)
cparker@pf-lawfirm.com

Chris D. Parker

*Counsel for President Donald J. Trump and
Representative Ronny Jackson*