**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, and REPRESENTATIVE RONNY JACKSON, an individual, <br><br>                 Plaintiffs, <br><br>     v. <br><br> PARAMOUNT GLOBAL d/b/a PARAMOUNT, a Delaware corporation, CBS BROADCASTING INC., a New York corporation, and CBS INTERACTIVE INC., a Delaware corporation, <br><br>                 Defendants. | Case No. 2:24-cv-00236-Z |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR LACK OF
SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ........................................................................................ 3

    I.     The Parties .................................................................................. 3

    II.    The Interview .............................................................................. 3

    III.   The Amended Complaint ............................................................ 5

ARGUMENT ............................................................................................. 7

    I.     The Lanham Act And The DTPA Do Not—And Could Not, Consistent With The First Amendment—Apply To Editorial Speech Like The Broadcasts At Issue ..... 7

          A.    Editorial Speech About Public Officials During An Election Enjoys Maximum First Amendment Protection ....................................... 7

          B.    Consistent With The First Amendment, The Lanham Act And The DTPA Extend Only To Commercial Speech ...................................... 10

          C.    The FTN And 60 Minutes Broadcasts Are Indisputably Editorial, Not Commercial, Speech ...................................................... 12

    II.    Plaintiffs Fail To Plead Article III Standing ........................................... 14

    III.   President Trump Fails To Plead A Lanham Act Claim ....................... 18

    IV.   Plaintiffs Fail To Plead A DTPA Claim ............................................. 21

CONCLUSION .......................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)................................................................................................13

*Amstadt v. U.S. Brass Corp.*,
    919 S.W.2d 644 (Tex. 1996).............................................................................21, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................15

*Associated Press v. All Headline News Corp.*,
    608 F. Supp. 2d 454 (S.D.N.Y. 2009)....................................................................20

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ..................................................................................13

*Bosch v. Tessa Complete Health Care, Inc*,
    2004 WL 1278225 (S.D. Tex. Apr. 5, 2004) ..........................................................18

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    447 F.3d 411 (5th Cir. 2006) ...................................................................................7

*Cameron v. Terrell & Garrett, Inc.*,
    618 S.W.2d 535 (Tex. 1981)...................................................................................21

*Citizens United v. FEC*,
    558 U.S. 310 (2010)........................................................................................8, 9, 10

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993)................................................................................................13

*Columbia Broad. Sys., Inc. v. DNC*,
    412 U.S. 94 (1973)....................................................................................................8

*CrewFacilities.com, LLC v. Humano, LLC*,
    2024 WL 993898 (W.D. Tex. Mar. 7, 2024) ........................................................24

*Cruz v. Andrews Restoration, Inc.*,
    364 S.W.3d 817 (Tex. 2012)...................................................................................25

*Cushman v. GC Servs., L.P.*,
    397 F. App'x 24 (5th Cir. 2010) (per curiam) .......................................................22

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996)..................................................................................................8

*Doe v. Boys Clubs of Greater Dall., Inc.*,
   907 S.W.2d 472 (Tex. 1995)......................................................................................23

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002)........................................................................................10

*FDA v. All. For Hippocratic Med.*,
   602 U.S. 367 (2024)...................................................................................15, 16, 18

*FEC v. Cruz*,
   596 U.S. 289 (2022)...................................................................................................17

*FTC v. POM Wonderful*,
   155 F.T.C. 1, 2013 WL 8364895 (2013), *aff'd*, 777 F.3d 478 (D.C. Cir. 2015) ...................12

*FTC v. R.J. Reynolds*,
   1988 WL 490114 (1988).............................................................................................12

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
   859 F. Supp. 1521 (S.D.N.Y. 1994)..........................................................................11

*Grubbs v. Sheakley Grp., Inc.*,
   807 F.3d 785 (6th Cir. 2015) ....................................................................................10

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
   700 F. App'x 251 (4th Cir. 2017) .............................................................................10

*Hines v. Hash*,
   843 S.W.2d 464 (Tex. 1992)........................................................................................6

*Hollingsworth v. Perry*,
   570 U.S. 693 (2013)............................................................................................15, 16

*Hotze v. Hudspeth*,
   16 F.4th 1121 (5th Cir. 2021) ...................................................................................16

*Hunt v. City of Diboll*,
   574 S.W.3d 406 (Tex. App.—Tyler 2017, pet. denied)............................................22

*Hurd v. BAC Home Loans Servicing, LP*,
   880 F. Supp. 2d 747 (N.D. Tex. 2012) (Lynn, J.).....................................................22

*Hustler Mag., Inc. v. Falwell*,
   485 U.S. 46 (1988).......................................................................................................8

*I Love Omni, LLC v. Omnitrition Int'l, Inc.*,
   2017 WL 3086035 (N.D. Tex. July 20, 2017) (Fish, J.)............................................21

*IQ Prods. Co. v. Pennzoil Prods. Co.*,
   305 F.3d 368 (5th Cir. 2002) ........................................................................20

*Kersh v. UnitedHealthcare Ins. Co.*,
   946 F. Supp. 2d 621 (W.D. Tex. 2013)...........................................................24

*Kraft, Inc. v. FTC*,
   970 F.2d 311 (7th Cir. 1992) ........................................................................12

*Kumar v. Panera Bread Co.*,
   2024 WL 1216562 (5th Cir. Mar. 21, 2024) (per curiam) ....................................21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014).....................................................................................21

*In re Lipsky*,
   460 S.W.3d 579 (Tex. 2015)..........................................................................10

*Little v. KMPG LLP*,
   575 F.3d 533 (5th Cir. 2009) ........................................................................17

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001)......................................................................................13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)......................................................................................15

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991)........................................................................................9

*McClung v. Wal-Mart*,
   866 F. Supp. 306 (N.D. Tex. 1994) (Belew, J.) ...............................................24

*Mia. Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974)................................................................................1, 7, 8

*Mid-Cities Bone & Joint Surgeons, P.A. v. GE Healthcare Diagnostic Imaging*,
   2008 WL 11429502 (N.D. Tex. Sept. 22, 2008) (Means, J.)...............................24

*Miss. Gay All. v. Goudelock*,
   536 F.2d 1073 (5th Cir. 1976) .........................................................................7

*Mother & Unborn Baby Care of N. Tex., Inc. v. State*,
   749 S.W.2d 533 (Tex. App.—Fort Worth (Mar. 30, 1988, *writ denied*).................11

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943)......................................................................................14

*Murthy v. Missouri,*
603 U.S. 43 (2024) ................................................................................................17

*N.Y. Times Co. v. Sullivan,*
376 U.S. 254 (1964) ........................................................................................8, 14

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.,*
45 F.4th 816 (5th Cir. 2022) ...............................................................................16

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
413 U.S. 376 (1973) .............................................................................................14

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,*
227 F.3d 489 (5th Cir. 2000) .........................................................................19, 20

*Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,*
332 F.3d 6 (1st Cir. 2003) ....................................................................................10

*Radiance Found., Inc. v. NAACP,*
786 F.3d 316 (4th Cir. 2015) ...............................................................................11

*Rehak Creative Servs., Inc v. Witt,*
404 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) .................10

*Riley v. Nat'l Fed'n of Blind,*
487 U.S. 781 (1988) .............................................................................................13

*Seven-Up Co. v. Coca-Cola Co.,*
86 F.3d 1379 (5th Cir. 1996) .........................................................2, 10, 18, 19

*Shemwell v. City of McKinney,*
63 F.4th 480 (5th Cir. 2023) ...............................................................................16

*Snyder v. Phelps,*
562 U.S. 443 (2011) ...............................................................................................7

*Taquino v. Teledyne Monarch Rubber,*
893 F.2d 1488 (5th Cir. 1990) ............................................................................20

*Tatum v. Dall. Morning News, Inc.,*
493 S.W.3d 646 (Tex. App.—Dallas Dec. 30, 2015), *overruled on other grounds*, 554
S.W.3d 614 (Tex. 2018)........................................................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
551 U.S. 308 (2007)................................................................................................4

*TikTok Inc. v. Garland,*
604 U.S. ---, 145 S. Ct. 57 (2025)........................................................................8

*Twitter, Inc. v. Paxton*,
    No. 21-15869 (9th Cir. 2021), ECF No. 33 ........................................................12

*United States v. Texas*,
    599 U.S. 670 (2023) ..............................................................................................15

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ..............................................................................................13

*Washburn v. Sterling McCall Ford*,
    521 S.W.3d 871 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ........................25

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................................................7

*Wingate v. Hajdik*,
    795 S.W.2d 717 (Tex. 1990) ................................................................................18

*Wood v. Georgia*,
    370 U.S. 375 (1962) ................................................................................................1

*In re XTO Energy Inc.*,
    471 S.W.3d 126 (Tex. App.—Dallas 2015, no pet.) ............................................18

*Yumilicious Franchise L.L.C. v. Barrie*,
    2015 WL 1822877 (N.D. Tex. Apr. 22, 2015) (Lindsay, J.) ................................24

**Statutes**

Federal Trade Commission Act § 5(a)(1) ....................................................................12

Lanham Act ...................................................................................................... *passim*

Texas Business and Commerce Code § 17.44 ............................................................11

Texas Business and Commerce Code § 17.45 ......................................................11, 25

Texas Business and Commerce Code § 17.46 ...................................................... *passim*

Texas Business and Commerce Code § 17.50 ......................................................24, 25

Texas Business and Commerce Code § 17.505 ............................................................6

**Rules**

Federal Rule of Civil Procedure 9 ..............................................................................21

Federal Rule of Civil Procedure 12 ..............................................................................1

**Constitutional Provisions**

First Amendment ................................................................................................................ *passim*

**Other Authorities**

Legislative History of S.B. 75, at 83, https://lrl.texas.gov/scanned/DTPA/SB75_63R.pdf ..........12

Defendants Paramount Global ("Paramount"), CBS Broadcasting Inc. ("CBS"), and CBS Interactive Inc. ("CBS Interactive") (collectively, "Defendants") respectfully submit this motion to dismiss Plaintiffs' Amended Complaint pursuant to FRCP 12(b)(1) and (b)(6).

## PRELIMINARY STATEMENT

This lawsuit is an affront to the First Amendment and is without basis in law or fact. Plaintiffs President Donald J. Trump and Representative Ronny Jackson, public officials at the highest ranks of our government, seek to punish a news organization for constitutionally protected editorial judgments they do not like. They not only ask for $20 billion in damages but also seek an order directing how a news organization may exercise its editorial judgment in the future. The First Amendment stands resolutely against these demands. "The choice of material to go into a [broadcast] . . . constitute[s] the exercise of editorial control and judgment," and punishing such choices is wholly inconsistent with "the First Amendment guarantees of a free press as they evolved to this time." *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). In our system, the remedy for disagreement with political speech one does not like is counter-speech—not court-enforced damages under the guise of commercial regulations. *See Wood v. Georgia*, 370 U.S. 375, 389 (1962).

For more than half a century, *60 Minutes*, "America's No. 1 news program," has interviewed the major party candidates in the run-up to a presidential election. Vice President Kamala Harris accepted *60 Minutes'* invitation to be interviewed last year, and excerpts of her interview (the "Interview") aired on CBS News' *Face the Nation* (the "FTN Broadcast") on October 6, 2024, and during a special *60 Minutes* election episode on October 7, 2024 (the "60 Minutes Broadcast"). President Trump declined to be interviewed and instead brought this action, now nominally joined by Rep. Jackson, accusing Defendants of "deceptively doctor[ing]"

Harris' answer to a single question related to U.S. foreign policy on the Israel/Gaza war—an issue they recognize was of "urgent public interest." CBS' editing was not deceptive: the answers that aired on each news show were simply excerpts of a single answer Vice President Harris gave to a single question, and taken together, viewers heard virtually all of Harris' answer.

Disagreeing with CBS' editing, Plaintiffs assert claims under the Lanham Act and Texas' Deceptive Trade Practices Act ("DTPA"), which were designed to regulate commercial business practices, not to police editorial decisions made by news organizations. That is why these statutes have uniformly been interpreted to extend *only* to commercial speech and not "in any way to limit political speech, consumer or editorial comment . . . or other constitutionally protected material." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n.6 (5th Cir. 1996). Neither the DTPA, nor the Lanham Act, nor the First Amendment itself permit Plaintiffs' challenge to Defendants' editorial decision-making.

Underscoring this point, Plaintiffs have not and cannot plead the most basic elements of their claims. With respect to the Lanham Act claim (brought on behalf of President Trump alone), President Trump fails to plausibly allege even the foundation of the claim: that CBS' news programming is "commercial advertising or promotion." And with respect to the DTPA claim, Plaintiffs not only fail to allege any actual purchase or transaction involving Defendants' services, but also fail to explain how they made any such commercial transaction detrimentally relying on the "false" depiction of the Vice President.

But that is not all. Plaintiffs also lack standing—and this Court therefore lacks subject-matter jurisdiction—because they have not alleged any cognizable injury. Rep. Jackson does not attempt to allege any harm from the broadcasts. And President Trump's theories of harm to *Truth Social* with respect to the Lanham Act claim, and to his presidential campaign with respect to the

DTPA claim, both fail for several reasons, including that neither represents harm to him personally, *Truth Social*'s share price allegedly "skyrocketed nearly 75%" in the same month the FTN and 60 Minutes Broadcasts aired, and the election has mooted the need for relief for any ostensible injury to his campaign.

For all these reasons, Plaintiffs' claims should be dismissed with prejudice.

## BACKGROUND

### I.   The Parties

Defendant Paramount is the parent company of Defendants CBS and CBS Interactive. ECF No. 36 ¶ 25. CBS operates CBS News, whose "flagship news show" is *60 Minutes. Id.* ¶¶ 4 n.1, 65. Together, Defendants are a "media organization with global reach that creates, produces, and disseminates broadcast and digital media content" nationwide about "news," "politics," and "public affairs." *Id.* ¶¶ 32, 152.

President Trump is a citizen of Florida and "the 47th President of the United States." *Id.* ¶ 23. In October 2024, when the broadcasts at issue aired, President Trump was the Republican nominee for president. Representative Ronny Jackson is a citizen of Texas and a member of the U.S. House of Representatives. *Id.* ¶ 24.

### II.  The Interview

In the lead up to the 2024 presidential election, consistent with its practice for more than half a century, *60 Minutes* prepared to interview the presidential candidates for both major parties. *See* Declaration of Bill Owens ("Owens Decl.") ¶ 5 & ECF No. 25-1, Ex. C at 9:48-10:08.[1] Although President Trump originally agreed to be interviewed, he ultimately withdrew. Owens Decl. ¶ 6 & ECF No. 25-1, Ex. C at 10:02-11:42. Vice President Harris accepted *60*

---

[1] On a motion to dismiss, courts "must consider . . . documents incorporated into the complaint by reference," such as the two broadcasts at issue herein and the full transcript of the Interview.

*Minutes'* invitation, and veteran CBS News journalist Bill Whitaker interviewed her on the campaign trail in Ripon, Wisconsin and at her residence in Washington, D.C. Owens Decl. ¶ 7 & ECF No. 25-1, Ex. C at 12:22-12:31. The Interview aired on a special broadcast of *60 Minutes* on October 7, 2024. *Id.* ¶ 10.

*60 Minutes* provided an excerpt from the Interview to its sister news program, *Face the Nation.* ECF No. 36 ¶ 72; Owens Decl. ¶ 11. On October 6, 2024, Margaret Brennan, the host of *Face the Nation*, opened the broadcast by reporting on ongoing airstrikes from Israel into Gaza and Southern Beirut, and observing that the "question of just how effective U.S. leadership has been and potentially would be in a new administration when it comes to Israel is one raised frequently on the campaign trail." ECF No. 25-1, Ex. A at 2:58-3:09. She then introduced a brief clip from the "special election edition of *60 Minutes*" with Bill Whitaker, who "sat down with Vice President Harris and asked her about U.S. influence with Israeli Prime Minister Benjamin Netanyahu." ECF No. 36 ¶ 6. The excerpt lasted about two-and-a-half minutes. *See* ECF No. 25-1, Ex. A at 3:22-5:44. In response to Whitaker's question about whether the United States has "sway" over Prime Minister Netanyahu, Harris provided a lengthy answer that lasted approximately one minute. Whitaker then challenged the Vice President, remarking, "But it seems that Prime Minister Netanyahu is not listening." In the FTN Broadcast, Harris is shown answering: "Well, Bill, the work that we have done has resulted in a number of movements in that region by Israel that were very much prompted by or a result of many things, including our advocacy for what needs to happen in the region." *Id.* at 5:04-5:25; *see* ECF No. 36 ¶ 72.

The following day, on October 7, 2024, CBS aired a special edition of *60 Minutes* that included approximately 15 minutes from Whitaker's interview with Vice President Harris (interspersed with excerpts from Whitaker's interview with Harris' running-mate, Governor Tim

---

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Walz, and other footage). *See* ECF No. 25-1, Ex. C at 12:44-27:09 & 34:25-35:20. At all times, the CBS Eyemark logo appeared on screen. *See id.* The 60 Minutes Broadcast covered a range of topics, including the war in Ukraine, immigration, how Harris planned to pay for her suggested child tax credit, and her changing positions on fracking. *See id.* With respect to the administration's relationship with Prime Minister Netanyahu, it included excerpts of the same questions previously aired on *Face the Nation*, but with shorter responses from Harris. *See* ECF No. 36 ¶ 115. In response to Whitaker's observation that "it seems that Prime Minister Netanyahu is not listening," rather than use the first line of Harris' answer broadcast the day before, *60 Minutes* used the concluding sentence given by Harris, in which she states, "We are not gonna stop pursuing what is necessary for the United States to be clear about where we stand on the need for this war to end." *Id.*

Defendants have now disclosed the unedited transcript publicly. *Id.* ¶ 111. As Defendants repeatedly explained, *see id.* ¶ 80 (referencing CBS' October 20, 2024 statement), as the unedited transcript proves, and as Plaintiffs now concede, CBS did not manufacture an answer or substitute in the answer to a different question, but simply aired different "part[s] of *a single* answer" to a *single* question on *Face the Nation* and *60 Minutes*. *Id.* ¶ 115 (emphasis added).

## III.   The Amended Complaint

Prior to filing this action, President Trump first accused Defendants of "deceptively 'doctoring'" the Interview in an October 7, 2024 *Truth Social* post. ECF No. 36 ¶ 78. This was followed by an exchange of letters between counsel for President Trump and CBS News concerning the Interview. In a letter dated October 29, 2024, President Trump invoked the DTPA for the first time. ECF No. 36-4. Without waiting the requisite 60 days before filing suit as required under the DTPA or even awaiting Defendants' response, President Trump commenced this action two days later, on October 31, 2024. *See* ECF No. 1. On November 5, 2024, President

Trump won the presidential election. On February 7, 2025, President Trump amended his complaint, adding Rep. Jackson as a party and a Lanham Act claim.[2] *See generally* ECF No. 36.

In their Amended Complaint, rather than identify allegedly misleading or deceitful conduct in commerce under the Lanham Act or the DTPA, President Trump and Rep. Jackson target Defendants' editorial choices, alleging that CBS engaged in "election interference" by "deceptively manipulat[ing]" the Interview. ECF No. 36 ¶¶ 3, 13. In particular, they allege that Vice President Harris' response to the Netanyahu question shown on *Face the Nation* was "word salad," with Harris appearing "incoherent[] and indecisive[]." *Id.* ¶¶ 7, 72. This "preview" allegedly induced consumers at large to purchase or acquire Defendants' broadcast services in order to watch the 60 Minutes Broadcast, but on *60 Minutes* the Vice President's answer to the same question was a "coherent, and decisive response." *Id.* ¶¶ 7, 73. While neither Plaintiff alleges he was actually confused (indeed, neither Plaintiff alleges he even watched the broadcasts when they aired), they allege generally that the 60 Minutes Broadcast "created confusion" by "portray[ing] Harris as intelligent, well-informed, and confident." *Id.* ¶ 195.

On these facts, President Trump brings Lanham Act and DTPA claims, alleging the news broadcasts amounted to "deceptive advertising" and "unfair competition" in part because President Trump is a "significant owner of shares in publicly traded company Trump Media & Technology Group Corp. ('TMTG')," which operates the social media site *Truth Social*. *Id.* ¶ 16. The Amended Complaint seeks damages of no less than $20 billion on the purported grounds that "Defendants unfairly secured commercial sales" and other "commercial benefits," injuring President Trump as a "direct[] compet[itor]," and that "CBS's distortion of the *60 Minutes* Interview damages President Trump's fundraising and support values by several billions of

---

[2] Rep. Jackson provided no notice to Defendants concerning his DTPA claim and his claim therefore must be abated for 60 days from filing. *See* Tex. Bus. & Com. Code § 17.505; *Hines v.*

dollars, particularly in Texas." *Id.* ¶¶ 153, 161, 199 n.1. Rep. Jackson sues only under the DTPA but does not identify any damages, instead alleging in conclusory fashion that he was "deceived and confused" by the Interview. *Id.* ¶ 198.

## ARGUMENT

**I.    The Lanham Act And The DTPA Do Not—And Could Not, Consistent With The First Amendment—Apply To Editorial Speech Like The Broadcasts At Issue**

### A.  Editorial Speech About Public Officials During An Election Enjoys Maximum First Amendment Protection

If the First Amendment means anything, it means that public officials like Plaintiffs cannot hold news organizations like CBS liable for the simple exercise of editorial judgment.[3] "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Nor may the courts constitutionally punish the exercise of editorial judgment, whomever the plaintiff. *See Miss. Gay All. v. Goudelock*, 536 F.2d 1073, 1075 (5th Cir. 1976) ("[W]e think the First Amendment interdicts judicial interference with the editorial decision."); *cf. Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (describing First Amendment principles that "ensure that courts themselves do not become inadvertent censors").

In *Tornillo*, the Supreme Court held that "[l]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper," as "[t]he choice of material" and "treatment of public issues and public officials—whether fair or unfair—constitute the exercise

---

*Hash*, 843 S.W.2d 464, 469 (Tex. 1992).

[3] Plaintiffs do not allege that Paramount itself had any involvement with the FTN or 60 Minutes Broadcasts, but rather that "Paramount, as the parent that directs CBS," is "subject to liability under the DTPA." ECF No. 36 ¶ 177. "[A] bedrock principle of corporate law is that 'a parent corporation . . . . is not liable' for actions taken by its subsidiaries." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (citation omitted). For this independent reason, Paramount should be dismissed from this lawsuit.

of editorial control and judgment." 418 U.S. at 258 & n.24. Such editorial judgments are not the proper subject of judicial review: "[T]he editorial function itself is an aspect of 'speech,' and a court's decision that a private party, say, the station owner, is a 'censor,' could itself interfere with that private 'censor's' freedom to speak as an editor." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-38 (1996) (citations omitted); *see also Columbia Broad. Sys., Inc. v. DNC*, 412 U.S. 94, 111 (1973) ("Since it is physically impossible to provide time for all viewpoints, however, the right to exercise editorial judgment was granted to the broadcaster."). Echoing *Tornillo*, Justice Gorsuch recently observed: "One man's 'covert content manipulation' is another's 'editorial discretion.' Journalists, publishers, and speakers of all kinds routinely make less-than-transparent judgments about what stories to tell and how to tell them. Without question, the First Amendment has much to say about the right to make those choices." *TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct. 57, 73 (2025) (Gorsuch, J., concurring). That observation could scarcely be more apt.

There is no dispute the subject matter of the Interview—the conflict in Israel and Gaza— is "a matter of particularly urgent public interest" and "of the utmost public significance." ECF No. 36 ¶¶ 71, 193. "[T]he free flow of ideas and opinions on matters of public interest and concern" lies "[a]t the heart of the First Amendment." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). And it is especially an affront to the First Amendment to impose liability for editorial speech made "in the heat of campaigning for the 2024 Presidential election." ECF No. 36 ¶ 145. "The First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310,

339 (2010) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). For

that reason, the Court has rejected "a theory of the First Amendment that would allow censorship

. . . of television and radio broadcasts," particularly "at election time, when it matters most." *Id.*

at 372, 385 (Roberts, C.J., concurring).

   In a world in which "[o]ur Nation's speech dynamic is changing" and "[s]peakers have

become adept at presenting citizens with sound bites," *id.* at 364, punishing the editing of a

politician's comments raises grave First Amendment concerns, *see* ECF No. 36 ¶ 83 (Harris'

answers allegedly "edited" to be less "long and rambling"). Indeed, Plaintiffs themselves

recognize as much, observing that "[e]diting to make something clearer is not nefarious. It's

Journalism 101." *Id.* ¶ 126. Plaintiffs toggle between insisting that including Harris' full

response to the question about Prime Minister Netanyahu "would have added, at most, mere

seconds to the Interview" to complaining that "the *entire* Interview" was "deceptively

manipulated." *Id.* ¶¶ 13, 104; *see id.* ¶¶ 114, 140-43, 148, 151, 157, 187; *see also id.* at ¶¶ 119-21

(complaining of "multiple instances" where Plaintiffs object to CBS' editing). But editing is the

province of the publisher. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 515 (1991)

(explaining that the "practical necessity" of a medium, in that case a newspaper, often requires

editing). Whether Plaintiffs believe the entire unedited Interview should have aired or only edited

in a way they approve, they are not entitled under the First Amendment to demand only news

that fits their wishes.

   In the end, Plaintiffs' effort to dress their grievances in the garb of the DTPA or Lanham

Act cannot hide their unconstitutional aim: Plaintiffs are public officials—the President of the

United States and a Member of the House of Representatives—seeking billions of dollars in

damages and an injunction against protected speech by private parties. "The scope of free speech

9

protection does not depend on the legal theory asserted by an inventive plaintiff." *Rehak Creative Servs., Inc v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (internal citation, quotation marks, and alteration omitted), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015). Whatever statutory causes of action Plaintiffs may devise, the First Amendment bars their attack on CBS' editorial freedom.

### B. Consistent With The First Amendment, The Lanham Act And The DTPA Extend Only To Commercial Speech

Because "[p]olitical speech must prevail against laws that would suppress it," *Citizens United*, 558 U.S. at 340, both the Lanham Act and the DTPA—like other unfair competition laws—were drafted so as *not* to infringe the First Amendment. Plaintiffs' claims therefore fail for the independent reason that the Lanham Act and the DTPA extend only to commercial speech, not the editorial news at issue here.

The Fifth Circuit has long held that Section 43 of the Lanham Act "'specifically extends only to false and misleading speech that is encompassed within the "commercial speech" doctrine developed by the United States Supreme Court'" and "should not be read in any way to limit political speech, consumer or editorial comment . . . or other constitutionally protected material." *Seven-Up*, 86 F.3d at 1383 n.6 (quoting legislative history of Section 43). "In order for representations to constitute 'commercial advertising or promotion' under Section 43(a)(1)(B), they must be," at a minimum, "commercial speech" "for the purpose of influencing consumers to buy defendant's goods or services." *Id.* at 1384 (quoting *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)).[4] Courts consistently reject

---

[4] Virtually every Circuit has adopted, at a minimum, the requirements that the representation be commercial speech for the purpose of influencing consumers to buy defendant's goods or services. *See, e.g., Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56-57 (2d Cir. 2002); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256 (4th Cir. 2017); *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 800-01 (6th Cir. 2015).

Lanham Act claims based on speech that is "not an advertisement," *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 332 (4th Cir. 2015), and especially based on "protected editorial speech on a topic of public importance," *Gordon & Breach*, 859 F. Supp. at 1544.

Similar to the Lanham Act, the DTPA was enacted "to protect consumers against false, misleading, and deceptive business practices." Tex. Bus. & Com. Code § 17.44. Section 17.46, which the Amended Complaint relies upon, prohibits "[f]alse, misleading, or deceptive acts or practices *in the conduct of any trade or commerce*." Tex. Bus. & Com. Code § 17.46(a) (emphasis added).[5] Governed by this clear statutory construct, Texas courts have uniformly found that the DTPA does not purport to regulate non-commercial speech and especially not the editorial judgments of news organizations. For example, in *Tatum v. Dallas Morning News, Inc.*, the court affirmed the dismissal of a DTPA claim brought against a newspaper by parents who had purchased an obituary for their son, but were later criticized in an editorial concerning the events related to their son's death. 493 S.W.3d 646, 653, 674 (Tex. App.—Dallas 2015, pet. granted), *rev'd on other grounds*, 554 S.W.3d 614 (Tex. 2018). In rejecting the DTPA claim, the court distinguished between the commercial transaction involving the purchase of an obituary, on the one hand, and the journalism of the reporter, on the other. *Id.* at 675; *see also Mother & Unborn Baby Care of N. Tex., Inc. v. State*, 749 S.W.2d 533, 540 (Tex. App.—Fort Worth 1988, writ denied) (recognizing that the DTPA "prohibits false statements or advertisements to protect the public" and "does not further encompass protected speech or conduct"). Texas' own Attorney General has likewise recognized the limits of the DTPA, arguing that DTPA investigations into purportedly "deceptive or misleading" speech are permissible only to the extent the speech

---

[5] "Trade" and "commerce" are in turn defined to "mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated." Tex. Bus. & Com. Code § 17.45(6).

involves commercial representations and not editorial decisions. *Twitter, Inc. v. Paxton*, No. 21-15869 (9th Cir. 2021), ECF No. 33, at 20-22.

The DTPA's legislative history underscores that it is limited to commercial speech concerning commercial transactions. Asked whether the statute "appl[ies] to political advertising," the drafter of the bill (Joe Longley) said, "I've come to the persuasion that nothing applies to political advertising," to which Texas Senator Ron Clower, chairman of the Subcommittee on Consumer Affairs, replied "Good."[6] In other words, even political advertising—much less pure editorial speech—is outside the reach of the DTPA.

Finally, interpretations of the DTPA are guided by "interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act," Tex. Bus. & Com. Code § 17.46(c)(1), which prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1). FTC decisions regarding deceptive trade practices (and circuit courts reviewing those decisions) consistently limit the Act's application to commercial, not editorial, speech. *See, e.g., FTC v. R.J. Reynolds*, 1988 WL 490114, at *2 (F.T.C. Mar. 4, 1988); *Kraft, Inc. v. FTC*, 970 F.2d 311, 320-21, 324-26 (7th Cir. 1992); *FTC v. POM Wonderful*, 155 F.T.C. 1, 50 (2013), *aff'd*, 777 F.3d 478 (D.C. Cir. 2015). As the FTC has explained, "[t]he more limited protection accorded commercial speech permits the FTC to act when necessary to challenge false or deceptive advertising." *R.J. Reynolds*, 1988 WL 490114, at *3. In short, the DTPA applies only to commercial speech.

### C.  The FTN And 60 Minutes Broadcasts Are Indisputably Editorial, Not Commercial, Speech

Recognizing the obvious First Amendment problems with attacking editorial speech, Plaintiffs frame the FTN Broadcast as an "advertisement" or "promotion" for the 60 Minute*s*

---

[6] *See* Legislative History of S.B. 75, at 83, https://lrl.texas.gov/scanned/DTPA/SB75_63R.pdf.

Broadcast, subject to the lesser protections of "commercial speech." But commercial speech is speech that "does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)); *accord Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976) ("There are commonsense differences between speech that does no more than propose a commercial transaction and other varieties."); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 339 (5th Cir. 2024) ("Commercial speech is '[e]xpression related solely to the economic interests of the speaker and its audience.'")[7] Neither the FTN nor 60 Minutes Broadcast proposed *any* commercial transaction, let alone "solely" a commercial transaction. *Book People*, 91 F.4th at 319. The Broadcasts are unquestionably news programming, and Plaintiffs repeatedly concede as much: They allege they acquired "CBS News programs such as *60 Minutes* and *Face the Nation*" to "view[] accurate and truthful *news* content." ECF No. 36 ¶¶ 174, 176 (emphasis added). And they elsewhere describe CBS News as a "legacy media organization['s]" "news division," whose audience is "consumers of news media," and whose Broadcasts addressed a topic of "utmost public significance" and " urgent public interest." *E.g.*, ECF No. 36 ¶¶ 4 n.1, 21, 32, 34, 69, 71, 139, 140, 193.[8] And, while entirely irrelevant to the commercial/editorial speech dichotomy, Plaintiffs' allegation that Defendants did "whatever it took" "to make Harris look better," *id.* ¶¶ 195-96, is belied by the

---

[7] Examples of commercial speech include advertising of alcohol beverages, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), prescription drugs, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), or tobacco, *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001).

[8] Even if the FTN Broadcast functioned in any way to promote the 60 Minutes Broadcast, it also was political speech by a presidential candidate about a matter of public concern, the conflict in Israel and Gaza. *See* ECF No. 36 ¶ 72. At a minimum, then, any promotional quality of the FTN Broadcast was "inextricably intertwined" with "fully protected speech," such that the FTN Broadcast is not commercial speech. *Riley v. Nat'l Fed. of Blind*, 487 U.S. 781, 796 (1988)

Interview, in which CBS correspondent Bill Whitaker engaged in probing and tough questioning of the Vice President, pressing her for answers when he felt she had not addressed the question.[9]

Because Plaintiffs cannot seriously dispute that *Face the Nation* and *60 Minutes* are news programs, they next attempt to expand the definition of commercial speech far beyond its well-established reach—ads proposing a commercial transaction—to cover essentially any speech by a for-profit entity, or speech they allege is "for commercial benefit and pecuniary gain." *E.g.*, ECF No. 36 ¶¶ 3, 4, 191, 193, 196-97. But this proposition was laid to rest decades ago. Even if Defendants have a profit motive, that economic motivation does not transform their editorial speech into commercial speech and divest it of its First Amendment protections. As the Supreme Court has repeatedly held, "[i]f a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973); *see Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943) (distribution of religious pamphlets fully protected despite "invit[ing] the purchase of books").[10] However framed, the speech at issue is not commercial speech subject to either the Lanham Act or the DTPA.

## II.    Plaintiffs Fail To Plead Article III Standing

---

(applying test for "fully protected expression" where commercial speech was "inextricably intertwined with otherwise fully protected speech").

[9] *E.g.*, ECF No. 25-1, Ex. C at 15:52-17:31 (Whitaker: "[Y]our economic plan would add $3 trillion to the federal deficit over the next decade. How are you going to pay for that? . . . Pardon me, Madam Vice President. The question was how are you going to pay for it. . . . We're dealing with the real world here. . . . How are you going to get this through Congress? . . . And Congress has sho[wn] no inclination to move in your direction.").

[10] *See also Sullivan*, 376 U.S. at 266 (advertisement was not commercial speech because "[i]t communicated information" in connection with "matters of the highest public interest and concern" and "[t]hat the Times was paid for publishing the advertisement is as immaterial in this connection as the fact that newspapers and books are sold").

The First Amendment is not the only constitutional obstacle to Plaintiffs' claim. The Court must also ask whether Plaintiffs "have standing under Article III to maintain this suit. The answer is no." *United States v. Texas*, 599 U.S. 670, 676 (2023). To establish standing, a plaintiff must demonstrate "(i) that []he has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). An "injury in fact" must be (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). These requirements ensure that a plaintiff is not "a mere bystander" but has "a 'personal stake' in the dispute," *FDA*, 602 U.S. at 379 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)), and that courts, in "refusing to entertain generalized grievances . . . exercise power that is judicial in nature," *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

***Rep. Jackson Lacks Standing.*** Rep. Jackson does not allege that he suffered any concrete harm as a result of the FTN and 60 Minutes Broadcasts. Nor could he, given that the broadcasts did not mention or concern him in any way. He does not claim, for example, that he was actually defrauded by CBS or another Defendant. In fact, he carefully avoids making any unequivocal allegation that he paid money to Defendants to view the broadcasts. *See, e.g.*, ECF No. 36 ¶¶ 175, 198. And his bare assertion that he "has sustained substantial damages in an amount to be determined upon trial of this action," *id.* ¶ 200, is exactly the type of "unadorned, the-defendant-unlawfully-harmed-me accusation" that is insufficient to survive dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, Rep. Jackson relies entirely on alleged intangible harms, claiming that he was "misled," "deceived," and "confused" by the broadcasts. ECF No. 36 ¶¶ 78, 198. But the Fifth Circuit has joined other circuits in holding that "the state of confusion, absent more, is

not a concrete injury under Article III." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 825 (5th Cir. 2022). Moreover, unlike even the plaintiff in *Perez*, Rep. Jackson makes no attempt to distinguish himself from any other viewer of Defendants' broadcasts. He concedes his alleged injury would be felt equally by "millions of Americans" whom he claims were similarly "deceived and misled."[11] ECF No. 36 ¶¶ 78, 124. This is precisely what the standing requirement of Article III was designed to avoid—the use of federal courts as "a 'vehicle for the vindication of the value interests of concerned bystanders.'" *FDA*, 602 U.S. at 382.

***President Trump Lacks Standing.*** For many of the same reasons, President Trump fails to allege Article III standing. Like Rep. Jackson, President Trump cannot claim to have suffered any consumer injury from the broadcasts themselves, which were not about him, and does not allege that he paid any money to CBS to view the broadcasts. Unable to point to any pecuniary or other tangible harm ***as a consumer***, he relies entirely on the "confusion" about Vice President Harris that he alleges was experienced by "millions" of other viewers of the broadcasts. ECF No. 36 ¶ 78. That allegation—contradicted by President Trump's insistence that the broadcasts did not confuse him, *see id.* (alleging that he immediately took to *Truth Social* to warn others about the "deceptive[] doctoring" of the Interview)—is precisely the kind of "generalized grievance[]" that cannot support standing. *Hollingsworth*, 570 U.S. at 715.

President Trump also cannot rely on his former status ***as a candidate*** for office. Any claim that the broadcasts constituted "election interference," ECF No. 36 ¶¶ 23, 125, or otherwise gave Vice President Harris a competitive advantage was rendered moot by President Trump's victory on Election Day. *See Hotze v. Hudspeth*, 16 F.4th 1121, 1124 (5th Cir. 2021); *Shemwell v. City of McKinney*, 63 F.4th 480, 483-85 (5th Cir. 2023). Nor can such a claim be

---

[11] Representative Jackson also alleges that he was injured "as a consumer of President Trump's media brands," ECF No. 36 ¶ 46, but he offers no plausible explanation for how CBS' editorial

saved from mootness by President Trump's allegations of a fundraising shortfall or "support values"[12] deficit. ECF No. 36 ¶ 19 n.4. Lost campaign donations impacted him, if at all, as a candidate in an election he ultimately won. In any event, election-related fundraising would have been conducted through campaign entities; those donations could not flow to him personally. *See FEC v. Cruz*, 596 U.S. 289, 294 (2022) (campaign is "a legal entity distinct from the candidate").

Finally, President Trump's new theory—that he was harmed ***as a competitor*** of CBS, *see, e.g.*, ECF No. 36 ¶¶ 16, 46—fares no better. He alleges that he "creates and produces digital media content," such as his posts on *Truth Social*. *Id.* ¶ 134. But merely posting on social media—like so many other citizens—does not give him standing to challenge Defendants' editorial decisions in federal court. His theory that viewers "withheld attention from President Trump and *Truth Social* by directing their attention to [Defendants'] media platforms," *id.* ¶ 156, is premised on entirely speculative assumptions that viewers would otherwise have looked to his social media posts. But "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted); *see Little v. KMPG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (claims of lost business were "too speculative to confer Article III standing" where they depended "on several layers of decisions by third parties"). Indeed, on this theory *anyone* could bring unfair competition claims against news organizations with which they disagreed. That is not the law.

Nor does President Trump's alleged status as "a significant owner[] of shares in publicly traded company TMTG" confer standing. ECF No. 36 ¶¶ 16, 56. TMTG is not a party in this

---

decisions harmed him as a consumer of entirely different content.

[12] President Trump's Amended Complaint fails to define "support values" and such an abstract concept does not constitute a concrete injury-in-fact. ECF No. 36 ¶ 19 n.4.

case, and President Trump cannot sue individually for harm to TMTG.[13] "[I]ndividual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock." *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990); *accord Bosch v. Tessa Complete Health Care, Inc.*, 2004 WL 1278225, at *5 (S.D. Tex. Apr. 5, 2004).[14] For all these reasons, while President Trump may disagree with Defendants' editorial decisions, "those kinds of objections alone do not establish a justiciable case or controversy in federal court." *FDA*, 602 U.S. at 396.

## III.    President Trump Fails To Plead A Lanham Act Claim

Plaintiffs' claims also fail for more pedestrian reasons: Plaintiffs fail to plausibly allege the required elements of each claim. Section 43(a)(1)(B) of the Lanham Act subjects to liability persons who "in commercial advertising or promotion, misrepresent[] the nature, characteristics, [or] qualities of his or her . . . services, or commercial activities." President Trump—the sole plaintiff asserting the Lanham Act claim, *see* ECF No. 36 at 41—does not plausibly allege that the FTN Broadcast or 60 Minutes Broadcast was "commercial advertising or promotion," that Defendants misrepresented the nature, characteristics, or qualities of their services, that any misrepresentation was material, or that he has standing under the Lanham Act.

***First***, CBS' news programming is not "commercial advertising or promotion." "The 'commercial' requirement was inserted to ensure that § 43(a) does not infringe on free speech protected by the First Amendment"—that is, "commercial advertising or promotion" must be "commercial speech." *Seven-Up*, 86 F.3d at 1383 n.6 (internal citations omitted). The challenged

---

[13] President Trump's generalized allegations of shareholder harm are flatly contradicted by his specific allegation elsewhere in the Amended Complaint that "the TMTG stock price skyrocketed nearly 75%" during the operative period. ECF No. 36 ¶ 61.

[14] Setting aside that a shareholder cannot assert an interest, here, President Trump's interest in TMTG is in a trust, of which he is a beneficiary, but not a trustee. *See* Form 4, https://s3.amazonaws.com/sec.irpass.cc/2660/0001474506-24-000291.pdf. Only a trustee has legal authority to initiate legal action on behalf of the trust. *See In re XTO Energy Inc.*, 471

broadcasts, as explained above, are editorial not commercial speech. The broadcasts also were not undertaken "for the purpose of influencing consumers to buy defendant's goods or services," as "advertising or promotion" must be. *Id.* at 1384. Indeed, those who "saw" the alleged "word salad" answer "on *Face the Nation*" and who "were deceived and misled by the astonishing contrast between the two versions of Harris's reply" must have already had access to CBS' services. ECF No. 36 ¶¶ 76, 78. And, if any viewers of the FTN Broadcast had not already acquired CBS' services, President Trump offers no explanation as to how hearing a "word salad" answer would induce a consumer to do so. *Id.* ¶ 76.

**Second**, President Trump does not plead any actionable misrepresentation. To be actionable under the Lanham Act, the challenged statement "must be 'a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) (citation omitted). Defendants never asserted as a factual matter that the Interview on either *Face the Nation* or *60 Minutes* was unedited, nor did they make a "specific and measurable" claim that the excerpts of the Interview aired on *Face the Nation* would appear the following day on *60 Minutes*. Notably, the Amended Complaint alleges that Harris' answers in the FTN Broadcast and the 60 Minut*es* Broadcast were "both part of a single answer," ECF No. 36 ¶ 115—that is, the answer that aired on each show was part of Harris' same answer to the question. Nothing was "hid[den]" or "doctored." *Contra id.* ¶¶ 95, 97, 105, 188. In fact, it was CBS that broadcast the very portion of the Interview Plaintiffs now contend was somehow hidden from the public. Plaintiffs also have not identified a single "statement of fact . . . shown to be literally false." *Pizza Hut,* 227 F.3d at 497. Nor have they pointed to any evidence of "actual deception" in the form of "consumer reaction to the advertising," "consumer surveys," or "consumer reaction

---

S.W.3d 126, 131-32 (Tex. App.—Dallas 2015, no pet.).

tests"—as they must "if the statements at issue are either ambiguous or true but misleading." *Id.*; *accord IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002).

Insofar as President Trump's theory is not about the FTN Broadcast specifically but that the broadcasts generally are merely "masquerading as news," ECF No. 36 ¶ 1, that also is not actionable. *Associated Press v. All Headline News Corp.* is instructive. In that case, the Associated Press brought claims including under Section 43 of the Lanham Act against All Headline News ("AHN"), an online venture that republished news reports and did not do any of its own reporting. 608 F. Supp. 2d 454, 457 (S.D.N.Y. 2009). The court granted AHN's motion to dismiss the Lanham Act claim because "AHN's self-described status as a news-gathering organization is an inadequate basis for a Lanham Act claim," as permitting the claim to proceed "would require the Court or a jury to sit in judgment of whether a self-described news service is required by the Lanham Act" to meet particular journalistic standards. *Id.* at 463. So too, here, the Court cannot arbitrate what is bona fide news consistent with the First Amendment.

**Third**, Plaintiffs have not alleged that any misrepresentation or deception was material "in that it is likely to influence the purchasing decision," as required for Section 43 claim. *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990). President Trump has not alleged any facts showing that "potential buyers would be influenced by any of the alleged false advertising." *Id.* If the alleged deception is that CBS edited down Vice President Harris' answer, the viewing "public is aware" that television is edited—indeed, *Face the Nation* made clear that it was showing just a short excerpt of a longer interview, and *60 Minutes* routinely cut between the Interview with Harris and studio commentary, making the edited nature of both shows overt—and the public was not "likely to be misled." *Id.*

*Last*, only those who suffered "an injury to a commercial interest in reputation or sales" may sue under Section 43(a)(1)(B) of the Lanham Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014); *see also*, *e.g.*, *I Love Omni, LLC v. Omnitrition Int'l, Inc.*, 2017 WL 3086035, at *5 (N.D. Tex. July 20, 2017) (Fish, J.) ("'Only plaintiffs who have suffered an injury that negatively impacts their ability to compete in the marketplace have standing to sue' under the Lanham Act.") (quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 797 (5th Cir. 2011)). As noted, President Trump does not plausibly allege that he individually suffered a commercial injury proximately caused by any alleged misrepresentation. Even under President Trump's theory that Defendants "divert[ed] viewership away" from *Truth Social*, ECF No. 36 ¶ 127, that injury is to TMTG, not President Trump himself. *See supra* Section II. In any event, generalized allegations that CBS "unfairly secured commercial sales, [and] business relationships," ECF No. 36 ¶ 31, amount to little more than "a mere 'formulaic recitation of the elements.'" *I Love Omni*, 2017 WL 3086035, at *5 (citation omitted). The failure to allege, for example, that specific "consumers have switched from purchasing" President Trump's goods or services to Defendants' dooms President Trump's Lanham Act claim. *Id.*

## IV.    Plaintiffs Fail To Plead A DTPA Claim

Plaintiffs' claim for a violation of the Deceptive Trade Practices Act is subject to Rule 9(b), which requires pleading "with particularity." *Kumar v. Panera Bread Co.*, 2024 WL 1216562, at *4 (5th Cir. Mar. 21, 2024) (per curiam). Plaintiffs do not plausibly state a DTPA claim, much less satisfy the more stringent Rule 9(b) standard.

The purpose of the DTPA is "to protect consumers in consumer transactions." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *accord Cameron v. Terrell & Garrett*, 618 S.W.2d 535, 541 (Tex. 1981). "The Texas Supreme Court has consistently held that '[o]nly a

"consumer" can maintain a cause of action directly under the DTPA.'" *Cushman v. GC Servs., L.P.*, 397 F. App'x 24, 27-28 (5th Cir. 2010) (per curiam) (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 386 (Tex. 2000)). "To qualify as a consumer, 'a person must have sought or acquired goods or services *by purchase or lease*' and 'the goods and services purchased or leased must form the basis of the complaint.'" *Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 765 (N.D. Tex. 2012) (Lynn, J.) (citation omitted) (emphasis added). Put differently, the plaintiff must allege that "the defendant's deceptive conduct . . . occur[red] in connection with a consumer transaction." *Amstadt*, 919 S.W.2d at 649.

Here, Plaintiffs conspicuously avoid making any factual allegation that they actually acquired *by purchase or lease* Defendants' services, as required by the DTPA. Instead, they vaguely allege that they "purchased *or otherwise acquired*" Defendants' services, ECF No. 36 ¶¶ 11, 173, 175. Such allegation falls far short of pleading with particularity any "consumer transaction," *Amstadt*, 919 S.W.2d at 649, or that Plaintiffs were themselves "sufficiently connected with the transaction to be consumers under the DTPA," *Hunt v. City of Diboll*, 574 S.W.3d 406, 432 (Tex. App.—Tyler 2017, pet. denied). For example, they do not allege whether they paid for Defendants' services, and if so, when, where, how much they paid, and who they purchased the services from. *See Hurd*, 880 F. Supp. 2d at 765 (rejecting conclusory allegations regarding "alleged consumer status").[15] This pleading deficiency compels dismissal of the claim.

The Amended Complaint also does not allege with particularity any false, misleading, or deceptive act. It cites to four provisions of the DTPA, specifically Texas Business and

---

[15] The only paid "service" Plaintiffs identify in their Amended Complaint and could have purchased or leased, as required by the DTPA, is *Paramount+*, Defendants' direct-to-consumer subscription streaming service. *See* ECF No. 136 ¶¶ 34, 77, 186. Therefore, if the Court were to credit Plaintiffs' vague and conclusory allegations that they are consumers of Defendants' goods or services, then Plaintiffs are bound by the *Paramount+* Terms of Use and must arbitrate their claims. Plaintiffs cannot have it both ways. Defendants intend to take discovery from Plaintiffs regarding any acquisition of *Paramount+* services and reserve the right to move to compel

Commerce Code Sections 17.46(b)(2), (3), (5), (9).[16] None is adequately pled.

**First**, with regard to Section 17.46(b)(2) or (3), viewers understand that CBS is the "source" of programming like *60 Minutes* because it airs on CBS, contains the CBS Eyemark logo throughout, and is hosted by CBS News correspondents. The only allegations in the Amended Complaint directly relating to source affirmatively state that *Face the Nation* and *60 Minutes* are "well-known programs" in the CBS News portfolio. *See* ECF No. 36 ¶ 32. The confusion pled—as to "what Harris really told Whitaker," "Harris's actual qualities as a candidate and as a person," and "Harris's actual position on hot-button issues, including foreign policy," *id.* ¶¶ 141, 195, 197—is not the kind of consumer confusion about the source, sponsorship, or affiliation of a product or service that the DTPA is designed to protect. *See generally supra* Section 1.B. **Next**, per their Section 17.46(b)(5) claim, Plaintiffs do not identify any "sponsorship," "characteristics," "ingredients," or "benefits" that Defendants misrepresented. *Cf. Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 480 (Tex. 1995) (rejecting claim where advertised language "did not contain an actionable representation as a matter of law"). The FTN Broadcast clip of the Interview is a far cry from the kinds of false claims in advertising—like "free" tax services or "made in USA"—that the law is designed to police. **Finally**, the purpose of Section 17.46(b)(9) "is the prevention of 'bait advertising,' a practice by which a seller seeks to attract customers through advertising products at low prices which he does not intend to sell in more than nominal amounts." *Mid-Cities Bone & Joint*

---

arbitration of Plaintiffs' claims if applicable.

[16] *See* ECF No. 36 ¶ 169 (alleging that Defendants "caus[ed] confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services"; "caus[ed] confusion or misunderstanding as to affiliation, connection, or association with, or certification, by another"; "represent[ed] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;" and "advertis[ed] goods or services with intent not to sell them as advertised").

*Surgeons, P.A. v. GE Healthcare Diagnostic Imaging*, 2008 WL 11429502, at *3 (N.D. Tex. Sept. 22, 2008) (Means, J.). Plaintiffs allege nothing of the kind.

Further, to state a claim under Section 17.50(a)(1) of the DTPA for "a false, misleading, or deceptive act or practice . . . enumerated in . . . Section 17.46(b)," Plaintiffs must also show they "relied on" that deception "to the consumer's detriment" and suffered "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a)(1). In other words, there needs to be a causal connection between the false, misleading or deceptive act and conduct in reliance on that misinformation. A DTPA claim is stated, for example, when a plaintiff shows reliance on misrepresentations about the terms or benefits of insurance coverage in deciding not to obtain insurance elsewhere, *see Kersh v. UnitedHealthcare Ins. Co.*, 946 F. Supp. 2d 621, 643 (W.D. Tex. 2013), or takes actions based upon representations "when buying a good, such as a warranty accompanying a good, or financial counseling in connection with the sale of securities," *McClung v. Wal-Mart*, 866 F. Supp. 306, 309 (N.D. Tex. 1994) (Belew, J.). Failure to plead detrimental reliance compels dismissal of a DTPA claim. *See CrewFacilities.com, LLC v. Humano, LLC*, 2024 WL 993898, at *3 (W.D. Tex. Mar. 7, 2024); *Yumilicious Franchise L.L.C. v. Barrie*, 2015 WL 1822877, at *4-6 (N.D. Tex. Apr. 22, 2015) (Lindsay, J.).

The Amended Complaint does not even attempt to allege any facts that would support a finding of detrimental reliance. Plaintiffs do not plead what misrepresentation they relied upon or what action they took in reliance upon that misrepresentation. They do not even allege that the FTN Broadcast occurred *before* they acquired Defendants' broadcast services, let alone that they relied on it. Indeed, they do not allege that they made any commercial purchase or lease (or failed to take any such action) as a result of the FTN Broadcast. To the contrary, they allege that President Trump was *not* confused and knew the *60 Minutes* interview responses were edited

24

when he promptly took to *Truth Social* to say as much. ECF No. 36 ¶ 78. Plaintiffs' barebones recital of the statutory requirement that they were "relying on Defendants' false and misleading advertisements," *id.* ¶¶ 174, 176, falls far short of the pleading requirements. "[W]ithout proof that he relied to his detriment on the deceptive act," a plaintiff "loses" his claim under Section 17.50(a)(1). *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823 (Tex. 2012).

Plaintiffs primarily frame their DTPA claim under Section 17.46(a), ECF No. 36 at 47, but the Amended Complaint also cites Section 17.50(a)(3), which provides that a consumer may maintain an action based on "any unconscionable action or course of action by any person" that causes economic damages or damages for mental anguish. *See* Tex. Bus. & Com. Code § 17.50(a)(3); ECF No. 36 ¶ 171. An "unconscionable action or course of action" is "an act or practice, which . . . takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). In other words, to state a claim for an unconscionable action, the plaintiff must plead the consumer's "lack of knowledge, ability, experience, or capacity." *See Washburn v. Sterling McCall Ford*, 521 S.W.3d 871, 877 (Tex. App.—Houston [14th Dist.] 2017, no pet.). It is hardly surprising that Plaintiffs do not allege they lack the knowledge, ability, experience, or capacity to consume and evaluate television news. To the contrary, they plead that President Trump understood the Interview was edited (in his words, "doctored") and alerted the public to that fact well before CBS issued a statement about it. *See* ECF No. 36 ¶ 78. Plaintiffs accordingly cannot claim Defendants acted "unconscionabl[y]" toward them within the meaning of the DTPA.

## **CONCLUSION**

For all the foregoing reasons, this Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Respectfully submitted,

/s/ *Thomas C. Riney*

**UNDERWOOD LAW FIRM, P.C.**

Thomas C. Riney
State Bar No. 16935100
C. Jason Fenton
State Bar No. 24087505
PO Box 9158 (79105-9158)
500 S. Taylor, Suite 1200
Amarillo, TX 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
tom.riney@uwlaw.com
jason.fenton@uwlaw.com

**JACKSON WALKER LLP**

Marc A. Fuller
State Bar No. 24032210
2323 Ross Ave., Ste. 600
Dallas, TX 75201
Telephone: (214) 953-6000
Facsimile: (214) 953-5822
mfuller@jw.com

**DAVIS WRIGHT TREMAINE LLP**

Elizabeth A. McNamara (admitted *pro hac vice*)
Jeremy A. Chase (admitted *pro hac vice*)
Alexandra Perloff-Giles (admitted *pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Telephone: (212) 489-8230
elizabethmcnamara@dwt.com
jeremychase@dwt.com
alexandraperloffgiles@dwt.com

*Attorneys for Paramount Global, CBS Broadcasting
Inc., and CBS Interactive Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2025 a true and correct copy of the foregoing was served via CM/ECF on all counsel of record.

<u>*/s/ Thomas C. Riney*                        </u>