# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

PRESIDENT DONALD J. TRUMP,
an individual, and REPRESENTATIVE
RONNY JACKSON, an individual,

                Plaintiffs,

      v.

PARAMOUNT GLOBAL d/b/a
PARAMOUNT, a Delaware corporation,
CBS BROADCASTING INC., a New York
corporation, and CBS INTERACTIVE INC.,
a Delaware corporation,

                Defendants.

Case No.: 2:24-cv-00236-Z

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

## Table of Contents

I.    INTRODUCTION ................................................................................................. 1

II.   RELEVANT ALLEGATIONS OF THE COMPLAINT AND PROCEDURAL
      HISTORY ........................................................................................................... 3

      A.   The Parties .................................................................................................. 3

      B.   The Interview and Defendants' Distortion Thereof .................................... 4

      C.   Defendants' Successive Rule 12 Motions .................................................. 5

III.  STANDARD OF REVIEW ................................................................................. 6

      A.   Rule 12(b)(1) .............................................................................................. 6

      B.   Rule 12(b)(6) .............................................................................................. 6

IV.   ARGUMENT ...................................................................................................... 7

      A.   The Instant Motion Must be Denied as Violative of Rule 12(g)(2)'s Proscription Against Successive
           Rule 12 Motions in an Attempt to Skirt Local Rule 7.2(c) ................................................................... 7

      B.   Defendants' First Amendment Challenge Must Fail on a Motion to Dismiss Because Whether the
           Broadcasts were Commercial Speech Cannot be Determined at This Stage of the Litigation .............. 10

      C.   Plaintiffs Have Standing to Bring the Instant Action .................................................. 15

      D.   President Trump Has Adequately Pleaded a Lanham Act Claim ................................. 18

      E.   Plaintiffs Have Adequately Alleged a DTPA Claim .................................................. 21

V.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trs.*,
    855 F.3d 681 (5th Cir. 2017) ............................................................................ 8, 9

*Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*,
    771 F.3d 697 (10th Cir. 2014) ............................................................................ 8

*Alexander v. City Police of Lafayette*,
    2021 WL 4396016 (W.D. La. Sept. 24, 2021) ................................................... 9

*Am. Home Prods. Corp. v. Johnson & Johnson*,
    577 F.2d 160 (2d Cir. 1978) ............................................................................. 20

*Amrhein v. eClinical Works, LLC*,
    954 F.3d 328 (1st Cir. 2020)............................................................................. 17

*Ariix, LLC v. NutriSearch Corp.*,
    985 F.3d 1107 (9th Cir. 2021) ...................................................................... 11, 13

*Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*,
    997 S.W.2d 803 (Tex. App. 1999) ................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 6

*Associated Press v. All Headline News Corp.*,
    608 F. Supp. 2d 454 (S.D.N.Y. 2009) ............................................................. 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 6

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983) .................................................................................. 10, 11, 13

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) .......................................................................................... 1

*Burnett & Sons, Inc. v. Hall Cattle Feeders, LLC*,
    2024 WL 3823537 (N.D. Tex. Apr. 30, 2024) ................................................. 8

*Cameron v. Terrell & Garrett, Inc.*,
    618 S.W.2d 535 (Tex. 1981) ............................................................................ 22

*Carson v. Simon*,
    978 F.3d 1051 (8th Cir. 2020) ................................................................. 17

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980) ........................................................................ 12, 14

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ............................................................................. 11

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
    911 F.2d 242 (9th Cir. 1990) ................................................................. 20

*Cranor v. 5 Star Nutrition, L.L.C.*,
    998 F.3d 686 (5th Cir. 2021) ................................................................. 17

*Denning v. Bond Pharmacy, Inc.*,
    50 F.4th 445 (5th Cir. 2022) ................................................................... 6

*Gutmann v. Campbell*,
    1998 WL 36030923 (D.N.M. Jan. 30, 1998) .......................................... 16

*Huffman v. Comm'r of Internal Revenue*,
    T.C.M. (RIA) 2024-012 (T.C. 2024) ...................................................... 16

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988) .............................................................................. 10

*Jordan v. Jewel Food Stores, Inc.*,
    743 F.3d 509 (7th Cir. 2014) ................................................................. 11

*Kickflip, Inc. v. Facebook, Inc.*,
    2015 WL 1517237 (D. Del. Mar. 31, 2015) ........................................... 12

*Kumar v. Panera Bread Co.*,
    2024 WL 1216562 (5th Cir. Mar. 21, 2024) ........................................... 21

*Landscape Images Ltd. v. IberiaBank Corp.*,
    2024 WL 4457844 (5th Cir. Oct. 10, 2024) .............................................. 7

*Lewis v. Google LLC*,
    461 F. Supp. 3d 938 (N.D. Cal. 2020) .................................................... 12

*Leyse v. Bank of Am. Nat. Ass'n*,
    804 F.3d 316 (3d Cir. 2015) .................................................................... 7

iv

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................................ 6

*Macklin v. City of New Orleans*,
  293 F.3d 237 (5th Cir. 2002) ............................................................................. 9

*Mid-Cities Bone & Joint Surgeons, P.A. v. GE Healthcare Diagnostic Imaging*,
  2008 WL 11429502 (N.D. Tex. Sept. 22, 2008) ............................................ 24

*Nationwide Bi-Wkly. Admin., Inc. v. Belo Corp.*,
  512 F.3d 137 (5th Cir. 2007) ............................................................................. 7

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ............................................................................. 6

*Phi Theta Kappa Honor Soc'y v. HonorSociety.org., Inc.*,
  2025 WL 1030240,n.2 (5th Cir. Apr. 7, 2025) .............................................. 13

*Pierre v. Vasquez*,
  2022 WL 68970 (5th Cir. Jan. 6, 2022) .......................................................... 16

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
  227 F.3d 489 (5th Cir. 2000) ........................................................................... 20

*Procter & Gamble Co. v. Amway Corp.*,
  242 F.3d 539 (5th Cir. 2001) ..................................................................... 13, 14

*Scanlan v. Eisenberg*,
  669 F.3d 838 (7th Cir. 2012) ........................................................................... 17

*Serafyn v. F.C.C.*,
  149 F.3d 1213 (D.C. Cir. 1998) ........................................................................ 2

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .......................................................................................... 17

*Strauss v. Strauss*,
  101 Md. App. 490 (1994) .................................................................................. 16

*Susinno v. Work Out World Inc.*,
  862 F.3d 346 (3d Cir. 2017) ............................................................................ 18

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .......................................................................................... 16

*United States v. Sanusi*,
  813 F. Supp. 149 (E.D.N.Y. 1992) .................................................................... 1

*Wallace v. Tesoro Corp.*,
  796 F.3d 468 (5th Cir. 2015) ........................................................................... 21

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................... 6, 17

## **Statutes**

15 U.S.C. § 1125(a)(1)(B) ............................................................................... 2, 18

Tex. Bus. & Com. Code § 17.45(4) ............................................................. 22, 24

Tex. Bus. & Com. Code § 167; 17.46 ................................................................. 25

Tex. Bus. & Com. Code § 167; 17.46(b) ............................................................ 24

Tex. Bus. & Com. Code § 167; 17.46(b)(9) ...................................................... 24

Tex. Bus. & Com. Code § 17.45(a)(4) ................................................................ 22

Tex. Bus. & Com. Code § 17.46(b)(5) ................................................................ 23

Tex. Bus. & Com. Code § 17.50(a)(1) & (a)(3) .................................................. 25

Tex. Bus. & Com. Code § 17.50(a)(3) ................................................................ 24

Tex. Bus. & Comm. Code §17.50(a)(1) ................................................................ 2

Tex. Bus. & Comm. Code § 17.46(a) .................................................................... 2

Tex. Bus. & Comm. Code § 17.46(b)(2), (3), (5), (9)……………………………………2

## **Rules**

Federal Rule of Civil Procedure 7(a)…………………………………………………..7

Federal Rule of Civil Procedure 8(a)………………………………………………….21

Federal Rule of Civil Procedure 9(b)………………………………………………...21, 22

Federal Rule of Civil Procedure 12(b)(1)………………………………………...………6

Federal Rule of Civil Procedure 12(b)(6)……………………………………...……2, 6, 8, 9

Federal Rule of Civil Procedure 12(c)………………………………………………..…7

Federal Rule of Civil Procedure 12(e)………………………………………...………..8

Federal Rule of Civil Procedure 12(g)(2)……………………………………………7, 8, 9

Federal Rule of Civil Procedure 12(h)(2)……………………………………..……..7, 8

Local Rule 7.2(c)……………………………………………………………...…………13

Plaintiffs, President Donald J. Trump ("President Trump") and Representative Ronny Jackson ("Representative Jackson"; together, "Plaintiffs"), by and through their undersigned counsel, respectfully submit the following Memorandum of Law in Opposition to Defendants Paramount Global's ("Paramount"), CBS Broadcasting Inc.'s ("CBS"), and CBS Interactive Inc.'s ("CBS Interactive"; collectively, "Defendants") Motion to Dismiss Plaintiffs' Amended Complaint (the "Complaint") for Lack of Subject-Matter Jurisdiction and Failure to State a Claim.

## I.    INTRODUCTION

As one trial court has noted in the past with respect to an improper attempt by CBS News to invoke the First Amendment, "[t]he First Amendment is a shield, not a sword." *United States v. Sanusi*, 813 F. Supp. 149, 160 (E.D.N.Y. 1992). The Supreme Court has unequivocally found that "[t]he Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons." *Branzburg v. Hayes*, 408 U.S. 665, 691–92 (1972). And yet Defendants, on this motion, seek to wield the First Amendment as a sword, arguing that they cannot be held responsible for illegal conduct, intended to mislead the masses and undertaken in the pursuit of profit, because such conduct was the result of "editorial judgment." But no matter how many times they claim the conduct at issue was editorial speech, that *ipse dixit* does not make it so. As alleged, Defendants' conduct, including news distortion, constituted commercial speech which cannot by any reasonable interpretation be found to have constituted editorial judgment, and that speech damaged Plaintiffs. The fact that such commercial speech was issued by a news organization does not insulate Defendants from liability under the First Amendment.

As outlined *infra*, Plaintiffs' Complaint contains two counts relating to Defendants' commercially motivated distortion of an interview of then-Vice President Kamala Harris ("Harris") in the lead-up to the 2024 Presidential Election. The first count alleges Defendants'

false advertising and unfair competition under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The second is for violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") pursuant to Tex. Bus. & Comm. Code §§ 17.46(a) and 17.46(b)(2), (3), (5), (9), for which a private right of action is afforded under Tex. Bus. & Comm. Code §17.50(a)(1). In a pair of motions filed pursuant to Rule 12(b), Defendants assert a hodgepodge of arguments seeking dismissal of the Complaint. Plaintiffs herein respond to Defendants' motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim.

Neither of these bases for dismissal stand up to scrutiny. Although the instant dispute may be aimed at a news organization, the allegations in the Complaint make clear that whether or not Defendants were actually reporting the news is precisely what is at issue in this action. Indeed, at least one circuit court has previously vacated a Federal Communications Commission ("FCC") decision and remanded a petition to revoke CBS's broadcasting license for the FCC's failure to adequately consider allegations of news distortion. *See Serafyn v. F.C.C.*, 149 F.3d 1213 (D.C. Cir. 1998). Determining that the First Amendment precludes the instant lawsuit would put the cart before the horse—the First Amendment is no shield to news distortion. Meanwhile, Defendants' arguments under Rule 12(b)(6) rely on glossing over Plaintiffs' claims and failing to reckon with the specific allegations of the Complaint, while simultaneously misrepresenting the law as it relates to Plaintiffs' claims. When taking into account the entirety of the Complaint and construing its allegations in the light most favorable to Plaintiffs, Plaintiffs' claims are adequately pleaded and cannot be disposed of at the motion to dismiss stage. As such, and as will be discussed at further length *infra*, the Court should deny the instant motion in its entirety. This is particularly the case where the instant motion, coupled with the other motion filed by Defendants on the same day, are

violative of the Federal Rule of Civil Procedure and this Court's local rules, warranting denial of the motions until Defendants come into compliance with both sets of rules.

## II. RELEVANT ALLEGATIONS OF THE COMPLAINT AND PROCEDURAL HISTORY

### A. The Parties

Defendant Paramount operates as a media company and owns CBS Broadcasting and CBS Interactive. As such, it has substantial control over CBS's commercial decisions and broadcast content. ECF No. 36 ¶ 25. Defendants' media portfolio includes *Face the Nation* and *60 Minutes*, the long-running and well-known programs at issue here, as well as countless other CBS programs, *Paramount+,* and a myriad of content on *YouTube. Id.* ¶ 32. *Paramount+* is a subscription video on-demand over-the-top streaming service owned by Paramount. Available among the *Paramount+* offerings are live streams of local CBS broadcast stations and CBS News content including *Face the Nation* and *60 Minutes*. *Id.* ¶ 34.

Aside from his role as a two-term President of the United States of America, President Trump is a prolific content creator who directly communicates with his tens of millions of followers on social media, a media brand in his own right which competes with Defendants. ECF No. 36 ¶ 23. At the relevant time of the acts discussed herein, President Trump was the majority owner of Trump Media & Technology Group Corp. ("TMTG"), a media company which directly competes with Defendants. *Id.* ¶ 16. Representative Jackson is a citizen of the United States and the State of Texas, represents Texas's 13th Congressional District in the House of Representatives, and was a consumer of the broadcast and digital news media content from Defendants at issue in this action. *Id.* ¶ 24.

### B.    The Interview and Defendants' Distortion Thereof

In the lead-up to the 2024 Presidential Election, an interview with Harris (the "Interview") was conducted by CBS's Bill Whitaker ("Whitaker") and recorded in two sessions to be aired on *60 Minutes*. ECF No. 36 ¶ 5. On October 6, 2024, Defendants broadcast a brief promotional excerpt of the Interview (the "Preview") for the commercial and pecuniary purpose of advertising and previewing a special episode of *60 Minutes* to air the next night (the "Election Special"; together with the Preview, the "Broadcasts"). This occurred during CBS's *Face the Nation,* when host Margaret Brennan advertised the Election Special by introducing the Preview, describing it as being from a "special election edition of *60 Minutes*." *Id.* ¶ 6.

During the Preview, Whitaker asked Harris a question regarding US relations with Israel vis-à-vis Israel's war of self-defense against Hamas to which Harris responded "[w]ell, Bill, the work that we have done has resulted in a number of movements in that region by Israel that were very much prompted by, or a result of many things, including our advocacy for what needs to happen in the region." (The "Advertised Harris Reply"). *Id.* ¶ 7. Plaintiffs have alleged that the accuracy of the Preview led to increased engagement with the Election Special. *Id.* ¶¶ 139–145. During the Preview, a *60 Minutes* watermark appeared on the upper-left hand corner of the screen. Paltzik Decl. Ex. A. The Preview concluded with a splash screen advertising the Election Special to be aired the next night, and included in it an advertisement for *Paramount+*, where the Election Special would be streamed. Paltzik Decl. Ex. B.

The next night, October 7, 2024, the Election Special aired. However, in response to the same question from Whitaker, Harris gave a different answer than the Advertised Harris Reply: "We are not going to stop pursuing what is necessary for the United States to be clear about where we stand on the need for this war to end." ECF No. 36 ¶ 8. This was one of many instances of

4

Defendants' distortion of the Interview. The Complaint recounts an inexhaustive list of examples of Defendants' distortion of the Interview in the Election Special. *See* ECF No. 36 ¶¶ 114–124.

Plaintiffs were foreseeably and actually misled by Defendants' advertising of the Election Special as containing certain statements by Harris, when in fact the Election Special did not contain the statements represented to be included by Defendants, as well as because the Interview was deceptively edited in material ways to misrepresent significant portions of what Harris said throughout her conversations with Whitaker. ECF No. 36 ¶ 155. This led to widespread confusion and mental anguish of consumers, including Plaintiffs, regarding a household name of the legacy media apparently deceptively distorting its broadcasts, and then resisting attempts to clear the public record. *Id.* ¶ 187. Moreover, because they were misled by Defendants' false advertising and tampering with the entirety of the Interview, viewers withheld attention from President Trump and *Truth Social* by directing their attention to Defendants' media platforms. This increased Defendants' engagement, viewership, and advertising revenue, and decreased the value of President Trump's ownership in TMTG and other media holdings. *Id.* ¶ 156. Similarly, to counteract the deception caused by Defendants' false advertising of the Interview and Election Special, and tampering with the entirety of the Interview, President Trump was forced to re-direct significant time, money, and effort to correcting the public record regarding the content of the Interview and Election Special. *Id.* ¶ 157. It took no less than a letter of inquiry from the FCC until Defendants finally capitulated and revealed their manipulation of Harris's answers during the Preview and the Election Special. ECF No. 36 ¶¶ 20, 111–13.

### C.    Defendants' Successive Rule 12 Motions

Plaintiffs filed their Amended Complaint on February 7, 2025. ECF No. 37. On March 6, 2025, Defendants filed a pair of motions, both seeking relief pursuant to Rule 12(b). The first-filed motion, the brief for which is 24 pages long, seeks to dismiss this action for lack of

jurisdiction and improper venue. ECF No. 50. The second-filed motion, which is 25 pages long, seeks dismissal for lack of subject matter jurisdiction and for failure to state a claim. ECF No. 52. Defendants did not file a request for permission to file a motion in excess of 25 pages, the page limit imposed by Local Civil Rule 7.2(c).

## III.    STANDARD OF REVIEW

### A.    Rule 12(b)(1)

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 450 (5th Cir. 2022). On a Rule 12(b) motion addressed to a plaintiff's standing, a court must "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

### B.    Rule 12(b)(6)

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A complaint will survive a Rule 12(b)(6) motion to dismiss if, accepting its factual allegations as true, the complaint plausibly states a claim for relief." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023) (internal quotation marks omitted). In addition to accepting all factual allegations as true, a court considering a Rule 12(b)(6) motion

must "constru[e] all reasonable inferences in favor of the plaintiff." *Landscape Images Ltd. v. IberiaBank Corp.*, 2024 WL 4457844, at *3 (5th Cir. Oct. 10, 2024).

## IV.    ARGUMENT

### A.    The Instant Motion Must be Denied as Violative of Rule 12(g)(2)'s Proscription Against Successive Rule 12 Motions in an Attempt to Skirt Local Rule 7.2(c)

Although the merits of Defendants' motion are addressed *infra*, this Court should decline to consider the merits of this motion, as well as Defendants' other pending motion to dismiss, because the motions violate Rule 12(g)(2) and this Court's Local Civil Rule 7.2(c).

Rule 12(g)(2) states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(h)(2), in turn, recognizes that although certain defenses are not waived by the failure to make them in a party's first Rule 12 motion, they cannot be asserted in a subsequent Rule 12(b) motion. Rather, they must be raised "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." Where successive Rule 12(b) motions are made, such motions should not be considered. *See, e,g., Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320–21 (3d Cir. 2015) (finding district court's consideration of motion error where "second motion to dismiss was plainly neither a Rule 7(a) pleading nor a motion raised at trial. Nor was it a Rule 12(c) motion for judgment on the pleadings, which may be filed only after the pleadings are closed") (internal quotation marks and brackets omitted).

The Fifth Circuit's cases regarding Rule 12(g)(2) have been factually distinct. In *Nationwide Bi-Wkly. Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 141 (5th Cir. 2007), the second Rule 12(b) motion was filed after a venue transfer to Texas made the relevant argument available to the defendant, taking the motion out of the purview of Rule 12(g)(2) which only applies where

the defense "was available to the party but omitted from its earlier motion." In *Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trs.*, the district court did not consider the first Rule 12(b) motion on the merits but instead "summarily denied the motion 'without prejudice to refiling.' At a later status conference, the district court offered the District an opportunity to re-urge its motion within a specified time." 855 F.3d 681, 685 (5th Cir. 2017). In these circumstances, the Fifth Circuit did not find Rule 12(g)(2) precluded a second Rule 12(b) motion where the merits of the second motion were either unavailable or not considered on the first motion. Indeed, assuming that the Fifth Circuit's rule in permitting successive 12(b)(6) motions is unqualified is untenable as a matter of statutory construction, as it would render Rule 12(h)(2) without meaning. *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 703 (10th Cir. 2014) ("[T]he court's reasoning fails to address the language from Rule 12(h)(2) that arguably limits a party to presenting those arguments in a pleading, a motion for judgment on the pleadings, or at trial. For that reason, we find the Seventh Circuit's approach problematic."). Indeed, **this very Court** has expressed that same skepticism. *Burnett & Sons, Inc. v. Hall Cattle Feeders, LLC*, No. 2:23-CV-148-Z, 2024 WL 3823537, at \*1 (N.D. Tex. Apr. 30, 2024) ("Because Defendants previously moved, pursuant to Rule 12(e), for a more definitive statement, the permissibility of their instant Motion is highly suspect — at least insofar as it relies on Rule 12 and not Rule 9.") (internal citation omitted).

But even assuming, *arguendo*, that the rule from *Columbia-Brazoria* is intended to apply generally, the facts of this case are distinguishable because Defendants' filing of the instant 25-page motion, after its first 24-page motion, was intended to skirt this Court's local rules. Pursuant to Local Civil Rule 7.2(c), "[u]nless another local civil rule provides otherwise, a brief must not exceed 25 pages . . . . Permission to file a brief in excess of these page limitations will be granted

by the presiding judge only for extraordinary and compelling reasons." Defendants did not seek such permission and instead split their Rule 12(b) motion into two. In *Alexander v. City Police of Lafayette*, 2021 WL 4396016 (W.D. La. Sept. 24, 2021), a sister court within this Circuit presciently recognized that certain circumstances would warrant courts imposing a remedy even assuming, *arguendo*, the Fifth Circuit's permissive attitude towards Rule 12(g)(2):

> In *Doe v. Columbia-Brazoria Ind. Sch. Dist.*, the Fifth Circuit reasoned that, even if Rule 12(g)(2) required the consolidation of the defendant's failure-to-state-a-claim defenses into a single Rule 12(b)(6) motion, its failure to do so was harmless. This Court notes, however, that **splitting failure-to-state-a-claim arguments into multiple Rule 12(b)(6) motions may, under some circumstances, skirt a court's local rules as far as page limits on briefs**. If so, and the parties have not requested and received leave to file a brief that exceeds these page limits, **the Court may impose an appropriate remedy, including requiring the parties to submit a single, omnibus brief that complies with the local rules**.

*Alexander*, 2021 WL 4396016 at *3 n.30 (emphasis added). The situation contemplated by *Alexander* is squarely on all fours with the gamesmanship undertaken by Defendants. They filed a successive Rule 12(b) motion to avoid this Court's local rules regarding page limits. It is fully within the scope of this Court's discretion to fashion an appropriate remedy in response to a violation of the local rules. *Macklin v. City of New Orleans*, 293 F.3d 237, 240 (5th Cir. 2002) ("We review the district court's administrative handling of a case, including its enforcement of the local rules and its own scheduling orders for abuse of discretion.").

Neither the Federal Rules of Civil Procedure nor this Court's local rules are mere suggestions. If these rules are to have any meaning then they must be enforced, and there must be consequences for *intentional* violations of those rules. It can hardly be clearer that Defendants' litigation strategy—filing 24- and 25-page motions on the same day—was an intentional end-run around Local Civil Rule 7.2(c). Consequently, this Court should decline to consider the merits of Defendants' pending motions and should instead direct them to file a single omnibus motion that is not violative of this Court's local rules regarding page limits.

**B.    Defendants' First Amendment Challenge Must Fail on a Motion to Dismiss Because Whether the Broadcasts were Commercial Speech Cannot be Determined at This Stage of the Litigation**

Before addressing the substance of Plaintiffs' claims, Defendants first argue that this Court lacks subject matter jurisdiction to hear this case pursuant to the First Amendment. This argument is flawed for at least two reasons. First, Defendants have wholly failed to support their legal arguments with a factual basis upon which this Court can determine whether the First Amendment bars Plaintiffs' claims. Although frequently claiming that the decision to air the Preview in distorted form was an exercise of editorial judgment, and despite offering a declaration from the former Executive Producer of *60 Minutes*, *see* ECF No. 52-1, Defendants have not proffered this Court with any details about the considerations which supposedly went into the decision to distort the Preview. But even were this Court to consider the merits of Defendants' argument, it is clear that argument is misguided. On a motion to dismiss, this Court cannot definitively determine that the Preview was not commercial speech without affording Plaintiffs an opportunity to conduct discovery which can shed light on whether the Preview's distortion was the result of purely commercial considerations or whether it was, in fact, the result of editorial discretion. Any decision definitively deciding one way or the other at this early point in this action would be premature.

At the outset, Defendants attempt to create a false dichotomy where "ideas and opinions on matters of public interest and concern" *ipso facto* entitle speech to ironclad First Amendment protections which are not provided to commercial speech. ECF No. 52 at 16 (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). However, the Supreme Court has definitively held that *not* to be the law. Rather, it has found conduct may "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues . . . ." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67–68 (1983). In fact, such blended speech does not warrant the blanket immunity which would be afforded to speech purely related to matters of

public interest. "A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Id.* at 68.

Thus, in determining the proper framework for analyzing any First Amendment defense to the instant action, the first question to be confronted is whether the Broadcasts constituted commercial speech. Defendants' make a tepid argument that the Broadcasts could not have constituted commercial speech because they did not "propose[] *any* commercial transaction." ECF No. 52 at 21 (emphasis in original). Defendant claim that this purported deficiency is fatal to Plaintiffs' claims because "commercial speech is speech that 'does no more than propose a commercial transaction.'" ECF No. 52 at 21 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993)). Defendants play intentionally obtuse with this argument. It has been broadly recognized among the Circuit Courts that "Courts view this definition [as] just a starting point, however, and instead try to give effect to a 'common-sense distinction' between commercial speech and other varieties of speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (alteration in original) (internal quotation marks omitted); *see also Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516–518 (7th Cir. 2014) ("Although commercial-speech cases generally rely on the distinction between speech that proposes a commercial transaction and other varieties of speech, it's a mistake to assume that the boundaries of the commercial-speech category are marked exclusively by this 'core' definition. . . . The notion that an advertisement counts as 'commercial' only if it makes an appeal to purchase a particular product makes no sense today, and we doubt that it ever did.") (internal citation omitted).

There is little doubt that in today's world of digital entertainment and streaming, the "common-sense distinction" between commercial and non-commercial speech recognizes multiple

monetization structures exist outside of the classical transactional form of commerce, such as where consumers do not pay any money but they are nonetheless monetized by advertisements. *See, e.g.*, *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 945 (N.D. Cal. 2020), *aff'd*, 851 F. App'x 723 (9th Cir. 2021) ("YouTube has a program which enables participants to receive a share of advertising revenue generated from advertisements posted on videos, which the parties label as 'monetization.'"); *Kickflip, Inc. v. Facebook, Inc.*, No. CV 12-1369-LPS, 2015 WL 1517237, at *1 (D. Del. Mar. 31, 2015) (recognizing the rise of video games which are "free to play, but players can 'improve the game experience' by acquiring virtual goods and spending 'virtual currency,' which can be . . . earned by viewing advertisements"). Thus, as an initial matter, the attempt by Defendants to artificially create demand for the Election Special by intentionally distorting the Preview to increase ad revenue constitutes commercial speech. Moreover, the Preview *did* contain an advertisement for a service, namely Paramount's Paramount+ streaming service. Paltzik Decl. Ex. B. Thus, considering both the ad revenue Defendants sought to increase and their advertisement of the Paramount+ streaming service, Defendants' conduct amounted to commercial speech.

Given that the Broadcasts were commercial speech, the Court must determine whether that speech may be entitled to First Amendment protection. In order "[f]or commercial speech to come within" the ambit of First Amendment Protection, as a threshold matter, "it at least must concern lawful activity and **not be misleading**." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980) (emphasis added). Defendants seek to obfuscate, arguing to this Court that "CBS' [sic] editing" of the Preview and the Election Special "was not deceptive: the answers that aired on each news show were simply excerpts of a single answer Vice President Harris gave to a single question, and taken together, viewers heard virtually all of Harris' [sic]

answer." But putting aside the fact that the entire answer was not heard, the issue is that the "answer" heard in the Preview was nowhere to be found in the Election Special. The fact that the Preview was aired as a commercial advertisement for the Election Special, only to include confusing material **not found in the Election Special**, was itself misleading; whether Harris actually responded in the fashion presented during the Interview is only one component of the equation. Moreover, Defendants wholly failed to respond to the other examples of misleading conduct identified in the Complaint, such as the fact that Harris's most damning answers were specifically cut from the Election Special, and that answers were edited to change the flow of the give and take of the Interview. *See* ECF No. 36 ¶¶ 119–124.

But Defendants' argument regarding First Amendment immunity is even weaker, at least at this early procedural stage of the litigation, because the question of whether the Preview and Election Special were unprotected commercial speech can be a fact-bound determination which requires an opportunity to develop a full record upon which to adjudicate the issue. It is noteworthy that Defendants make a cursory parenthetical reference to the case of *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), *see* ECF No. 52 at 21, but fail to identify for this Court that *Bolger* is the seminal case which established the test for determining whether speech is commercial or not. The Fifth Circuit, like the other circuit courts, have recognized so-called "*Bolger* factors: '(i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech.'" *Phi Theta Kappa Honor Soc'y v. HonorSociety.org., Inc.*, No. 24-60452, 2025 WL 1030240, at *2 n.2 (5th Cir. Apr. 7, 2025) (quoting *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001)). Courts have also noted that "[t]hese so-called *Bolger* factors are important guideposts, but they are not dispositive." *Ariix*, 985 F.3d at 1116.

13

All of the *Bolger* factors either support Plaintiffs' position that the speech at issue is commercial, or, at a minimum, cannot be determined on this record, before Defendants have answered, let alone any discovery having happened. The Preview was undoubtedly an advertisement. Likewise, it specifically identified Defendants' services, *60 Minutes* and *Paramount+*. Paltzik Decl. Ex. B. Finally, it is fair to assume that Defendants' prominent placement of its own streaming service's logo in the advertisement was indicative of its economic motivation, and Plaintiffs are further entitled to discovery so that the relevant personnel who prepared the Broadcasts can be deposed on the topic of their potentially economic motivations. Indeed, in the Fifth Circuit's first case considering whether "the commercial speech line of cases, which mainly deals with government regulation of speech, should apply in th[e] case of a private action for false speech," *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 547 (5th Cir. 2001), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Fifth Circuit concluded "that the third [*Bolger* factor]—the motivation of the speaker—[wa]s determinative" and remanded the case on that basis, *id.* at 552.

*Proctor* was decided in the district court on a motion for a judgment as a matter of law made during trial, where a factual record had been established. *Id.* at 545. That component is clearly lacking here. This Court can see for itself that the Preview was an advertisement for Defendants' services. *See* Paltzik Decl. Ex. B. Moreover, the misleading nature of the Preview itself precludes any First Amendment protections regarding Defendants' commercial speech. *Cent. Hudson Gas*, 447 U.S. at 566. In light of all of these factors, coupled with the procedural posture of this case, there is no basis for this Court to find that the First Amendment is a bar to Plaintiffs' claims and Plaintiffs' motion should be denied.

14

C.        **Plaintiffs Have Standing to Bring the Instant Action**

Defendants' arguments in favor of dismissal of Plaintiffs' claims based on a purported lack of standing ignore numerous tranches of damages suffered by Plaintiffs, as well as the fact that damages based on rights vested in Plaintiffs by state law constitute injuries in fact which suffice for purposes of Article III standing.

Initially, Defendants ignore Plaintiffs' explicit allegation that President Trump was damaged by having to expend significant time and money "to correct[] the public record regarding the content of the Interview and Election Special." ECF No. 36 ¶ 157. This, standing alone, constitutes an injury in fact.

Next, Defendants are incorrect that President Trump cannot establish standing based on damages incurred as a result of TMTG's performance. President Trump is uniquely damaged by any damages incurred by TMTG[1] for at least two reasons. First, TMTG was at all relevant times majority owned by President Trump.[2] *See* Pete Gannon, *Trump's media company plans move into financial services*, Axios (Jan. 29, 2025), https://www.axios.com/2025/01/29/trump-media-tmtg-financial-services-truthfi (last visited May 23, 2025) ("Shares in TMTG, which is majority owned by President Trump . . . ."). Thus, any damages suffered by TMTG are uniquely felt by President Trump in a way that no other shareholder would similarly experience such damages. Second, Trump Media & Technology Group Corp. bears President Trump's name. TMTG's growth and success reflects upon him and impacts his personal reputation. "The Supreme Court has expressly

---

[1] Defendants' suggestion that claims of damages are contradicted by TMTG's positive performance, ECF No. 52 at 26 n.13, is a red herring. The fact that TMTG's stock rose does not preclude a finding by a trier of fact that damage occurred and that ad revenue or TMTG's stock price would have been higher but for Defendants' deception.

[2] Defendants note that President Trump's interest in TMTG is held in a trust, ECF No. 52 at 26 n.14, but fail to also note that the evidence they rely on is explicit that the transfer to a trust occurred after the events described in the Complaint.

15

recognized that reputational harm is a 'concrete' form of injury to support standing." *Pierre v. Vasquez*, No. 20-51032, 2022 WL 68970, at *3 (5th Cir. Jan. 6, 2022) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). Courts throughout the country have recognized that a special relationship between an individual and an entity may be a basis upon which to find a connection between the entity and the owner's reputation. *See, e.g.*, *Strauss v. Strauss*, 101 Md. App. 490, 502–03 (1994) ("[O]wners have claimed that any goodwill inuring to the entity is not marital property, but, rather, a direct reflection of the owner's reputation and skill and therefore 'uniquely personal' to the holder."); *Huffman v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2024-012 (T.C. 2024) (recognizing one form of goodwill being "personal goodwill owned by key employees or **<u>shareholders</u>**") (emphasis added).

Similarly, separate and apart from President Trump's damages flowing from damages to TMTG, Defendants' wholly neglect to address Plaintiffs' allegations regarding President Trumps' individual status as a media icon. President Trump's status as a content creator, *see* ECF No. 36 ¶¶ 53–62, which was damaged by the attention diverted to Defendants' distorted programming, is independent of any interest President Trump has or had in TMTG.

Defendants also argue that President Trump "cannot rely on his former status *as a candidate* for office" in asserting injury. ECF No. 52 at 24 (emphasis in original). But courts have recognized that a candidate can seek damages "caused by receiving fewer votes" as well as "additional expenses" with respect to campaigning. *Gutmann v. Campbell*, 1998 WL 36030923, at *16 (D.N.M. Jan. 30, 1998). Independent of the fact that President Trump won the 2024 Election, "candidates . . . have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast and as such "[a]n inaccurate vote tally is a concrete and

particularized injury to candidates" and satisfies the standing requirement. *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020).

Finally, Plaintiffs have both sufficiently alleged damages based on the rights vested in them by the DTPA. The Supreme Court has recognized that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (internal quotation marks and ellipsis omitted); *see also Scanlan v. Eisenberg*, 669 F.3d 838, 845 (7th Cir. 2012) ("Moreover, in *FMC Corp. v. Boesky*, we held that the actual or threatened injury required under Article III can be satisfied solely by virtue of an invasion of a recognized state-law right."); *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 334 (1st Cir. 2020) ("It's true, the actual or threatened injury required under Article III can be satisfied solely by virtue of an invasion of a recognized state-law right, at least when the courts have long permitted folks in the plaintiffs' shoes to bring the type of suit at issue.") (internal quotation marks and ellipsis omitted). Defendants' protestation that Plaintiffs' alleged injury constituted "intangible harms," ECF No. 52 at 23, does not defeat this Court's jurisdiction. The Supreme Court has directed that "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of" the legislature which passed a given law is relevant, and that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016). The Fifth Circuit has expressly found, relying on *Spokeo*, that a party has adequately alleged an injury where the "asserted injury has a close relationship to a harm actionable at common law: public nuisance." *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 691 (5th Cir. 2021). That is particularly the case where a plaintiff "sues under a statute alleging the very injury the statute is intended to

17

prevent . . . ." *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (internal quotation marks and brackets omitted).

In this instance, Plaintiffs have suffered "the very injury the [DTPA] is intended to prevent." *Id.* What Defendants attempt to handwave away as mere "confus[ion]," ECF No. 52 at 23, was the intended impact of a for-profit scheme to deceive the American people. Texas's legislature has rightfully seen fit to outlaw such deceptive trade practices. There can be no question that the harms inherent to such deceptive acts give rise to standing where a party seeks redress of such bad acts.

As described *supra*, Plaintiffs have adequately alleged various injuries-in-fact sufficient to invoke this Court's jurisdiction; those harms include monetary, reputational, and statutory damages. Any of these damages alone—and certainly pleaded together—suffice to establish standing to maintain this action.

### D.    President Trump Has Adequately Pleaded a Lanham Act Claim

Defendants attempt to argue that President Trump has not adequately alleged *any* element of a claim under the Lanham Act. *See* ECF No. 52 at 26–29. These arguments are blatant misrepresentations of President Trump's claims.

First, Defendants claim that neither of the Broadcasts constituted "commercial advertising or promotion." ECF No. 52 at 26 (quoting 15 U.S.C. § 1125(a)(1)(B)). But the Preview was explicitly an advertisement for both the Election Special *and* Paramount's *Paramount+* streaming service. *See* Paltzik Decl. Ex. B. Defendants claim that anyone who saw the Preview necessarily subscribed to Defendants' services already. ECF No. 52 at 27. This argument is both incorrect and, even if true, irrelevant. Initially, it is not true that someone who watched the Preview necessarily subscribed to Defendants' services. The Preview during Face the Nation was uploaded as a free video on *YouTube*. *See* https://www.youtube.com/watch?v=3N-yaqClBqg (last visited  28, 2025).

18

This argument also discounts the possibility that an individual could have seen the Preview somewhere besides for their home.

But even assuming, *arguendo*, that a given individual already had access to Defendants' services, it does not negate President Trump's theory of damages that the Preview's deceptive advertising of the Election Special damaged him by diverting consumer interest from his own content. Merely having access to Defendants' services does not mean that a consumer would have watched the Election Special even without Defendants' deceptive advertising of it. Harris's meandering answer in the Preview was engaging in much the same way one cannot look away from a car crash happening in slow motion. Moreover, as discussed *supra*, Defendants' myopic view of what constitutes "advertising or promotion" as being relegated to "buying defendant's good or services," ECF No. 52 at 27, neglects to reckon with modern forms of advertising monetization; the consumers' attention *is* the product which content creators vie for, which they can then monetize with advertisements.

Next, Defendants argue Plaintiffs have not pleaded "any actionable misrepresentation." ECF No. 52 at 27. This line of argumentation is based on the claim that "Defendants never asserted as a factual matter that the Interview on either Face the Nation or 60 Minutes was unedited, nor did they make a 'specific and measurable' claim that the excerpts of the Interview aired on Face the Nation would appear the following day on 60 Minutes." *Id.* This argument cannot stand up to scrutiny either on the law or on the facts.

On the law, Defendants are incorrect as to what constitutes an actionable misrepresentation under the Lanham Act. There is no requirement that the misrepresentation is contained in an explicit assertion or claim; rather, it is well-settled that "a false advertising cause of action under the [Lanham] Act is not limited to literal falsehoods; it extends to false representations made by

implication or innuendo." *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990); *see also Am. Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978) ("That Section 43(a) of the Lanham Act encompasses more than literal falsehoods cannot be questioned."); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) (describing the necessary proof to establish a claim for "false or misleading advertising that is not literally false."). Even if it was never explicitly stated that the content from the Preview would be included in the Election Special, the natural implication—which in fact led to consumer confusion after it was not the case—was that the Preview showed content from the Election Special being advertised.

But the misrepresentation in this instance was much more explicit than mere implication. The Preview, which aired on Face the Nation, also contained a *60 Minutes* watermark on it. *See* Paltzik Decl. Ex. A. And yet the Advertised Harris Reply *was never broadcast on 60 Minutes*. The watermark is explicitly advertising the Preview as content from *60 Minutes*' Election Special and then was never actually broadcast on *60 Minutes*. As such, not only was the advertising from Defendants impliedly misleading, but it was actually false advertising regarding the content of the Election Special.

Defendants also attempt to argue that their blatant and intentional manipulation of the Interview for the purpose of misleading consumers in an attempt to benefit Harris, while also lining their pockets with ad revenue and streaming subscriptions, is not actionable by invoking wholly inapposite case law. Plaintiffs cite *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 463 (S.D.N.Y. 2009), a case where the question at bar was whether the defendant's activities in repackaging news was misleading either as to whether the defendant was properly categorized as a "news-gathering organization," or otherwise misled consumers as to the whether the defendant

was associated with the plaintiff. There was no claim that the content being disseminated was itself misleading to the consumer. Plaintiffs' allegations that Defendant have engaged in manipulation of "news" for pecuniary gain at the expense of the consumer, to the detriment of President Trump, is certainly actionable conduct under the Lanham Act.

Finally, Defendants argue that President Trump has not established an injury with respect to his Lanham Act claim. As addressed *supra* addressing Defendants' arguments regarding Plaintiffs' standing, President Trump has plausibly alleged various tranches of damages which suffice at this stage of the litigation to plead a claim under the Lanham Act, whether those damages are monetary or reputational. In light of the foregoing, President Trump has adequately alleged a claim under the Lanham Act regarding Defendants' misleading promotion of the Election Special with the Preview as well as with regard to the actual content of the Election Special.

### E.    Plaintiffs Have Adequately Alleged a DTPA Claim

Defendants cast Plaintiffs' DTPA claim as having been inadequately pleaded under Rule 9(b). Notably, they do not address what Rule 9(b) requires of a pleading in order to be pleaded with particularity. "Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Wallace v. Tesoro Corp.*, 796 F.3d 468, 480 (5th Cir. 2015). None of these are lacking in Plaintiffs' Complaint. In fact, the very case Defendants cite for the applicability of Rule 9(b) to a DTPA makes clear "that Rule 9(b) does not supplant Rule 8(a)'s notice pleading, which requires only enough facts to state a claim to relief that is plausible on its face." *Kumar v. Panera Bread Co.*, No. 23-20178, 2024 WL 1216562, at *4 (5th Cir. Mar. 21, 2024).

Defendants attempt to obfuscate, raising questions as to Plaintiffs' status as a consumer under the DTPA, by yet again misrepresenting the facts and law at issue. Initially, Defendants claim that Plaintiffs did not allege "that they actually acquired *by purchase or lease* Defendants'

services, as required by the DTPA." ECF No. 52 at 30 (emphasis in original). But the DTPA covers a broader scope of consumer than what Defendants claim. A consumer includes someone "**who seeks**[3] or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(a)(4) (emphasis added). Thus, merely seeking out Defendants' myriad services— such as broadcast or streaming services—entitles parties to consumer status under the DTPA. Defendants further suggest Plaintiffs should have provided additional allegations regarding such services, such as, *inter alia*, "how much they paid" for such services so that Plaintiffs would be found to have pleaded their DTPA claim with particularity. ECF No. 52 at 30. But there is no such requirement and, as addressed *supra*, Rule 9(b) only requires pleading with particularity regarding specific components of "the circumstances constituting fraud," none of which are the kind identified by Defendants. Moreover, as a factual matter, Defendants appear to concede that allegations regarding Defendants *Paramount+*[4] service suffice to allege a "good[] or service[]" for

---

[3] As discussed *supra*, the broader definition of a consumer is particularly appropriate nowadays where courts have repeatedly recognized that businesses monetize consumers in ways that did not exist in decades past.

[4] Defendants presume that Plaintiffs would necessarily be bound to arbitrate any claims which could arise from being a consumer of *Paramount+*. ECF No. 52 at 30 n.15. This is incorrect. It is possible to subscribe to *Paramount+* content without agreeing to the *Paramount+* Term of Use. For instance, when signing up for *Paramount+* through Amazon's Prime Video service, the consumer agrees to Amazon sharing certain information "in accordance with the *Paramount+* Privacy Policy," which does *not* contain an arbitration Provision. Paltzik Decl. Ex. C. However, the consumer only agrees to Amazon's Prime Video Terms of Use, **_not_** *Paramount+*'s. *Id.* Notably, there is "no indication in the definition of consumer in section 17.45(4), or any other provision of the Act, that the legislature intended to restrict its application only to deceptive trade practices committed by persons who furnish the goods or services on which the complaint is based. Nor do we find any indication that the legislature intended to restrict its application by any other similar privity requirement. . . . The Act is designed to protect consumers from **_any_** deceptive trade practice made in connection with the purchase or lease of any goods or services." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540–41 (Tex. 1981) (emphasis added). Plaintiffs reserve the right to seek discovery regarding Defendants' business arrangements with Amazon to the extent that Defendants contest whether such arrangements are relevant to Plaintiffs' standing to sue Defendants.

which a claim under the DTPA would be actionable.[5] Indeed, Defendants explicitly refer to Paramount+ as a "direct-to-**consumer** subscription streaming service." ECF No. 52 at 30 n.15 (emphasis added).

Defendants next take aim at whether Plaintiffs adequately allege that any of Defendants conduct is actionable "under the laundry list of DTPA violations contained in section 17.46." *Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 811 (Tex. App. 1999). These arguments take aim at strawmen and are supported by nothing more than Defendants' *ipse dixit* proclamation that this element has not been met. For instance, Defendants claim that "Plaintiffs do not identify any 'sponsorship,' 'characteristics,' 'ingredients,' or 'benefits' that Defendant misrepresented," ECF No. 52 at 31, which are among the potentially misrepresented properties identified in Section 17.46(b)(5) of the laundry list of DTPA violations. But one of these things is not like the others; it is abundantly clear that Plaintiffs have alleged that the "characteristics" of the Election Special were misrepresented in the Preview when content portrayed in the Preview was not present in the Election Special. We are supposed to just accept Defendants' word for it that "[t]he FTN Broadcast Clip of the Interview is a far cry from the kinds of false claims in advertising . . . that the law is designed to police." ECF No. 52 at 31. But the DTPA clearly outlaws "representing that goods or services have . . . characteristics . . . which they do not have." Tex. Bus. & Com. Code § 17.46(b)(5). Plaintiffs have alleged misrepresentations by Defendants which fall within this category, and arguments about what Defendants feel "the law [wa]s designed to police" cannot contradict the explicit statutory language.

---

[5] As discussed *supra*, regardless of whether Defendants concede the point or not, Defendants' various service, not just Paramount+, are all properly the subject of the DTPA claim.

Defendants' arguments regarding Section 17.46(b)(9), which proscribes "advertising goods or services with intent not to sell them as advertised," are even more disingenuous, bordering on misleading. Defendants claim that "**the** purpose" of that section, ECF No. 52 at 31 (emphasis added), "is the prevention of 'bait advertising,' a practice by which a seller seeks to attract customers through advertising products at low prices which he does not intend to sell in more than nominal amounts." *Mid-Cities Bone & Joint Surgeons, P.A. v. GE Healthcare Diagnostic Imaging*, 2008 WL 11429502, at *3 (N.D. Tex. Sept. 22, 2008). However, Defendants omit the words from *Mid-Cities* immediately before that quotation, which instead claims that it was "[t]he **primary** purpose of this section." *Id.* (emphasis added). This is not a minor distinction—Defendants' represent that subsection (9) is *only* violated by "bait advertising" regarding price. But that is not what the statute, nor courts interpreting the statute, have said. The simple language of the statute makes clear that the DTPA is violated by "advertising goods or services with intent not to sell them as advertised." Tex. Bus. & Com. Code § 17.46(b)(9). That is precisely what Plaintiffs have alleged happened here, and so Plaintiffs have also adequately alleged a violation of this subsection of the laundry list.

Separate from the laundry list violations of Section 17.46(b), Plaintiffs have also alleged that Defendants acts were "unconscionable," ECF No. 36 ¶ 191, in line with the DTPA's creation of a private right of action regarding "any unconscionable action or course of action by any person," Tex. Bus. & Com. Code § 17.50(a)(3). The DTPA defines such conduct as that which "takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* § 17.45(a)(5). Initially, <u>Defendants do not challenge Representative Jackson's "lack of knowledge, ability, experience, or capacity</u>" with respect to the Preview and the Election Special; they specifically only argue that President Trump "understood the Interview was

24

edited," supposedly negating the possibility that any act was unconscionable as to him. ECF No. 52 at 33. But even with respect to President Trump, this ignores the scope of Defendants' bad acts. President Trump was misled, just like all consumers, when the Preview aired; he could not know of Defendants' deception until the Election Special aired. This malicious deception of the public, standing alone, constitutes an unconscionable act. Separately, President Trump was damaged by a lack of ability and capacity to rectify the Defendants' misrepresentations where Defendants doggedly refused to take responsibility for their bad acts after the Election Special aired, despite President Trump's attempts to hold them accountable with a significant investment of his time and money. It took no less than a letter of inquiry from the FCC until Defendants finally capitulated and revealed their manipulation of Harris's answers during the Preview and the Election Special. ECF No. 36 ¶¶ 20, 111–13. Defendants' entire course of action through this saga was unconscionable.

Finally, Plaintiffs' reliance[6] and damages are more fulsomely discussed *supra* with respect to Plaintiffs' injury-in-fact. As noted, Plaintiffs relied both on Defendants' false and misleading advertisements as well as their deceptively edited content, leading both to pecuniary damages (and for President Trump, damage to his campaign) as well as mental anguish and confusion as to the truth of the matters asserted by Defendants. ECF No. 36 ¶¶ 174, 176.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny the instant motion to dismiss in its entirety and grant such other and further relief as this Court deems just and proper.

---

[6] Notably, reliance is only an element of a claim regarding the laundry list factors of Section 17.46, not for claims regarding unconscionable actions. *See* Tex. Bus. & Com. Code § 17.50(a)(1) & (a)(3).

Dated: May 28, 2025
      New York, New York

                                    Respectfully submitted,

                                    EDWARD ANDREW PALTZIK
                                    Texas Bar No. 24140402
                                    Bochner PLLC
                                    1040 Avenue of the Americas
                                    15th Floor
                                    New York, NY 10018
                                    (516) 526-0341
                                    edward@bochner.law

                                    */s/ Edward A. Paltzik*
                                    Edward Andrew Paltzik

                                    DANIEL Z. EPSTEIN
                                    Texas Bar No. 24110713
                                    16401 NW 37th Ave.
                                    Suite No. 209
                                    Miami Gardens, FL 33054
                                    (202) 240-2398
                                    dan@epsteinco.co

                                    */s/ Daniel Z. Epstein*
                                    Daniel Z. Epstein
                                    ***(pro hac vice)***

                                    CHRIS D. PARKER
                                    Texas Bar No. 15479100
                                    Farris Parker & Hubbard
                                    A Professional Corporation
                                    P. O. Box 9620
                                    Amarillo, TX 79105-9620
                                    (806) 374-5317 (T)
                                    (806) 372-2107 (F)
                                    cparker@pf-lawfirm.com

                                    */s/ Chris D. Parker*
                                    Chris D. Parker